
Receipt of Copy of the within acknowledged
18TH OCT; 2007
1:50 P.M.
P.R. CROSSEN

STATE OF WISCONSIN

COURT OF APPEALS

DISTRICT I

---

STATE OF WISCONSIN,

Plaintiff-Respondent,

v.                     Case No. 2007AP1469-CR

RICO SANDERS,

Defendant-Appellant.

---

ON NOTICE OF APPEAL TO REVIEW A
JUDGMENT OF CONVICTION ENTERED
IN CIRCUIT COURT FOR MILWAUKEE
COUNTY,THE HONORABLE DAVID A
HANSHER PRESIDING AND AN ORDER
DENYING POSTCONVICTION MOTION
ENTERED IN THE CIRCUIT COURT FOR
MILWAUKEE COUNTY, THE HONORABLE
JEFFREY A. WAGNER PRESIDING

---

BRIEF AND APPENDIX OF DEFENDANT-APPELLANT

---

ELLEN HENAK
Assistant State Public Defender
State Bar No. 1012490

735 North Water Street, Room 912
Milwaukee, WI 53203
Telephone (414) 227-4805

Attorney for Defendant-Appellant

Exhibit C

Case 2:11-cv-00868-LA   Filed 02/03/17   Page 1 of 78   Document 20-3

# Table of Contents

Page

Issue Presented ................................................... 1

Statement on Oral Argument and Publication ............... 2

Statement of the Case ......................................... 2

Statement of Facts ............................................. 3

Argument ....................................................... 9

> The Trial Court Erred in Denying Rico Sanders an Evidentiary Hearing on His Motion to Withdraw His *Alford* Pleas on the Grounds that The Pleas Were Not Knowing, Intelligent, and Voluntary. ................. 9

Conclusion ..................................................... 17

Appendix ....................................................... 100

# Cases Cited

*State v. Bangert*, 131 Wis.2d 246, 389 N.W.2d 12 (1986) ................................................. 9, 10, 11, 12

*State v. Bollig*, 224 Wis.2d 621, 593 N.W.2d 67 (Ct. App. 1999), *aff'd*, 2000 WI 6, 232 Wis.2d 561, 605 N.W.2d 199 ...................... 12

*State v. Brown*, 2006 WI 100, 293 Wis.2d 594, 716 N.W.2d 906 ................................... 11, 12, 13, 14

*State v. Hampton*, 2004 WI 207, 274 Wis.2d 379, 683 N.W.2d 14 .................................. 15, 16

*State v. Howell*, 2007 WI 75, __ Wis. 2d __, 734 N.W.2d 48 ................................... 11, 12, 16

*State v. Love*, 2005 WI 116, 284 Wis.2d 111, 700 N.W.2d 62 ......................................... 15

*State v. Nawrock*, 193 Wis. 2d 373, 534 N.W.2d 624 (Ct. App. 1995) ................................... 10

*State v. Van Camp*, 213 Wis. 2d 131, 569 N.W. 2d 577 (1997). ......................................... 10, 13

# Statutes Cited

Wisconsin Statutes

971.08 ....................................................................... ...... 11

971.08(1)(a) ............................................................... ........ 9

# Other Authorities

American Heritage Dictionary at 641, def. 1a

(2d college ed.) ........................................................... ...... 13

Case 2:11-cv-00868-LA   Filed 02/03/17   Page 3 of 78   Document 20-3

STATE OF WISCONSIN

COURT OF APPEALS

DISTRICT I

STATE OF WISCONSIN,

                Plaintiff-Respondent,

v.                   Case No. 2007AP1469-CR

RICO SANDERS,

                Defendant-Appellant.

ON NOTICE OF APPEAL TO REVIEW A JUDGMENT OF CONVICTION ENTERED IN CIRCUIT COURT FOR MILWAUKEE COUNTY, THE HONORABLE DAVID A HANSHER PRESIDING AND AN ORDER DENYING POSTCONVICTION MOTION ENTERED IN THE CIRCUIT COURT FOR MILWAUKEE COUNTY, THE HONORABLE JEFFREY A. WAGNER PRESIDING

BRIEF AND APPENDIX OF DEFENDANT-APPELLANT

## Issue Presented

Did the trial court err in denying Rico Sanders an evidentiary hearing on his postconviction motion under *State v. Bangert*, 131 Wis.2d 246, 389 N.W.2d 12 (1986), which sought to withdraw his guilty pleas on the grounds that they were not knowingly, voluntarily and intelligently entered because he did not understand the elements of the offenses and he did not understand the terms of the plea agreement?

The trial court denied the motion without an evidentiary hearing.

## Statement on Oral Argument and Publication

Oral argument is requested as the arguments of the appellant have merit and oral argument may help develop the theories and issues on appeal. *See* Wis. Stats. (Rule) 809.22. Publication is unlikely to be appropriate. *See* Wis. Stats. (Rule) 809.23.

## Statement of the Case

Following a waiver from juvenile court, R5, seventeen year old Rico Sanders was charged in adult court with three counts of first degree sexual assault, two counts of armed burglary, one count of armed robbery (use of force), one count of second degree sexual assault, two counts of aggravated burglary, and one count of armed burglary, R6. While the case was pending, Rico's competence was questioned multiple times, R65, R80; R70, resulting in a stay for Rico for diagnosis at the Winnebago Mental Health Institute. R66; R68; R70. Ultimately, the trial court, the Honorable David A. Hansher presiding found Rico competent. R70:25-26.

On March 11, 1997, Rico entered Alford pleas on six counts in this case pursuant to a plea agreement. R39. The trial court, the Honorable David A. Hansher presiding, sentenced him on April 25, 1997 as follows:

| Charge | Statute | Sentence |
|--------|---------|----------|
| First degree sexual assault | Wis. Stats. §940.225(1)(b) | 30 years |
| Armed robbery (use of force) | Wis. Stats. §943.32(2) | 10 years consecutive |
| Second degree sexual assault | Wis. Stats. §940.225(2)(a) | 10 years consecutive |

2

| First degree sexual assault | Wis. Stats. §940.225(1)(b) | 30 years consecutive |
|---|---|---|
| First degree sexual assault | Wis. Stats. §940.225(1)(b) | 30 years consecutive |
| First degree sexual assault | Wis. Stats. §940.225(1)(b) | 30 years consecutive |
| | **TOTAL SENTENCE:** | 140 years |

*Id.*

On March 15, 2006, Rico filed a Petition for a Writ of Habeas Corpus pursuant to *State v. Knight*, 168 Wis.2d 509, 484 N.W.2d 540 (1992) in this Court. The petition sought reinstatement of his appellate rights. This Court granted that petition on August 2, 2006.[1] R47.

Rico timely filed a postconviction motion on February 28, 2007 in which he sought to withdraw his *Alford* pleas on the grounds that the trial court failed to comply with Wisconsin Statutes § 971.08(1)(a) and he failed to understand the elements of the crimes to which he was pleading guilty. R49. The trial court, the Honorable Jeffrey A. Wagner presiding, denied the postconviction motion without an evidentiary hearing on June 11, 2007. R56.

Notice of Appeal was timely filed on June 21, 2007. R57.

## Statement of Facts

Prior to the entry of the pleas in this case, original defense attorneys Edward Little and E. Duke McNeil questioned Rico's competency on several occasions. The trial court, the Honorable David A. Hansher, held the first competency hearing on March 15, 1996. *See* R65. At that

---

[1] This Court subsequently amended the deadlines *sua sponte* in an order issued on September 8, 2006. R48.

3

hearing, Dr. George Palermo, a forensic psychiatrist, found Rico to be of low average intelligence, noted that he had been administered medications, and that further stated he did not personally observe Rico's interactions with people at the jail. *See id.* at 13, 16. He noted that Rico reported hallucinating visions of a monkey and a dog, *see id.*, and that use of drugs and alcohol can sometimes produce auditory and visual hallucinations, *see id.* at 8. Nevertheless, Dr. Palermo testified that he believed that Rico was competent, *id.* at 7, and the trial court adopted his opinion, *id.* at 20-21.

On June 5, 1996, at what was supposed to be the final pretrial hearing in this case, Rico began getting up, whistling, and snapping his fingers as though calling a dog. R80:5. Based upon this behavior, defense counsel requested, and was granted a reevaluation of Rico for competency. *See id.* at 7-9. Dr. Palermo then reevaluated Rico and reached the conclusion that he was not competent. Dr. Palermo recommended transferring Rico to Winnebago Mental Health Institute for diagnostic purposes, *see* R66, as did Dr. Stephen Emiley, *see* R68. The court then sent Rico to the Mendota Mental Health Institute. *Id.* at 25-26.

Another competency hearing was held on December 19, 1996. R70. Dr. Molli Rolli, a psychiatrist, testified that she believed that Rico was competent. *Id.* at 13-14. She noted that his mother had indicated that he had been tested in the past and had a third grade reading level. *Id.* at 18. She noted that she did not test his reading and that she believed, based upon comments from his teacher there, that he had approximately a junior high reading level. *Id.* at 19-20. She believed that he had average to low average intelligence. Id. at 18. The trial court then found Rico competent and dubbed the situation to be a "blatant case of malingering." R70:25-26.

4

Nevertheless, even after his convictions when appearing mentally ill or incompetent could have no pay-off in his case, Rico continued to have mental health problems in the prison system. In July of 1997, shortly after Rico had entered the prison system, Dr. John Gehring, a psychiatrist, evaluated him. *See* R49:10-11. Dr. Gehring noted that he had been hearing voices and had delusions that people were talking about him. Dr. Gehring then diagnosed Rico as having schizophrenia, chronic undifferentiated type and post-hallucinogenic perceptive disorder, as well as a history of cannabis abuse and a past history of major depressive disorder. *See id.*

In 2004, Dr. Steven Schmidt examined Rico at Green Bay Correctional Institution and recommended that Rico get additional mental health treatment beyond what Green Bay Correctional Institution could provide and be sent to the Wisconsin Resource Center. *See id.* at 12-13. Rico's initial reaction was to object and indicate that he did not think that he was crazy. *See id.* at 12. After a lengthy discussion, Rico agreed to be referred to the Wisconsin Resource Center as he was still hallucinating and still had paranoid thoughts. *See id.* Rico subsequently was admitted to the Wisconsin Resource Center on October 21, 2004. *See id.* at 14. Educational testing indicated that Rico had a 5.2 grade level reading ability, *see id.* at 16, considerably less than the junior high level that Dr. Rolli believed he read at.

Rico was recommended for transfer back to Green Bay Correctional Institution on or about June 2, 2005. *See id.* He actually was transferred back on September 22, 2005.

Green Bay Correctional Institution again referred Rico to the Wisconsin Resource Center on October 18, 2006 for "increasingly intense depressive symptoms." *See id.* at 17-18. In addition to depressive symptoms and thoughts of suicide,

5

Rico continued to hear "voices." *See id.* Once again, Rico initially resisted the idea of the referral but eventually became more positive about it. *See id.* Rico currently is incarcerated at the Wisconsin Resource Center.

Thus, at the time of the plea, Rico was a mentally ill seventeen-year-old, of low average intelligence, who read at an elementary school level. He had been in special education classes for a learning disability and did not read or write well. *See id.* at 16; R28. He had been evaluated two years earlier and been found to have an IQ of 72. *See id.*.

On March 11, 1997, the same day that Rico was to enter his pleas, he met with his subsequent trial attorney, Martin Love, in the bullpen behind the courtroom. *See* R49:4-5. Attorney Love read Rico at least some sections of the document designated as an "Alford *Guilty Plea Questionnaire and Waiver of Rights Form" and Rico signed it. *See* R38. This form listed the names of offenses to which Rico was pleading and incorrectly listed the names of the offenses that were being read-in. *Id.* The form did not give the elements of the crimes that were being charged and no jury instructions were attached. *See id.* Subsequent to this discussion, Rico was allowed to meet with his family at the jail to discuss whether to plead guilty. R49:5. Those discussions did not focus on the elements of the charges. *Id.*

At the plea hearing, Rico entered his guilty pleas under *North Carolina v. Alford*, 400 U.S. 25 (1970). *See* R74:10. Rico had to be prompted to enter his pleas properly under this decision. *See id.* The court then read off each charge and had Rico enter his plea, except for the charge in count 9. The Court never finished reading off the full charge in count 9. *Id.* at 10-11. As for whether Rico understood the elements of these charges, this Court asked only one confusing, multiple part question as follows:

6

> THE COURT: Okay. So do you understand, and I just discussed with you what you're charged with and I read it to you, what the penalties are, your attorney told you that, we'll go through that, why you've been charged, and the elements of each of these offenses. Is that correct?
>
> DEFENDANT: Right.

*Id.* at 13-14. The trial court then followed up with the trial attorney by asking only one question:

> THE COURT: And counsel, you discussed with him what the elements would be, what the state would have to prove in each count in order to convict him?
>
> MR. LOVE: I did, Your Honor.

*Id.* at 14.

Subsequently, the state asked to "supplement the record." The state then noted that:

> First of all, we have – there's a discrepancy in the terms that defense counsel and I used. The way that the complaint has count 5 and count 10 enumerated is called aggravated burglary and it is a burglary that is aggravated by the committing of a battery. It is my hearing that on that sheet he has it listed as an aggravated battery. It doesn't make any difference in terms of the title, but just so that Mr. Sanders understands that count 5 and count 10 are, I'm sorry, count 5 and count 7 are, in the criminal complaint, are entitled "aggravated burglary" and that that relates to his entering a dwelling in each of those instances and then committing a battery upon a person who was lawfully therein.

*Id.* at 17-18. The trial court then did not ask Rico if he understood but instead asked the attorney:

> THE COURT: Is that your understanding, counsel?

7

MR. LOVE: Your Honor, I have, as a matter of fact, I have a copy that I drafted before the one that was submitted to the court, and I have referred to it as aggravated burglary. It's a misnomer if I have place the word "battery" instead, I'm sorry. But yes, we understand the circumstances and the elements.

*Id.* at 18.

The trial court never summarized the elements of the crimes by reading from jury instructions, did not ask counsel to summarize the extent of his explanation of the elements of the charges, and did not ask Rico whether he understood the nature of the charge based upon the criminal complaint. *See* R74.

Rico subsequently alleged in his postconviction motion that, at the time he entered his pleas, he did not understand the nature of the charges against him. R49:6-7. He did not understand the elements of the multiple charges against him. *Id.* The types of words used to describe the crimes were beyond his vocabulary, including such concepts as "first degree" and "article used for fashioned in a manner to lead the victim to reasonably believe it's a dangerous weapon" as well as the term, although not the concept, of "sexual intercourse." *Id.* Rico also alleged that he maintained that he was not guilty of the charges and that "there was another individual who was involved in these break-ins" and who was guilty of these crimes. *Id.; see also* R74: 9. In addition, there was some physical evidence that supported his contention. *Id.*

The trial court, the Honorable Jeffrey A. Wagner presiding, denied the postconviction motion without an evidentiary hearing, holding that the plea colloquy was not deficient because the defendant had signed the plea questionnaire, the defendant said that the criminal complaint had been read to him, the court read the charges to him from

8

the information, and counsel assured the court that he had gone over the elements of the crimes. R56:2-4. The trial court further held that Rico Sanders's statements to police were sufficient to illustrate his understanding of the nature of the charges. *Id.* at 4-6.

## Argument

### The Trial Court Erred in Denying Rico Sanders an Evidentiary Hearing on His Motion to Withdraw His *Alford* Pleas on the Grounds that The Pleas Were Not Knowing, Intelligent, and Voluntary.

In his postconviction motion, Rico Sanders invoked *State v. Bangert*, 131 Wis.2d 246, 257, 389 N.W.2d 12 (1986), and alleged that his plea was not entered knowingly, intelligently, and voluntarily because this Court failed to comply with Wisconsin Statutes § 971.08(1)(a) and he failed to understand the elements of the crimes to which he was pleading guilty. R49. He noted that he was a seventeen-year-old who had not completed eighth grade, who had been in special education classes for a learning disability, read and wrote at only an elementary school level, and had mental health issues. He specifically alleged that

> [t]he trial court never summarized the elements of the crimes by reading from jury instructions, did not ask counsel to summarize the extent of his explanation of the elements of the charges, and did not ask Rico whether he understood the nature of the charge based upon the criminal complaint.

*Id.* at 6. He then further alleged that

> [a]t the time of he entered his pleas, Rico did not understand the nature of the charges against him. He did not understand the elements of the multiple charges against him. The types of words used to describe the

9

> crimes were beyond his vocabulary, including such
> concepts as "first degree" and "article used for
> fashioned in a manner to lead the victim to reasonably
> believe it's a dangerous weapon" as well as the term,
> although not the concept, of "sexual intercourse." Rico
> maintains that he is not guilty of the charges and that
> "there was another individual who was involved in these
> break-ins" and who was guilty of these crimes. *See*
> Tr.3/11/97 at 9. In addition, there was some physical
> evidence that supported his contention. *Id*.

*Id*. at 6-7. Although these allegations were sufficient to require an evidentiary hearing, the trial court erred in denying the motion without such a hearing. This Court therefore should vacate the order denying Rico's postconviction motion and should remand the matter with directions for the trial court to hold an evidentiary hearing on the motion.

A defendant who wishes to withdraw a plea after sentencing must show a manifest injustice by clear and convincing evidence. *State v. Nawrock*, 193 Wis. 2d 373, 379, 534 N.W.2d 624 (Ct. App. 1995). Although the question whether a defendant may withdraw a plea ordinarily is within the trial court's discretion, the question whether Rico Sanders's plea was knowing, intelligent, and voluntary is one of constitutional fact which this Court reviews *de novo*. *State v. Van Camp*, 213 Wis. 131, 139-40, 569 N.W. 2d 577 (1997). A plea that is not knowing, voluntary, and intelligent is not valid and the record must establish that, among other things, the defendant understood the charges against him. *Bangert*, 131 Wis.2d at 257. The failure of a defendant to completely understand the charge can render a plea involuntary. *Id*. at 265.

Here, however, because the trial court denied an evidentiary hearing, the question before this Court is not whether Rico should be entitled to withdraw his *Alford* pleas.

Instead, the issue is whether Rico was entitled to an evidentiary hearing on his postconviction motion. He is.

As the Wisconsin Supreme Court explained in *State v. Howell*, 2007 WI 75 ¶¶26-27, __ Wis. 2d __, 734 N.W.2d 48, once a defendant has, as here, invoked *Bangert* and has alleged that the circuit court failed to fulfill its duties at the plea colloquy, the defendant is entitled to an evidentiary hearing if

> (1) the motion makes "a *prima facie* showing that [the] plea was accepted without the trial court's conformance with [Wis. Stats.] § 971.08 or other mandatory procedures," and if (2) the motion alleges that in fact the defendant did not know or understand the information that should have been provided at the plea colloquy.

When, as here, a defendant alleges that he did not understand the elements of the crimes to which he pled, he is entitled to an evidentiary hearing if the court failed to "[d]etermine the extent of the defendant's education and general comprehension so as to assess the defendant's capacity to understand the issues at the hearing," *State v. Brown*, 2006 WI 100 ¶35, 293 Wis.2d 594, 716 N.W.2d 906 (citing *Bangert*, 131 Wis.2d at 262), and to "[e]stablish the defendant's understanding of the nature of the crime with which he is charged." *Id*. It is not sufficient if the court mechanically makes some effort to explain the charges. The requirement is that the court **establish** understanding, not that the court give an explanation to the defendant. *See id*.

The Wisconsin Supreme Court further expounded on the need to establish understanding and not mere explanation in *Howell*, 2007 WI 75 ¶¶50-54. In *Howell*, *id*. at ¶52, the Wisconsin Supreme Court held it insufficient for a court to establish the defendant's understanding by merely asking him "questions that required simple 'yes' or 'no' responses." The Court also rejected as insufficient "'[a] statement from

11

defense counsel that he has reviewed the elements of the charge, without some summary of the elements or detailed description of the conversation...."' *Id.* at ¶54 (quoting *Brown*, 2006 WI 100 ¶58.)

The adequacy of a colloquy cannot be determined in a vacuum. When Rico Sanders entered his pleas in this case, he was a seventeen-year-old who had not completed eighth grade, who had been in special education classes for a learning disability, read and wrote at only an elementary school level, and had mental health issues. Despite the sense at the time that Rico might be malingering with regard to his mental health issues, those issues have continued beyond any time in which there would be a payoff for them.

Merely asking a young defendant with clear mental health issues and an elementary school reading level whether he understood long paragraphs with high-level vocabulary in them does not establish understanding. Such colloquies may allow a court to determine from whether a defendant was giving particular information, *see, e.g., State v. Bollig*, 224 Wis.2d 621, 630-31, 593 N.W.2d 67 (Ct. App. 1999), *aff'd*, 2000 WI 6, 232 Wis.2d 561, 605 N.W.2d 199 (reproducing portions of the plea colloquy as part of its decision in determining what the trial court told the defendant). But knowledge and understanding are not the same thing. Knowledge is an antecedent to understanding, *see Bangert*, 131 Wis.2d at 269, but knowledge cannot establish understanding. Knowledge, for example, can be superficial and a matter of rote memory as when a child can say that 2x2=4 or when a defendant can tell the court that he has a right to remain silent. Understanding is a deeper grasp of the meaning as when a child can figure out from 2 x 2 that 2 x 3 must be six of when a defendant grasps that his right to

12

remain silent means that he cannot be required to testify at his trial.

In taking a plea, it is not enough that a defendant merely be informed of that which he is supposed to understand. Instead, the court must establish that he actually understood it. *Cf. Van Camp*, 213 Wis.2d at 147-48 (testimony that trial counsel read the defendant "a litany of rights" seven months before the plea was insufficient to establish that the defendant "both knew and understood the constitutional rights he was waiving").

The facts in this case are similar to those in *Brown*, 2006 WI 100, in which the Wisconsin Supreme Court held that Brown was entitled to an evidentiary hearing on his motion. Like Rico, Brown alleged that the plea colloquy was deficient and that he did not understand the elements of the rime when he entered his plea. Brown and Rico Sanders had essentially the same problems when they came into the system. First, they were both literate. Illiteracy is not a matter of reading or not reading. Illiteracy is a matter of level of reading. A first grader can read and therefore might be considered literate, *see* American Heritage Dictionary at 641, def. 1a (2d college ed.), yet no one would suggest that someone with a first grade reading level could make sense on his or her own of a guilty plea questionnaire form.

Second, both were young and had barely completed elementary school. Just as Brown was a "17-year-old high-school dropout," *Brown*, 2006 WI 100 ¶9, so too was Rico Sanders a 17-year-old who had not completed high school, R49:16, 19. In fact, Rico had less education than Brown. While Brown had completed ninth grade, *Brown*, 2006 WI 100 ¶9, Rico had completed only eighth grade, *see* R49:19.

Third, both had serious learning difficulties. Just as Brown had been diagnosed with reading and mathematics

13

disorders, *see Brown*, 2006 WI 100 ¶9, so too Rico had been in special education classes for a learning disability and did not read or write well, *see* R68.

But also had impairments that Brown did not have. Although Rico may have been competent, he also was mentally ill. Although questions of "malingering" had been raised, some of those questions are answered by Rico's mental health history after his conviction. If all of his mental health problems were a matter of malingering, they should have disappeared once he was convicted and they were of no particular use to him. Instead, they persisted. They persisted even though Rico initially did not want to be transferred to the prison system's mental health facility. *See, e.g.,* R49:12-13. This mental illness, even if not severe enough to prevent all understanding, reduced his understanding, especially when coupled with his low average intelligence.

Just as the plea colloquy in *Brown* was insufficient, so too was the plea colloquy in this case insufficient. Unlike here in which Rico alleges that he only knows that trial counsel read some of the plea questionnaire, *see* R49:5, trial counsel in *Brown*, 2006 WI 100 ¶12, told the court that, as to the plea questionnaire he had "gone over every word." In *Brown, id.,* trial counsel told the court that he had gone over the elements and believed that Brown understood those elements. Similarly, in this case, trial counsel told the court that he had reviewed the elements, although, unlike in *Brown*, trial counsel never assured this Court that he believed that Rico understood. R74:14.

Nor, as the trial court suggested, *see* R56:3, is reading the charge from the information or the complaint sufficient in this case. In *Brown*, 2006 WI 100 ¶12, the defendant told the court that the complaint had been read to him and that he understood it and the charges. The description of the charges

14

in the Brown complaint would have been comparable to the description of the charges that the trial court read Rico Sanders. If the reading of the complaint in *Brown* was not sufficient, the reading of the less detailed information that the trial court read in this case is not sufficient.

In addition, Rico's allegations that he did not understand the elements were sufficient to require a hearing when accepted as true. Whether a particular defendant did or did not understand is an issue of fact, *see State v. Hampton*, 2004 WI 207, 274 Wis.2d 379, 406-07, 683 N.W.2d 14, and this Court must accept the assertions in the postconviction motion as true for purposes of assessing the sufficiency of the motion, *State v. Love*, 2005 WI 116, 284 Wis.2d 111, 131 n. 15, 700 N.W.2d 62. Credibility is to be determined at an evidentiary hearing, not on the papers. *See id*.

In *Hampton*, 274 Wis.2d at 406-408, the Wisconsin Supreme Court rejected an argument that the allegations in a defendant's motion for plea withdrawal were insufficient when the defendant alleged specifically what the trial court did not tell him and then stated specifically what he did not understand. In doing so, the Wisconsin Supreme Court approved as sufficient allegations of fact such allegations as "the defendant did not understand...," and distinguished them from conclusory allegations of law. *Id*. at 406. As the Court noted,

> The allegation that the defendant did not understand is, admittedly, conclusory; but the allegation raises a question of *fact* and perhaps law that requires resolution.
>
> The allegation that a defendant did not understand something is qualitatively different from the allegation of a legal conclusion such as "counsel's performance was deficient and resulted in prejudice to the defendant," or "the defendant's plea was not voluntary." These *legal* conclusions cry out for

> supporting facts, and these supporting facts must be alleged to satisfy the defendant's burden for an evidentiary hearing.

*Id.* at 406-407 (emphasis in original). As the Court further noted, pointing to a lack of reference to material the trial court should have conveyed is relatively easy but "[i]t would be considerably more difficult to expand on an allegation that the defendant did not understand information that was not conveyed to him." *Id.* at 407.

Rico Sanders is entitled to an evidentiary hearing because he has identified deficiencies in the plea colloquy, stated what he did not understand, and connected his lack of understanding to the deficiencies. *See* R49. He identified deficiencies in explaining the elements, he said he did not understand the elements, he said that his lack of understanding of the elements arose in part from the vocabulary used, and he suggested that, in light of his claims of innocence, he would not have plead guilty if he had understood the elements. *Id.*

Contrary to the trial court's belief, R56:4, an argument, based on the record as a whole, cannot circumvent Rico Sanders's right to an evidentiary hearing, *Howell*, 2007 WI 75¶70, and his statements to the police are irrelevant to the question whether his motion requires an evidentiary hearing. His establishment of a *prima facie* violation requires the holding of an evidentiary hearing. *Id.*

16

## Conclusion

This Court therefore should vacate the order denying Rico Sanders's postconviction motion and remand the matter to the trial court with instructions to hold an evidentiary hearing on the motion.

Dated at Milwaukee, Wisconsin, October 10, 2007

Respectfully submitted,

*Ellen Henak*

ELLEN HENAK
Assistant State Public Defender
State Bar No. 1012490

735 North Water Street, Room 912
Milwaukee, WI 53203
Telephone (414) 227-4805

Attorney for Defendant-Appellant

17

STATE OF WISCONSIN

COURT OF APPEALS

DISTRICT I

---

STATE OF WISCONSIN,

Plaintiff-Respondent,

v.                                                    Case No. 2007AP1469-CR

RICO SANDERS,

Defendant-Appellant.

---

## Certification of Form & Length

---

I certify that this brief meets the form and length requirements of Rule 809.19(8)(b) and (c) in that it is: proportional serif font, minimum printing resolution of 300 dots per inch, 13 point body text, 11 point for quotes and footnotes, leading of minimum 2 points and maximum of 60 characters per line. The text is 13 point type and the length of the brief is 6,072 words.

Respectfully submitted,

*Ellen Henak*
ELLEN HENAK
Assistant State Public Defender
State Bar No. 1012490

735 North Water Street, Rm. 912
Milwaukee, WI 53203
Telephone (414) 227-4805

Attorney for Defendant-Appellant

# APPENDIX

# INDEX TO APPENDIX

Page

Decision and Order Denying
Postconviction Motion .............................................. 101-106

Postconviction Motion Pursuant to
Wisconsin Statutes § 809.30 to Withdraw
Guilty Plea.................................................................. 107-126

Judgment of Conviction ........................................... 127-128

Guilty Plea Transcript (Transcript of
3/11/19970................................................................. 129-154



STATE OF WISCONSIN           CIRCUIT COURT         MILWAUKEE COUNTY
                                       Branch 38

**R E C E I V E D**

STATE OF WISCONSIN,

        Plaintiff,

           vs.

RICO SANDERS,

        Defendant.

FILED
CRIMINAL DIVISION

38     JUN 11 2007     38

JOHN BARRETT
Clerk of Circuit Court

JUN 18 2007

Office of State Public Defender
Post-Conviction Division
Milwaukee, WI

Case No. 95CF954600

---

### DECISION AND ORDER
### DENYING MOTION TO WITHDRAW ALFORD PLEAS

On February 28, 2007, the defendant by his attorney filed a motion for postconviction

relief pursuant to section 809.30, Stats., seeking to withdraw his <u>Alford</u>[1] pleas on grounds that

they were not knowingly, voluntarily and intelligently entered because he did not understand the

elements of the offenses. On March 11, 1997, the defendant entered <u>Alford</u> pleas to four counts

of first-degree sexual assault, one count of second-degree sexual assault and one count of armed

robbery (use of force). Additional counts of armed burglary (two counts) and aggravated

burglary (two counts) were dismissed and read in pursuant to plea negotiations. On April 25,

1997, Judge David Hansher sentenced the defendant to a total of 140 years in prison. The

defendant alleges that the defendant did not understand the elements of the multiple charges

against him at the time he entered his pleas. Specifically, he alleges that the types of words used

to describe his crimes were beyond his vocabulary, including such concepts as "first degree" and

"article used or fashioned in a manner to lead the victim to reasonably believe it's a dangerous

weapon" as well as the term, although not the concept, of "sexual intercourse." He argues that

---

[1] <u>North Carolina v. Alford</u>, 400 U.S. 25 (1970).

the court did not fulfill its duties under section 971.08, Stats., as set forth in State v. Bangert, 131 Wis. 2d 246 (1986) and State v. Brown, 293 Wis. 2d 594 (2006).

Bangert provides that a defendant may move to withdraw his plea when the procedures outlined in section 971.08, Stats., are not undertaken or other court-mandated duties at the plea hearing are not fulfilled. State v. Hampton, 274 Wis. 2d 379, 401 (2004). The defendant bears the initial burden of showing that the court's plea colloquy did not conform to section 971.08 or other mandatory procedures. If the defendant makes this *prima facie* showing and alleges that he did not know or understand the information which should have been provided at the plea hearing, the burden shifts to the State to show by clear and convincing evidence that the defendant's plea was knowingly, voluntarily and intelligently entered. During the course of the plea hearing, the court must address the defendant personally and establish that the defendant understands the nature of the crime with which he is charged. § 971.08(1)(a), Stats. *See also*, Brown, *supra* at 617. The court may establish the defendant's understanding of the charges to which he is pleading by any one of, or combination of the following non-exhaustive methods:

> 'First, the trial court may summarize the elements of the crime charged by reading from the appropriate jury instructions . . . or from the applicable statute.'

> 'Second, the trial judge may ask defendant's counsel whether he explained the nature of the charge to the defendant and request him to summarize the extent of the explanation, including a reiteration of the elements, at the plea hearing.'

> 'Third, the trial judge may expressly refer to the record or other evidence of defendant's knowledge of the nature of the charge established prior to the plea hearing. For example, when a criminal complaint has been read to the defendant at a preliminary hearing, the trial judge may inquire whether the defendant understands the nature of the charge based on that reading. A trial judge may also specifically refer to and summarize any signed statement of the defendant which might demonstrate that the defendant has notice of the nature of the charges.'

> 'The State emphasizes that the *Bangert* list is non-exhaustive, and we agree. There may be other ways to show a defendant's understanding of the charges.'

Brown at 622-23. (Citations omitted). Thus, failing to following one of the methods suggested in Brown does not necessarily entitle a defendant to withdraw his plea if the record otherwise demonstrates his understanding of the nature of the charges.

In this instance, the court read each of the charges to the defendant and asked him what his plea was to each charge as it was read. (Tr. 3/11/97, pp. 10-12). The reading as to the multiple sexual assault charges included the date and location of the offense, the name of the victim, the lack of consent, the particular conduct involved (i.e. sexual intercourse), and where applicable, the manner in which the offense was committed (i.e. by use of an article used or fashioned in a manner to lead the victim to reasonably believe it's a dangerous weapon).[2] The court then referenced the plea questionnaire and waiver of rights form signed by the defendant. Paragraph four of the form states indicates that the defendant read or had read to him the criminal complaint and the information in this case, that he understands what he is being charged with, what the penalties are and why he has been charged. It further indicates that the defendant understands the elements of the offenses and their relationship to the facts in the case and how the evidence establishes his guilt. The court directly asked the defendant if he signed this document after going over it with his attorney, and he said yes. (Id. at pp. 12-13). The court also personally questioned the defendant on the record about his understanding of the nature of the charges he was facing:

> THE COURT: Okay. And was the criminal complaint read to you or did you read it yourself? The one charging you with these sexual offenses?
>
> THE DEFENDANT: It was read to me.

---

[2] Although the court did not finish reading count nine, this count was fully set forth in the criminal complaint which the defendant stated was read to him.

THE COURT: Okay. So do you understand, and I just discussed with you what you're charged with and I read to you, what the penalties are, your attorney told you that, we'll go through that, why you've been charged, and the elements of each of these offenses. Is that correct?

THE DEFENDANT: Right.

THE COURT: And counsel, you discussed with him what the elements would be, what the state would have to provide in each count in order to convict him?

[DEFENSE COUNSEL]: I did, Your Honor.

(Id. at pp. 13-14). The court also questioned defense counsel as to the defendant's mental competence to enter his pleas given the defendant's history of mental illness, and counsel responded that he had "no such question." (Id. at p. 13).

The defendant argues that the plea colloquy is deficient because it does not demonstrate his understanding of concepts such as "first-degree," "article used or fashioned in a manner to lead the victim to reasonably believe it's a dangerous weapon," and "sexual intercourse." First, the term "first-degree" is not an element of the crime of first-degree sexual assault; it is merely a descriptive term used to classify the severity of a sexual assault offense. Consequently, whether the defendant understood the term "first-degree" is not particularly relevant to whether he understood the *nature* of this offense, i.e. sexual contact or sexual intercourse with another person without the consent of that person by use or threat of use of a dangerous weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a dangerous weapon. Moreover, the defendant's statements to police, which were summarized by the prosecutor at the plea hearing, illustrate his understanding of the concepts "article used or fashioned in a manner to lead the victim to reasonably believe it's a dangerous weapon" and "sexual intercourse."

THE PROSECUTOR: Finally Mr. Sanders spoke with Detective Daniel Ruzinski. Detective Ruzinski spoke to him at length about each of the incidents that are involved in this criminal complaint and also about the two burglaries that he committed . . . . I will characterize it as a confession.

Mr. Sanders agreed that as to each of these incidents he gained entrance by prying open various windows. He explained in each of the circumstances how it is and what he used in order to get into the buildings. For example, when he was entering the building of Ms. Poinciana Sprewell, he used a milk crate that was orange in color to help himself climb up through the window. He indicated that the reason he was going into these various residences was because it was around the 1st of the month and he figured that people would have gotten their checks and would have some money, and he needed that money to support his drug habit.

Once inside, he would see the women lying on the bed, he gives various descriptions of where they are and he knew, for example, that when he entered the Redmond home, he crashed a fan down on to her, a window fan.

In the case of Miss Sprewell as another example, he observed her lying on her bed with her two children. *In each of the instances when he saw the women, what he described is that, quote, 'his stuff got hard,' and he decided to have sexual intercourse with them. He indicates that he understood that he – that they did not want to do this, but he forced them to have sex.* He indicates that he used a screwdriver when he was gaining access into each of those places and that – these places and he could understand how he could believe the women had a gun (sic).

The women would indicate that throughout the course of the time he would make various threats to them like the fact that he was going to shoot them or blow their heads of, *which I think corresponds with his personal belief that they might have believed that he had a gun.*

(Id. at pp. 21-23). The court asked defense counsel if he disputed any of the facts set forth by the prosecutor, and counsel responded "we're not in a position to dispute. We've stipulated to the complaint which I think is sufficient." (Id. at p. 23). The court asked the defendant if he had any questions about his plea, and he said no. (Id. at p. 16). Based upon the foregoing, the court finds that the record demonstrates the defendant's understanding of the nature of the charges, including the elements of the offenses.

Even assuming *arguendo* that the court's plea colloquy was deficient, the defendant has not sufficiently alleged a lack of understanding to warrant an evidentiary hearing. Although the

defendant states that the concepts of "first-degree," "article used or fashioned in a manner to lead the victim to reasonably believe it's a dangerous weapon," and "sexual intercourse" were beyond his vocabulary, he does not indicate precisely what he did not understand about these concepts or what additional information should have been provided to him. It may very well be that the defendant was unfamiliar with this type of legal terminology; however, a mere lack of familiarity with legal verbiage does not demonstrate a misunderstanding about the nature of the charges or the elements of the offense. Under the circumstances, the court finds that the defendant has not alleged a viable claim for plea withdrawal.

**THEREFORE, IT IS HEREBY ORDERED** that the defendant's motion for postconviction relief (i.e. plea withdrawal) is **DENIED.**

Dated this _____ day of June 2007 at Milwaukee, Wisconsin.

**BY THE COURT:**

Jeffrey A. Wagner
Circuit Court Judge

R E C E I V E D

MAR 1 2007

Office of State Public Defender
Post-Conviction Division
Milwaukee, WI

STATE OF WISCONSIN : CIRCUIT COURT : MILWAUKEE COUNTY

---

STATE OF WISCONSIN,

                                        Plaintiff,

v.                                            Case No. 95CF954600

RICO SANDERS,

                                        Defendant.

*FILED*
*CRIMINAL DIVISION*
*FEB 2 8 2007*
*JOHN BARRETT*
*Clerk of Circuit Court*

---

## POSTCONVICTION MOTION PURSUANT TO WISCONSIN STATUTES § 809.30 TO WITHDRAW GUILTY PLEA

---

TO:   Miriam Falk
      Milwaukee County Assistant District Attorney
      Milwaukee County Safety Building
      821 West State Street, 4th Floor
      Milwaukee, WI 53233

PLEASE TAKE NOTICE that the defendant, Rico Sanders, by his attorney, Assistant State Public Defender Ellen Henak, moves this Court for the entry of an order: (1) allowing him to withdraw his guilty plea; (2) vacating the judgment of conviction in this case; and (3) granting him such further relief as this Court may deem appropriate. Mr. Sanders seeks this relief on the grounds that his plea was not entered knowingly, intelligently, and voluntarily because this Court failed to comply with Wisconsin Statutes § 971.08(1)(a) and he failed to understand the elements of the crimes to which he was pleading guilty.

**Please note that, pursuant to Wis. Stats. (Rule) 809.30(2)(i), this Court has sixty days from the date this motion was filed to decide this motion. Mr. Sanders requests an evidentiary hearing on this motion as he is entitled to one under State v. Bangert, 131 Wis.2d 246, 389 N.W.2d 12 (1986), and State v. Brown, 2006 WI 100, __ Wis. 2d __, 716 N.W.2d 906. Mr. Sanders reserves the**

right to supplement this motion within a reasonable time if deemed appropriate by counsel in light of her review of information not yet received.

As grounds for this motion, Rico Sanders states as follows:

1.    On March 11, 1997, when he was seventeen years old, Rico entered *Alford* pleas in this case and was sentenced on April 25, 1997 as follows:

| Charge | Statute | Sentence |
|---|---|---|
| First degree sexual assault | Wis. Stats. §940.225(1)(b) | 30 years |
| Armed robbery (use of force) | Wis. Stats. §943.32(2) | 10 years consecutive |
| Second degree sexual assault | Wis. Stats. §940.225(2)(a) | 10 years consecutive |
| First degree sexual assault | Wis. Stats. §940.225(1)(b) | 30 years consecutive |
| First degree sexual assault | Wis. Stats. §940.225(1)(b) | 30 years consecutive |
| First degree sexual assault | Wis. Stats. §940.225(1)(b) | 30 years consecutive |
|  | TOTAL: | 140 years |

2.    Prior to the entry of Rico's pleas, defense attorneys Edward Little and E. Duke McNeil questioned Rico's competency on several occasions. The trial court, the Honorable David A. Hansher, held the first competency hearing on March 15, 1996. *See* Tr.3/15/96. At that hearing, Dr. George Palermo, a forensic psychiatrist, found Rico to be of low average intelligence, noted that he had been administered medications, and that further stated he did not personally observe Rico's interactions with people at the jail. *See id.* at 13, 16. He noted that Rico's reported hallucinating visions of a monkey and a dog, *see id.*, and that use of drugs and alcohol can sometimes produce auditory and visual hallucinations, *see id.* at 8. Nevertheless, Dr. Palermo testified that he believed that Rico was competent, *id.* at 7, and the trial court adopted his opinion, *id.* at 20-21.

3.    On June 5, 1996, at what was supposed to be the final pretrial hearing in this case, Rico began getting up, whistling, and snapping his fingers as though calling a dog. Tr.6/5/96 at 5. Based upon this behavior, defense counsel requested, and was granted a reevaluation of Rico for competency. *See id.* at 7-9.

Dr. Palermo then reevaluated Rico and reached the conclusion that he was not competent and recommended transferring Rico to Winnebago Mental Health Institute for diagnostic purposes, *see* Tr.6/11/96, as did Dr. Stephen Emiley, *see* Tr.7/25/96. The court then sent Mr. Sanders to the Mendota Mental Health Institute.

4. A competency hearing was held on December 19, 1996. Dr. Molli Rolli, a psychiatrist, testified that she believed that Rico was competent. Tr.12/19/96 at 13-14. She noted that his mother had indicated that he had been tested in the past and had a third grade reading level. *Id.* at 18. She noted that she did not test his reading and that she believed, based upon comments from his teacher there, that he had approximately a junior high reading level. *Id.* at 19-20. She believed that he had average to low average intelligence. *Id.* at 18. The trial court then found Mr. Sanders competent and dubbed the situation to be a "blatant case of malingering." *Id.* at 25-26.

5. Nevertheless, after his convictions, Rico continued to have mental health problems in the prison system. In July of 1997, shortly after Rico entered the prison system, Dr. John Gehring, a psychiatrist, evaluated him. *See* Psychiatric Report of 7-21-97, which is attached to this motion as Exhibit A. Dr. Gehring noted that he had been hearing voices and had delusions that people were talking about him. Dr. Gehring then diagnosed Rico as having schizophrenia, chronic undifferentiated type and post-hallucinogenic perceptive disorder, as well as a history of cannabis abuse and a past history of major depressive disorder. *See id.*

6. In 2004, Dr. Steven Schmidt examined Rico at Green Bay Correctional Institution and recommended that Rico get additional mental health treatment beyond what Green Bay Correctional Institution could provide and be sent to the Wisconsin Resource Center. *See* Psychological Services Clinical

Contact of 10/5/04, which is attached to this motion as Exhibit B. Rico's initial reaction was to object and indicate that he did not think that he was crazy. *See id.* at 1. After a lengthy discussion, Rico agreed to be referred to the Wisconsin Resource Center as he was still hallucinating and still had paranoid thoughts. *See id.* Rico subsequently was admitted to the Wisconsin Resource Center on October 21, 2004. *See* Initial Treatment Learning Plant—Inmate dated 11/9/04, which is attached to this motion as Exhibit C. Educational testing indicated that Rico had a 5.2 grade level reading ability. *See* Release/Transfer Summary—Inmate dated 6/2/05, which is attached to this motion as Exhibit D. Rico was recommended for transfer back to Green Bay Correctional Institution on or about June 2, 2005. *See id.* He actually was transferred back on September 22, 2005.

7.     Green Bay Correctional Institution again referred Rico to the Wisconsin Resource Center on October 18, 2006 for "increasingly intense depressive symptoms." *See* Review for Mental Health Placement dated 10/18/06, which is attached to this motion as Exhibit E. In addition to depressive symptoms and thoughts of suicide, Rico continued to hear "voices." *See id.* Once again, Rico initially resisted the idea of the referral but eventually became more positive about it. *See id.* at 2. Rico currently is incarcerated at the Wisconsin Resource Center.

8.     Thus, at the time of the plea, Mr. Sanders was a mentally ill seventeen-year-old, of low average intelligence, who read at an elementary school level. He had been in special education classes for a learning disability and did not read or write well, *see* Presentence Investigation Report at 4; Competency report of Dr. Stephen Emiley. He had been evaluated two years earlier and been found to have an IQ of 72. *See* Competency report of Dr. Stephen Emiley.

9.     The same day that Rico was to enter his pleas, he met with his trial attorney, Martin Love, in the bullpen behind the courtroom. Mr. Love read Rico at

least some sections of the document designated as an "Alford *Guilty Plea Questionnaire and Waiver of Rights Form" and Rico signed it. A copy of this document is attached to this motion as Exhibit E This form listed the names of offenses to which Rico was pleading as well as (incorrectly) the names of the offenses that were being read-in. The form did not give the elements of the crimes that were being charged and no jury instructions were attached. *See* Exhibit E. Subsequent to this discussion, Rico was allowed to meet with his family at the jail to discuss whether to plead guilty. Those discussions did not focus on the elements of the charges.

10. At the plea hearing, Rico entered his guilty pleas under *North Carolina v. Alford*, 400 U.S. 25 (1970). See Tr.3/11/97 at 10. Rico had to be prompted to enter his pleas properly under this decision. *See id.* The court then read off each charge and had Rico enter his plea, except for the charge in count 9. The Court never finished reading off the full charge. Id. at 10-11. As for whether Rico understood the elements of these charges, this Court asked only one confusing, multiple part question as follows:

> THE COURT: Okay. So do you understand, and I just discussed with you what you're charged with and I read it to you, what the penalties are, your attorney told you that, we'll go through that, why you've been charged, and the elements of each of these offenses. Is that correct?

> DEFENDANT: Right.

*Id.* at 13-14. The Court then followed up with the trial attorney, Martin Love, by asking only one question:

> THE COURT: And counsel, you discussed with him what the elements would be, what the state would have to prove in each count in order to convict him?

> MR. LOVE: I did, Your Honor.

*Id.* at 14.

11.    Subsequently, the state asked to "supplement the record." The state then noted that:

> First of all, we have – there's a discrepancy in the terms that defense counsel and I used. The way that the complaint has count 5 and count 10 enumerated is called aggravated burglary and it is a burglary that is aggravated by the committing of a battery. It is my hearing that on that sheet he has it listed as an aggravated battery. It doesn't make any difference in terms fo the title, but just so that Mr. Sanders understands that count 5 and count 10 are, I'm sorry, count 5 and count 7 are, in the criminal complaint, are entitled "aggravated burglary" and that that relates to his entering a dwelling in each of those instances and then committing a battery upon a person who was lawfully therein.

*Id.* at 17-18.   The trial court then did not ask Rico if he understood but instead asked the attorney:

> THE COURT:  Is that your understanding, counsel?
>
> MR. LOVE:  Your Honor, I have, as a matter of fact, I have a copy that I drafted before the one that was submitted to the court, and I have referred to it as aggravated burglary.  It's a misnomer if I have place the word "battery" instead, I'm sorry.  But yes, we understand the circumstances and the elements.

*Id.* at 18.

12.    The trial court never summarized the elements of the crimes by reading from jury instructions, did not ask counsel to summarize the extent of his explanation of the elements of the charges, and did not ask Rico whether he understood the nature of the charge based upon the criminal complaint.

13.    At the time of he entered his pleas, Rico did not understand the nature of the charges against him.   He did not understand the elements of the multiple charges against him.   The types of words used to describe the crimes were beyond his vocabulary, including such concepts as "first degree" and "article used for fashioned in a manner to lead the victim to reasonably believe it's a dangerous weapon" as well as the term, although not the concept, of "sexual intercourse." Rico maintains that he is not guilty of the charges and that "there was another individual who was involved in these break-ins" and who was guilty of these

crimes. *See* Tr.3/11/97 at 9. In addition, there was some physical evidence that supported his contention. *Id.*

**RICO SANDERS IS ENTITLED TO AN EVIDENTIARY HEARING ON WHETHER HE UNDERSTOOD THE ELEMENTS OF THE CRIMES TO WHICH HE PLED AND SHOULD BE ALLOWED TO WITHDRAW HIS PLEAS, UNLESS THE STATE ESTABLISHES THAT THE PLEA WAS ENTERED KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY.**

14.   A defendant who wishes to withdraw a plea after sentencing must show a manifest injustice by clear and convincing evidence. *State v. Nawrock*, 193 Wis. 2d 373, 379, 534 N.W.2d 624 (Ct. App. 1995). This showing is met if the plea is not constitutionally valid. *Hatcher v. State*, 82 Wis. 2d 559, 565, 266 N.W.2d 320 (1978).

15.   An *Alford* guilty plea that is not voluntarily, knowingly, and intelligently entered violates fundamental due process. *State v. Bangert*, 131 Wis. 2d 246, 389 N.W. 2d 12 (1986).

16.   Pursuant to *Bangert* and Wis. Stats. §971.08 (1997-98), a trial court conducting a plea hearing must address the defendant personally and "[d]etermine the extent of the defendant's education and general comprehension so as to assess the defendant's capacity to understand the issues at the hearing," *State v. Brown*, 2006 WI 100 ¶35 (citing *Bangert*, 131 Wis.2d at 262). In addition, a trial court must "[e]stablish the defendant's understanding of the nature of the crime with which he is charged." *Id.*

17.   If the trial court fails to fulfill these duties at the plea hearing, the trial court must hold an evidentiary hearing if a defendant alleges in this postconviction motion that he does not understand an aspect of the plea because of the omission. *Brown*, 2006 WI 100 ¶36. Rico makes that allegation in this motion. If the defendant's motion requires a hearing, then he may withdraw his

plea as a matter of right unless the state can show that, despite the deficiencies in the plea hearing, the plea was entered knowingly, intelligently, and voluntarily. *Id.* The rules allow a defendant to "wait until he knows his sentence before he moves to withdraw his plea and he may not be disadvantaged by this delay as long as he is able to point to a deficiency in the plea colloquy." *Id.* at ¶38.

18.     In this case, as in *Brown*, this Court did not use any of the methods suggested in *Bangert* to establish Rico's understanding of the elements of the charges. This Court did not summarize the elements of the crime or read from the jury instructions, did not ask trial counsel to summarize what explanation he gave Rico, and did not ask whether Rico understood the charges based upon a reading of the criminal complaint. *See* Tr.3/11/97; *see generally Brown*, 2006 WI 100 ¶¶46-48. As in *Brown, id.* at ¶50, trial counsel merely stated that he had reviewed the elements with the defendant. Worse, in this case, unlike in *Brown, see id.* at ¶50, Rico did not confirm that trial counsel had reviewed the elements and his answer to whether he understood the charges is not very clear because of the complicated and convoluted question that this Court asked. As in *Brown, see id.* at ¶54, this Court had information on Rico's limitations that should have warned the court that "special steps were imperative to ensure, on the record, that the defendant was fully apprised and understood the charges. As in *Brown, see id.* at ¶57, Rico's limitation, his one-word responses, and the complexity of the charges, and the failure of the court to have Rico acknowledge that he had reviewed the elements with his trial attorney, makes any acknowledgement by Rico that he understood the elements insufficient.

19.     Rico therefore has made out a *prima facie* violation of § 971.08(1)(a). *See Bangert*, 131 Wis.2d at 274. The burden in this case therefore shifts to the state to show by clear and convincing evidence that Rico's plea was

knowingly, voluntarily, and intelligently entered, despite the inadequacy of the record at the time. Mr. Sanders therefore is entitled to a hearing on this motion.

20.     In any event, the state will not be able to show that Rico's plea was knowing, intelligent, and voluntary. Rico's learning disabilities, limited intellectual functioning, low reading level, and mental illness made the concepts of the elements difficult to understand and prevented a quick reading of the charges from sufficing as an explanation..

WHEREFORE, Rico Sanders respectfully requests that this Court issue an order: (1) granting him an evidentiary hearing on this motion; (2) allowing him to withdraw his guilty plea; (3) vacating the judgment of conviction in this case; and (4) granting him such further relief as this Court may deem appropriate.

Dated at Milwaukee, Wisconsin, February 27, 2007.

Respectfully submitted,

RICO SANDERS, Defendant

ELLEN HENAK
Assistant Public Defender
State Bar No. 1012490

735 North Water Street, Room 912
Milwaukee, Wisconsin 53202
(414) 227-4300



**CONFIDENTIAL**

FOR PROFESSIONAL USE ONLY

FURTHER DISTRIBUTION PROHIBITED
WITHOUT CONSENT OF
BUREAU OF HEALTH SERVICES

## PSYCHIATRIC REPORT

SANDERS, RICO                    331049-A                    GBCI
07-21-97

**IDENTIFYING INFORMATION:** This patient is an 18-year-old Afro-American male who is serving 140-year sentence. He had been at Dodge Correctional Institution for two months and has been here at GB Correctional Institute since July 1, 1997.

**PRESENTING PROBLEM:** He had been hearing auditory hallucinations. He would hear voices which would tell him something with reference to all the people in the world. He also had delusions he felt that people were talking about him. He also, in the past when he took LSD, would see trees moving and snipers shooting at him. He has had many suicidal thoughts in the past but not at present. When he was 14 years old, he attempted suicide by hanging himself from a tree. Presently, he does not feel depressed.

**PAST PSYCHIATRIC HISTORY:** He had been in Mendota Mental Health Institute for a period of one-half year; that was when he was 17 years old. When he was discharged from there, he was on Navane, Artane and Ritalin. At one time, he was diagnosed as having attention deficit/hyperactivity disorder but does not have those symptoms at this time.

He used LSD on a daily basis from the ages of 14 to 16 years of age. He would have hallucinations as mentioned above; that is seeing trees move and snipers shooting at him. He occasionally has had flashbacks of this. He does have a startle response. He used cannabis from the age of 12 until the age of 16 on a daily basis. He would become intoxicated with some alcoholic beverage approximately three times a week from the age of 12. He would smoke approximately a package of cigarettes daily. He began smoking at the age of 13 years.

**FAMILY HISTORY:** He was the youngest of seven children. When asked about his formative years, he relates his mother was good to him. He felt close to her emotionally and could talk to her. When asked about his father, he relates his father sexually molested him when he was 5 or 6 years old. To his knowledge, it was never reported. His father died when the patient

**CONFIDENTIAL**
FOR PROFESSIONAL USE ONLY

FURTHER DISTRIBUTION PROHIBITED
WITHOUT CONSENT OF
BUREAU OF HEALTH SERVICES

## PSYCHIATRIC REPORT

SANDERS, RICO                    331049-A
07-21-97
Page 3

**DIAGNOSIS:**

**AXIS I.**    Schizophrenia, chronic undifferentiated type.
Post-hallucinogenic perceptive disorder (LSD).
Past history of cannabis abuse.
Past history of depressive disorder, at times major, presently not depressed.
Past history of attention deficit/hyperactivity disorder, now asymptomatic.

**AXIS II.**    None identified.

**AXIS III.**    Apparent good physical health.

**AXIS IV.**    Psychosocial stressors and environmental conditions have been rather severe, being sexually molested when he was very young, no real father figure throughout the years and now a long incarceration.

**AXIS V.**    Global assessment of functioning the past year has been in the realm of Code 40.

**TREATMENT PLAN:** He will be seen in approximately one month for follow-up.


John Gehring, M.D.
Consulting Psychiatrist
Bureau of Health Services

JG/cls, T: 7/27/97, cc: CS, SS, Agent
OM/VKaj025.N/27

## PSYCHOLOGICAL SERVICES CLINICAL CONTACT

| OFFENDER NAME | | | SOURCES OF INFORMATION | |
|---|---|---|---|---|
| Sanders, Rico | | | ☒ Clinical Interview  ☒ PSU file | |
| | | | ☒ Social Services File  ☐ HSU chart | |
| DOC NUMBER | INSTITUTION | DATE | ☐ Psychological Testing | |
| 331049 | GBCI | 10/5/04 | ☐ Other | |

**REASON FOR CONTACT**

Inmate request, indicating Mr. Sanders has been double celled, is not "getting along" with his cellmate, and that Mr. Sanders believes his cellmate is "continuously spying on me and making fun of me to his friends."

**RELEVANT HISTORY**

The inmate is serving a total sentence of 140 years on a 1997 conviction for 1st Degree Sexual Assault, Armed Robbery, and 2nd Degree Sexual Assault. He has a PED of 9/7/2030 and MR of 2089. He began reporting auditory hallucinations in May 1997. He has received a variety of mental health diagnoses, including History of Schizophrenia (Chronic, Undifferentiated), History of Hallucinogen-Induced Persistent Perceptual Disorder, and PTSD, and has been treated with antipsychotic and sleep-enhancing medications.

**OFFENDER'S REPORT**

Mr. Sanders complained of being unable to sleep or defecate in the presence of his cellmate, feels "uncomfortable" and "uneasy," and worries that his cellmate may "come after me" if he is on the toilet. He described himself as "not trusting" and "fearful." Mr. Sanders requested that he be placed again in a single cell. At that point, I suggested that his continued reports of paranoia, auditory hallucinations, and aggressive impulses stronly indicate that he is in need of more treatment than is available to him here at GBCI. He initially objected to this strongly, stating "I don't think I'm crazy...I'm misunderstood...I'm just a regular person." After a lengthy discussion of his symptoms, treatment needs and treatment history (especially his perception of the treatment he received at Mendota Mental Health Institute in 1996), Mr. Sanders expressed agreement with a recommendation of a referral to WRC for assessment and programming that would be aimed at helping him cope more effectively with his problems and with the stresses of incarceration.

**MENTAL STATUS**

Alert, oriented, no unusual psychomotor behavior observed. Affect was limited in scope range and continues to reflect dysphoric/irritable mood. No thought disorder characteristics were observed. Mr. Sanders conmfinues to report distress associated with the "voices" that he hears. He denied active intent or plan to harm himself or others.

**DIAGNOSES**

| | |
|---|---|
| Axis I | PTSD, by History; Substance-Induced Persistent Hallucinosis, by History |
| Axis II | Antisocial PD, by history  Axis III (If Relevant)  **Deferred to HSU** |

**TREATMENT PLAN / FOLLOW-UP**

I will recommend Mr. Sanders be placed again on Red Tag status and will complete a referral for WRC. In the interim, he will be followed to assess stability and acceptance of this referral.

| | ☐ MH code has changed  ☒ MH code has not changed | | |
|---|---|---|---|
| ☐ MH-0 | ☐ MH-1 | ☒ MH-2 | ☐ MH-3 |
| No MH need | MH need (not *SMI) | Diagnostic SMI or Functional SMI | Mental Retardation |

| CLINICIAN SIGNATURE | | DATE SIGNED |
|---|---|---|
| Steven Schmidt, Ph.D. | *S Schmidt PhD* | 10/6/04 |

## PSYCHOLOGICAL SERVICES CLINICAL CONTACT

| OFFENDER NAME | | | SOURCES OF INFORMATION | |
|---|---|---|---|---|
| Sanders, Rico | | | ☒ Clinical Interview | ☒ PSU file |
| | | | ☒ Social Services File | ☐ HSU chart |
| DOC NUMBER | INSTITUTION | DATE | ☐ Psychological Testing | |
| 331049 | GBCI | 10/5/04 | ☐ Other | |

| SUPERVISOR'S SIGNATURE (If Needed) | DATE SIGNED |
|---|---|
| | |

\* SMI – Serious Mental Illness

DISTRIBUTION:  Original – PSU Record (DOC-3370A); Copy – HSU (file in DOC-3370); Copy – Social Services File Confidential Section; Copy - CRU

CONFIDENTIAL

DEPARTMENT OF HEALTH AND FAMILY SERVICES
Division of Disability and Elder Services
DDE-5596D (03/05)

STATE OF WISCONSIN

## RELEASE / TRANSFER SUMMARY - INMATE

| Name - Inmate (Last, First, MI) | ID Number | Date - Admitted | Date - Summary Developed |
|---|---|---|---|
| SANDERS, Rico | 331049 | 10/21/04 | 06/02/05 |

| Recommended Institution / Custody Level | |
|---|---|
| Max | ☒ Original (Date Completed) 11/09/04 |
| | ☒ Update (Date Completed) 06/02/05 |

| Present at Staffing | DPP Agent Number |
|---|---|
| Corcoran, Giannunzio, Wojdac, Mahoney and Lennop. | 32805 |

### Focus of Treatment at WRC (Check any that apply.)

- ☐ Suicidal / Self-Abuse
- ☐ Transition to GP
- ☐ Release Planning
- ☐ Recommitment / Commitment
- ☐ Stabilize Medications
- ☐ Mental Illness
- ☐ AODA
- ☐ Coping Skills
- ☐ Anger Control
- ☒ Evaluation
- ☐ Adjustment Problems
- ☐ ADL
- ☐ Other (Specify)

### Adjustment at WRC (Check all that apply.)

- ☒ Very Good
- ☐ Fights / Battery
- ☐ Escape Risk
- ☐ Refuses Meds
- ☒ Adequate
- ☐ Threats
- ☐ Suicidal
- ☐ Non-compliant
- ☐ Marginal
- ☐ Self Abusive
- ☐ Refuses Programs

### Information for PRC

The primary reason inmate was referred to WRC: Evaluation and testing related to his reports of auditory hallucinations, anxiety and/or thought disorder.

Indicate the outcome of WRC placement:

- ☒ No appropriate needs for treatment were identified.
- ☐ The inmate was referred to and completed the Brief Coping Skills Program.
- ☐ The inmate was referred and failed to complete the Brief Coping Skills Program. (see below)
- ☐ The inmate has completed recommended programming.
- ☐ The inmate failed to complete recommended programming. (see below)

### Reason for Release / Transfer from WRC (Check all that apply.)

- ☐ Completed WRC Programming
- ☐ To Receive Programming
- ☐ Assaultive
- ☐ Reached Maximum Benefit
- ☒ MR / Discharge / Grant
- ☐ Adjustment Problems
- ☐ Medications Stabilized
- ☐ Refuses / Failed Programs
- ☐ SPN
- ☐ Stabilized Mental Functioning
- ☐ Lacks Motivation
- ☒ Other (Specify)

Inmate's needs can be met at a traditional DOC facility.

DISTRIBUTION

| Name - Inmate (Last, First, MI) | ID Number | Date - Admitted | Date - Summary Developed |
|---|---|---|---|
| SANDERS, Rico | 331049 | 10/21/04 | 06/02/05 |

**Identified Problem No.1:** (Describe both inmate and team views; describe inmate's motivation and insight.)

**Status (Relative to Admission)**

☐ Worse  ☐ No Change  ☐ Progress  ☐ Attained

Describe Status:

**Identified Problem No.2:** (Describe both inmate and team views; describe inmate's motivation and insight.)

**Status (Relative to Admission)**

☐ Worse  ☐ No Change  ☐ Progress  ☐ Attained

Describe Status:

**Identified Problem No.3:** (Describe both inmate and team views; describe inmate's motivation and insight.)

**Status (Relative to Admission)**

☐ Worse  ☐ No Change  ☐ Progress  ☐ Attained

Describe Status:

**Record of Discontinued Problems**

| Problem | Date Initiated | Date Discontinued | Indicate Final Status (Worse, No Change, Progress, Attained) and Explain |
|---|---|---|---|
|  |  |  |  |

| Name - Inmate (Last, First, MI) | ID Number | Date - Admitted | Date - Summary Developed |
|---|---|---|---|
| SANDERS, Rico | 331049 | 10/21/04 | 06/02/05 |

RELEASE / TRANSFER STAFFING NOTES FROM ALL DISCIPLINES: (See final discipline notes for updates.)

### Security Issues

This is Inmate Sanders' 1st admission to WRC. He has had 63 conduct reports since the start of his incarceration at the time of his admission to WRC. He has received a conduct report for Battery on 01/14/97, a conduct report for Fighting on 01/30/98 and 2 conduct reports for Group Resistance/Petitions, most recently on 11/02/00–in relation to his institutional conduct. He has no known SPN's prior gang affiliation nor any issues in relation to an escape history noted

### A & E Needs

1. Denier's Program
2. OSCI Sex Offender Treatment programming
3. AODA Level 5B–Cognitive Based
4. ABE–Based
5. Vocational Education

### Release / Transfer Plans

He is currently serving multiple sentences for the following: 30 years, 2 terms 10 years CS/CS and 3 terms 30 years CS/CS for 4 counts of 1st Degree Sexual Assault, Armed Robbery and 2nd Degree Sexual Assault. His MR date is 08/04/89 (PMR) and his Maximum Discharge date is 09/08/2135. He is eligible for parole on 09/07/30.

### Unit

Mr. Sanders is a positive role model on the unit. He seldom needs re-direction from staff, completes his jobs independently, and usually has a positive attitude. He has no warnings or conduct reports.

### Multidisciplinary Programming

### Education

Mr. Sanders is enrolled in Education classes. He needs science, math, and writing skills to complete his HSED. He is goal oriented and driven to succeed academically.

Reading: 5.2
Math: 5.4
Works in the kitchen.

### Therapeutic Services

DEPARTMENT OF CORRECTIONS
Division of Adult Institutions
DOC-1479 (Rev. 8/2006)

# REVIEW FOR MENTAL HEALTH PLACEMENT

| OFFENDER NAME | DOC NUMBER | INSTITUTION/UNIT | REFERRAL DATE |
|---|---|---|---|
| Sanders, Rico | 331049 | GBCI/GP | 10/18/06 |

REASON FOR PSYCHOLOGICAL SERVICES REVIEW:

Evaluation and stabilization, treatment as determined by WRC staff. Inmate Sanders has reported increasingly intense depressive symptoms and is not responding to treatment efforts offered at GBCI.

REFERRING STAFF:

Steven Schmidt, Ph.D.

## PSYCHOLOGICAL SERVICES REVIEW

### PROGRAM PLACEMENT GRID

Please refer to description of categories of mental disturbances and level of function found in the instruction packet.

### CATEGORY OF MENTAL DISTURBANCE

| STABILITY | Developmental Disability - Assaultive | Developmental Disability - Non-assaultive | Mental Illness - Assaultive | Mental Illness - Non-Assaultive | Personality Disorder -Assaultive | Personality Disorder - Non-Assaultive | Situational/Transitory |
|---|---|---|---|---|---|---|---|
| Stable in GP | GP 1a | GP 2a | Monitor by PSU 3a | GP & PSU Monitor 4a | Any GP not WRC or CCI-SMU 5a | Any GP PSU Monitor 6a | GP CS or SS Monitor 7a |
| Stable in Special Setting | CCI- SMU WRC OSCI-TTC 1b | CCI-SMU WRC OSCI-TTC 2b | CCI SMU WRC OSCI-TTC 3b | CCI-SMU WRC OSCI-TTC 4b | Program Seg; not WRC or CCI-SMU 5b | GP or Seg; CCI-SMU WRC 6b | PSU treatment locally WRC 7b |
| Unstable | WRC 1c | Call CCI-SMU WRC 2c | WRC 3c | Call CCI-SMU WRC 4c | Call CCI-SMU WRC 5c | Call CCI-SMU WRC 6c | WRC 7c |

## DIAGNOSIS

Axis I

Major Depressive Disorder; PTSD; Hallucinogen-Induced Psychotic Disorder with Hallucinations

Axis II

Antisocial PD

PRESENT MEDICATION: Geodon, Prozac (see HSU section). NOTE: COMPLIANCE IS PROBLEMATIC

MENTAL HEALTH HISTORY (INCLUDING RECENT INTERVENTIONS AND OFFENDER'S RESPONSE):

Rico Sanders is a 27 year-old African American male serving a 140 year sentence. He has an extensive history of contact with PSU and psychiatrists throughout his incarceration, which began in 1997. He has consistently reported auditory hallucinations and "flashbacks" to experiences of violence that he witnessed in the past. He was referred to WRC in 10/04 and remained there until 9/05. Since his return to GBCI he made a marginal adjustment, but continually sought PSU intervention to be housed in a single cell due to his concerns about flashbacks, emotional lability/anger, and frequent paranoid ideation regarding other inmates and staff. His functioning appeared to have stabilized somewhat in the spring/early summer of 2006, during which time he had some individual therapy with a psychology intern. However, during the summer he was informed that a sentence reduction appeal that he had filed was denied and that his 140-year sentence was upheld. Since that time he has become increasingly depressed, hopeless, and withdrawn. He reports an exacerbation of flashbacks and describes chronic thoughts that his life is without purpose or meaning. He voices suicidal thinking, primarily in the form of expressing a wish to be dead, but also reports occasions of more active thoughts of suicide, such as hanging. He has consistently denied engaging in any behavior leading to suicide but was placed in Observation status just prior to Labor Day due to concerns about his risk. His compliance with psychotropic medications has been a problematic issue. He consistently reports that antipsychotic medications are ineffective in controlling the "voices" that he reports – these are typically described as emanating from a person Mr. Sanders calls "Deandre"

The receiving facility ☐ can ☐ cann⎵ accommodate offender's current medical sta⎵

**Health Services Supervisor Signature:** **Date Reviewed:**

**DISTRIBUTION:** Original - Psychological Services Unit Record; Copy – Medical Chart Miscellaneous Section; Copy - Social Service File - CONFIDENTIAL PACKET

STATE OF WISCONSIN,

*ALFORD* **GUILTY PLEA QUESTIONNAIRE**
and **WAIVER OF RIGHTS FORM**

Plaintiff,

FILED

MAR 11 1997

42 | 42

GARY J. ~~~~
CLERK OF COURTS

Case No. *F 954600*

-vs-

*RICO SANDERS*

Defendant,

I, _____*RICO SANDERS*_____, the above-named defendant, plead guilty to the

offense(s) of: *FIRST DEGREE SEXUAL ASSAULT - 4 COUNTS - # 1, 6, 8 & 9.*
*ARMED ROBBERY - ONE COUNT # 3*
*SECOND DEGREE SEXUAL ASSAULT ONE COUNT # 4*

1. I am __*17*__ years old and have completed __*8*__ grades in school; have obtained a (GED, high school diploma); and

   have __*0*__ years additional education at _____

2. I (have) ~~(have never)~~ been committed to a mental institution as mentally ill or incompetent, and I (have) ~~(have not)~~

   received psychological or psychiatric care.

3. I am now in possession of all my faculties; I am not currently using drugs or alcohol to such an extent that it would

   interfere with my understanding of the court proceedings.

4. I have read (or have had read to me) the criminal complaint and the information in this case, and I understand

   what I am charged with, what the penalties are and why I have been charged. I also understand the elements of

   the offense and their relationship to the facts in this case and how the evidence establishes my guilt.

5. I understand that by pleading guilty I will be giving up any possible defenses, including but not limited to self

   defense, intoxication, insanity, alibi.

6. I am further giving up my right to challenge matters commonly set forth in motions, such as the arrest, suppression

   of physical evidence, suppression of identification, suppression of my statements and challenges to the sufficiency

   of the complaint and/or information.

7. I understand that by pleading guilty I will be giving up the following constitutional rights:

   (a) I will be giving up my right to remain silent and not to incriminate myself. I understand by pleading guilty I

   am incriminating myself;

   (b) I will be giving up my right to see and have my attorney cross-examine or ask questions of the State's witnesses;

   (c) I will be giving up my right to call witnesses and the right to make them come to court and testify for me;

   (d) I will be giving up my right to both a jury and court trial in this case. In a court trial the judge would decide my

   guilt or innocence; in a jury trial my case would be decided by 12 people. I understand that all 12 people would

   have to agree in order to reach a verdict;

   (e) I will be giving up my right to make the State prove me guilty by evidence beyond a reasonable doubt to each

   element of the crime charged.

8. I wish to give up these constitutional rights and plead guilty. ✱

    (a) No one has made any threats against me to get me to give up these rights and plead guilty. ✱

    (b) No one has made any promises to me, outside of any plea agreement in this case, to get me to give up the rights and plead guilty. ✱

9. NO CONTEST PLEA: If the Court allows a plea of no contest, I understand that I will be giving up all of the san rights, defenses and motions that I would give up with a plea of guilty.

10. I understand that the Judge is not bound to follow any plea agreement or any recommendation made by the Distri Attorney, my attorney, or any presentence report. I understand that the Judge is free to sentence me to th following minimum (if applicable) and maximum possible penalties in this case. (If there is a presumptiv minimum sentence the Court can impose a lesser sentence if the Court states on the record the appropria reasons.)

Offense: FIRST DEGREE SEXUAL ASSAULT (4 COUNTS)     *40 YEARS*     Years: 160     Fine: $

Offense: ARMED ROBBERY (1 COUNT)     *40 YEARS*     Years: 40     Fine: $

Offense: SECOND DEGREE SEXUAL ASSAULT (1 COUNT)     *10 YEARS*     Years: 10     Fine: $ 10,000

*210*

Additionally I understand that I may be required to make full or partial restitution to any victim(s) of the crime(s including any "read-ins." ARMED BURGLARY - CTS 2 & 10   AGGRAVATED BATTERY   CTS 6 & 7 } DISMISSED + READ IN

11. PROBATION/PAROLE: I understand that if this crime was committed while I was on probation/parole, my guilt plea could be grounds for revocation of my probation/parole.

12. I understand that if I am convicted of a felony, it will be illegal for me to possess a firearm.

13. DEPORTATION: If I am not a citizen of the United States of America, I know that upon a plea of guilty or n contest and a finding of guilty by the Court for the offense with which I am charged in the criminal complaint o information, I may be deported, excluded from admission to this country or denied naturalization under federal law

14. I have discussed this case and all the matters mentioned in this questionnaire with my attorney, _____ MARTIN LOVE , and I am satisfied with the representation I have received from my attorney I have no questions about what has happened in this case so far.

15. I have read (or have had read to me) this entire questionnaire, and I understand its contents.

Dated at Milwaukee, Wisconsin, this ___11th___ day of ___MARCH___, 1998 7.

         XReco SANDERS     (Defendant

## ATTORNEY'S ACKNOWLEDGEMENT

I, ___MARTIN LOVE___, state that I am the attorney for the above-named defendant, that (the defendant personally read the questionnaire in my presence) (I read the questionnaire to the defendant); that I discussed and explained the contents of the questionnaire to the defendant; that the defendant acknowledged his understanding of each item in this questionnaire; and that I personally observed the defendant sign and date this questionnaire

Attorney _____

Date _____

| State of Wisconsin, Plaintiff<br>-vs-<br><u>Rico Sanders</u>, Defendant<br><u>11-10-78 or 11-10-79</u><br>Defendant's Date of Birth | TYPE OF CONVICTION (Select One)<br>**x** Sentence to Wisconsin State Prisons<br>   Sentence Withheld, Probation Ordered<br>   Sentence Imposed & Stayed, Probation Ordered<br>**COURT CASE NUMBER 95CF004600** |
|---|---|

The defendant entered plea(s) of: [ ] Guilty    [ ] Not Guilty    [x] Alford Plea

The [x] Court [ ] Jury   found the defendant guilty of the following crime(s):

| CRIME(S) | WIS STATUTE(S) VIOLATED | FELONY OR MISDEMEANOR (F OR M) | CLASS (A-E) | DATE(S) CRIME COMMITTED |
|---|---|---|---|---|

**PLEASE SEE REVERSE FOR OFFENSES**

IT IS ADJUDGED that the defendant is convicted on <u>March 11, 1997</u> as found guilty, and:

| | |
|---|---|
| x | on <u>April 25, 1997</u> is sentenced to prison for <u>PLEASE SEE REVERSE FOR SENTENCING INFORMATION.</u> |
| | on is sentenced to intensive sanctions for |
| | on is sentenced to county jail/HOC for |
| | on is placed on probation for |

<u>CONDITIONS OF SENTENCE/PROBATION</u>

| Obligations (Total amounts only) | Jail: To be incarcerated in the county jail/HOC for |
|---|---|
| **Fine**<br>(includes jail assessments; drug assessments; penalty assessments)<br><br>**Court Costs**      No court costs ordered<br>(includes service fees; witness fees; restitution surcharge; domestic abuse fees; subpoena fees; automation fees)<br><br>**Attorney fees**<br>**Restitution**<br>**Other**          DNA SURCHARGE $250.00<br>**Mandatory victim/witness surcharge(s)**<br>     felony 6 counts      $420.00<br>     misdemeanor counts | **Confinement Order For Intensive Sanctions sentence only - length of term:**<br>**Miscellaneous** |

IT IS ADJUDGED that days sentence credit are due pursuant to s.973.155 Wis. Stats. and shall be credited if on probation and it is revoked.

IT IS ORDERED that the Sheriff shall deliver the defendant into the custody of the Department located in the City of Waupun, County of Dodge.

| NAME OF JUDGE<br>David Hansher | BY THE COURT: |
|---|---|
| DISTRICT ATTORNEY<br>Miriam Falk | *Sandy Richter* |
| DEFENSE ATTORNEY<br>Martin Love | Circuit Court Judge/Clerk/Deputy Clerk<br><u>April 25, 1997</u>      afb<br>Date Signed |

-127-

DEPARTMENT OF CORRECTIONS                Wisconsin Statutes, Sections 939.50, 939.51, 972.13 & Chapter 973

Circuit Court Case 96CF004600
State of Wisconsin vs.
Rico Sanders

Count 1: First Degree Sexual Assault
    May 1, 1995
    Wisconsin Statute: 940.225(1)(b) Class B

Sentence: Thirty (30) years 595 days credit

Counts 2, 5, 7 & 10: DISMISSED

Count 3: Armed Robbery - Use of Force
    May 1, 1995
    Wisconsin Statute: 943.32(2) Class B

Sentence: Ten (10) years consecutive to sentence imposed in count 1.

Count 4: Second Degree Sexual Assault
    August 2, 1995
    Wisconsin Statute: 940.225(2)(a) Class C

Sentence: Ten (10) years consecutive to sentence imposed in count 3.

Count 6: First Degree Sexual Assault
    August 9, 1995
    Wisconsin Statute: 940.225(1)(b) Class B

Sentence: Thirty (30) years consecutive to the sentence imposed in count 4.

Count 8: First Degree Sexual Assault
    September 5, 1995
    Wisconsin Statute: 940.225(1)(b) Class B

Sentence: Thirty (30) years consecutive to the sentence imposed in count 6.

Count 9: First Degree Sexual Assault
    September 5, 1995
    Wisconsin Statute: 940.225(1)(b) Class B

Sentence: Thirty (30) years consecutive to the sentence imposed in count 8.

```
 1    STATE OF WISCONSIN         CIRCUIT COURT        MILWAUKEE COUNTY
                                 BRANCH 42
 2    ------------------------------------------------------------------

 3    STATE OF WISCONSIN,

 4                 Plaintiff,

 5         v.                                   Case No. F-954600

 6    RICO SANDERS,

 7                 Defendant.

 8    ------------------------------------------------------------------

 9                      GUILTY PLEA

10    ------------------------------------------------------------------
      March 11, 1997                          Hon. David A. Hansher
11                                            Circuit Judge, Presiding

12

13              Count 1  - FIRST DEGREE SEXUAL ASSAULT
                Count 2  - ARMED BURGLARY (Dismissed)
14              Count 3  - ARMED ROBBERY
                Count 4  - SECOND DEGREE SEXUAL ASSAULT
15              Count 5  - AGGRAVATED BATTERY (Dismissed)
                Count 6  - FIRST DEGREE SEXUAL ASSAULT
16              Count 7  - AGGRAVATED BATTERY (Dismissed)
                Count 8  - FIRST DEGREE SEXUAL ASSAULT
17              Count 9  - FIRST DEGREE SEXUAL ASSAULT
                Count 10 - ARMED BURGLARY (Dismissed)
18

19    APPEARANCES:

20              MIRIAM FALK, Assistant District Attorney,
           appeared on behalf of the State.
21
                MARTIN LOVE, Attorney at Law, appeared on
22         behalf of the Defendant.

23              DEFENDANT present in Court.

24                         *     *     *

25    Beth J. Fringer - Court Reporter
```

FILED
CRIMINAL DIVISION

JUN 2 6 1997

GARY J. BARCZAK
CLERK OF CIRCUIT COURT

TRANSCRIPT OF PROCEEDINGS

2          CLERK:  State of Wisconsin versus Rico

3     Sanders.  Case Number F-945600.

4          MS. FALK:  The state is appearing by Assistant

5     D.A. Miriam Falk.

6          MR. LOVE:  Martin Love for and with Mr. Rico

7     Sanders, Your Honor.  Your Honor, this case was put over

8     to today although scheduled for jury or other

9     disposition to accommodate Mr. Sanders' family to have

10    contact with him regarding the decision that he is

11    making or at least is in the process of making in this

12    case.  The court had passed the case until today to

13    accommodate that contact and was to take place at the

14    County Jail.

15          I spoke to the family, preparations were made

16    that at 1:30 they would go to visit Mr. Sanders at the

17    County Jail.  I spoke to Mr. Sanders with a personal

18    visit as an attorney yesterday at quarter to 5:00.  He

19    told me that by that time the family had not been in

20    contact with him.  He was instructed to call me at my

21    home, given the number, told to call collect once he had

22    spoken to his family.  That never happened.  This

23    morning I asked him if he had that contact.  He said no.

24          Family is here, they're in from Chicago, the

25    second day.  They have told me that they tried to see

1    Rico yesterday and they were told that there was lock

2    down and he could not be seen.  That was, I assume, at

3    approximately or early afternoon hours of -- of

4    yesterday.  So the very thing that -- and I think it's

5    critical in this case that that contact be accommodated

6    because of the very substantial penalties that Mr.

7    Sanders is facing, his contemplation of a plea other

8    than not guilty, his inexperience and his tender years

9    as a defendant, plus the complications that were

10   presented by his episodes of -- of questionable

11   emotional or mental behavior that are established in

12   this record.  So I don't know what can be done to

13   accommodate that contact, but I think an effort again

14   should be made given all these circumstances and the

15   case passed until sometime later today.

16          THE COURT:  John, how can that be

17   accomplished?

18          DEPUTY KRUEGER:  I suppose it's not the

19   correct day for them to do it in the jail this morning,

20   right?

21          DEPUTY APPLEGATE:  Right.

22          DEPUTY KRUEGER:  We could probably do

23   something here, but it's going to have to be done after

24   we're done with this next case, the other case we got

25   out here, and if I could have a couple of officers stand

```
1       by, but the family will have no physical contact
2       whatsoever and officers will be here in the room.  I'm
3       sorry, that's the best we can do.
4                 MR. LOVE:  Well I don't think that's --
5       whatever you say.  I mean I --
6                 THE COURT:  Okay, we'll try to do it that way.
7       Basically bringing them up here one at a time to talk to
8       him or --
9                 MR. LOVE:  Well, I think what -- what I
10      would -- I'd like to see if it's possible, if you clear
11      out the rest of the -- there's one secure room back in
12      the -- in the lock-up area back there.  And if one
13      person, I think principally they would like his older
14      brother to speak to him.
15                DEPUTY KRUEGER:  It's not going to happen on a
16      one-to-one basis.
17                MR. LOVE:  Between a window and a--
18                DEPUTY KRUEGER:  No.
19                MR. LOVE:  --locked room?
20                DEPUTY KRUEGER:  It's where we're going to be
21      where we physically watch what's going on.
22                MR. LOVE:  Judge, the problem I have with that
23      is the nature of the communication.  I think that they
24      should be given -- the critical aspect here, the nature
25      of the communication should be somewhat confidential or
```

```
 1        at least private.

 2                    THE COURT:  Well, is there any way to do it

 3        over --

 4                    MR. LOVE:  They can certainly search -- search

 5        the brother and -- and make sure that he's secure.  But

 6        of course that's their province.

 7                    THE COURT:  I don't run the security in this

 8        courtroom, the bailiffs do.  Unless it's done over the

 9        lunch hour, but I don't even know if it can be done over

10        the lunch hour.  Aren't they eating?

11                    MR. LOVE:  Don't they eat from 11:00 to 12:30

12        or something?

13                    DEPUTY APPLEGATE:  Twelve o'clock.  They do,

14        but situation is such they only allow certain letters of

15        the alphabet on certain odd and even days, and today

16        wouldn't be the day.

17                    MR. LOVE:  Yeah, but can't somebody prevail

18        upon the person who runs the jail, the lieutenant or

19        something to make an exception or accommodate something?

20        This is an unusual circumstance.

21                    DEPUTY KRUEGER:  I can probably inquire and --

22                    THE COURT:  Okay, why don't you inquire.

23        State's position?

24                    MS. FALK:  Well, Your Honor, I just -- I would

25        want this accomplished this morning.  I have time
```

```
1    constraints this week.  If we start this trial, we will
2    finish it this week.  I am not available next week.  I
3    mean I can go on Saturday, too, but if we delay for a
4    lengthy period of time and then the defendant decides
5    that he wants to proceed with a trial, this is a case
6    where I have four victims of sexual assaults, two
7    burglary victims, and the bulk of the Milwaukee Police
8    Department, so -- and I've tried to scale down my
9    presentation of this case, but it will take several days
10   for me to get it in.  And I just need the court to be
11   aware of that so that the court understands.  I -- I
12   would prefer that if it's going to happen, that it
13   happen this morning so if it's -- if he's -- if we're
14   starting a trial, we're going to start it in a timely
15   way today.
16              THE COURT:  I don't know how to accomplish it
17   this morning.  Except over the lunch hour, unless it's
18   done this morning.  Is there any way to accomplish it
19   this morning -- John, in the jail?
20              DEPUTY KRUEGER:  We can get him back over
21   there, I will speak with the jail lieutenant and see if
22   we can facilitate a visit this morning.
23              THE COURT:  I'm continuing a homicide trial to
24   the court this morning so I'm not going to be able to
25   start anything this morning.  There's just no way.  I'm
```

```
 1        letting the state know.  The earliest would be this

 2        afternoon, and I would probably have to spin it off,

 3        because of personal reasons I would have to spin it off,

 4        I couldn't try this case.

 5                 MS. FALK:  Well, maybe we should impose on

 6        your clerk to start looking for a spin in the event this

 7        is ready for trial.  Can you start doing that?

 8                 THE COURT:  Okay, call Bruce Harvey, sure.

 9        Okay, we'll put it over to 1:30.

10                 (Proceedings suspended till 1:30 p.m.)

11                 CLERK:  State of Wisconsin versus Rico

12        Sanders.  Case Number F-945600.  Appearances.

13                 MS. FALK:  The state is appearing by Assistant

14        D.A. Miriam Falk.

15                 MR. LOVE:  Martin Love for and with Mr. Rico

16        Sanders.

17                 MS. FALK:  Your Honor, there have been

18        successful negotiations in this case.  I would like to

19        state those for the record.  Mr. Sanders is going to

20        enter Alford pleas to the following counts:  Count 1,

21        first degree sexual assault.  Count 3, armed robbery,

22        use of force.  Count 4, second degree sexual assault.

23        Count 6, first degree sexual assault.  Count 8, first

24        degree sexual assault.  And count 9, which is first

25        degree sexual assault.
```

```
1              The state is going to move to dismiss and read

2         in count 2, which is an armed burglary.  Count 5, which

3         is an aggravated burglary.  Count 7, which is an

4         aggravated burglary.  And count 10, which is an armed

5         burglary.  The total of the counts that are being

6         dismissed is a hundred years.  And Mr. -- the total of

7         the counts to which Mr. Sanders will be entering his

8         Alford pleas is 210 years.

9              I tendered an offer letter dated September

10        30th of 1995.  This is -- the terms are set forth in

11        that offer.  Mr. Sanders has made a choice, there were

12        two options for him to choose from, and he has chosen

13        the second.  Therefore, at sentencing the state is going

14        to recommend that he be incarcerated for a period of 50

15        to 70 years on the sexual assault charges, and that he

16        receive a stayed sentence and consecutive lengthy

17        probation on the armed robbery charge.

18              THE COURT:  Mr. Love, is that your

19        understanding?

20              MR. LOVE:  It is, Your Honor.

21              THE COURT:  And Mr. Sanders, is that your

22        understanding?

23              DEFENDANT:  Yes.

24              THE COURT:  And I think also it has been

25        stated on the record the defendant is going to enter an
```

1      Alford plea?

2                MS. FALK:  Yes.

3                THE COURT:  And the reason for it?

4                MR. LOVE:  Your Honor, the defendant -- I'm

5      sorry, the defendant feels that the risk and exposure is

6      simply so great that he can't afford to -- to proceed

7      with trial.  The court will note that there are first --

8      the first four counts that he's pleading to, at least in

9      the questionnaire, are sexual assault counts.  I am the

10     third lawyer in this case, so it's my understanding that

11     there is at least a potential defense to these

12     particular counts predicated not only on Mr. Sanders'

13     representation that there was another individual who was

14     involved in these break-ins, but that that individual

15     was the person who had engaged in the sexual assaults,

16     not Mr. Sanders.

17                In addition to that representation, there is

18     arguably some physical evidence that would support Mr.

19     Sanders' contention that he was not the person who

20     assaulted some of these women.  The state has a counter

21     for that, but I -- I -- my position is that it at least

22     is a jury issue.  Mr. Sanders recognizes that,

23     recognizes the counter that the state has to that

24     argument, but in the true character of -- of the Alford

25     plea, is abandoning that defense in view of reducing his

```
1         exposure by a hundred years.

2                    THE COURT:  Is that correct, Mr. Sanders, what

3         your attorney said.  Is that right?

4                    DEFENDANT:  Yeah.

5                    THE COURT:  Okay.  So you agree that -- you

6         want to maintain you're innocent, you believe you have a

7         defense, but you want to take advantage of the state's

8         offer in this case.  Correct?

9                    DEFENDANT:  Right.

10                   THE COURT:  Okay.  Move the microphone closer

11        to him, Mr. Love.  Okay.  To the first count, count 1,

12        first degree sexual assault, which happened on May 1st,

13        1995, at 2325 North 50th Street, it's alleged you had

14        sexual intercourse with Yolanda Washington without her

15        consent and by use of an article used or fashioned in a

16        manner to lead the victim to reasonably believe it's a

17        dangerous weapon, is your plea, guilty, not guilty, or

18        guilty under the Alford decision?

19                   DEFENDANT:  Guilty.

20                   MR. LOVE:  Guilty under Alford decision.

21                   DEFENDANT:  Oh, guilty.

22                   THE COURT:  Under the Alford --

23                   DEFENDANT:  Right.

24                   THE COURT:  You have to say guilty --

25                   DEFENDANT:  Guilty under the Alford.
```

```
 1          THE COURT:  Okay.  And you and your attorney
 2     discussed this Alford--
 3          DEFENDANT:  Right.
 4          THE COURT:  --plea.  As to the next count,
 5     would be count 3, armed robbery, use of force, it
 6     alleges that on May 1st, 1995, at 2325 North 50th
 7     Street, with intent to steal and by use or threat of use
 8     of an article used or fashioned in a manner to lead
 9     Yolanda Washington to reasonably believe it is a
10     dangerous weapon, took property from her person, the
11     owner, by threatening the imminent use of force against
12     her with intent thereby to compel her to acquiesce--that
13     means agree--in the taking or carrying away of said
14     property, is your plea guilty, not guilty, or guilty
15     under the Alford decision?
16          DEFENDANT:  Guilty under the Alford.
17          THE COURT:  Okay.  And as to count 4, second
18     degree sexual assault, which alleges that on August 2nd,
19     1995, at 2229 North 47th Street, you did have sexual
20     intercourse with Tracy Denise Robinson without her
21     consent by use or threat of violence, what is your plea,
22     guilty, not guilty, or guilty under the Alford decision?
23          DEFENDANT:  Guilty under the Alford.
24          THE COURT:  Okay.  Count 6 alleges that on
25     August 9th at 2319 North 44th Street, you did have
```

```
 1        sexual intercourse with Yolanda Redmond (sic) without

 2        her consent and by use of a dangerous weapon, contrary

 3        to Wisconsin Statutes Section 940.225(1)(b).  Is your

 4        plea guilty, not guilty, or guilty under the Alford

 5        decision?

 6                      DEFENDANT:  Guilty by -- under Alford.

 7                      THE COURT:  And as to count 8, it alleges that

 8        on September 5th, 1995, at 2559 North 49th Street, city

 9        of Milwaukee, did have sexual intercourse, penis to

10        mouth, with Poinciana, P-o-i-n-c-i-a-n-a, Sprewell,

11        S-p-r-e-w-e-l-l, without her consent and by use of a

12        dangerous weapon.  Is your plea guilty, not guilty, or

13        guilty under the Alford decision?

14                      DEFENDANT:  Guilty under the Alford.

15                      THE COURT:  Count 9 alleges that on September

16        5th, 1995, at 2559 North 49th Street, city of Milwaukee,

17        again you had sexual intercourse, penis to vagina with

18        Poincin --

19                      MS. FALK:  Poinciana.

20                      THE COURT:  Poinciana Sprewell, is your plea

21        guilty, not guilty, or guilty under the Alford decision?

22                      DEFENDANT:  Guilty under Alford decision.

23                      THE COURT:  And did you sign this, I'll call

24        it Alford plea questionnaire and waiver of rights form

25        after going through this with your attorney.  Did you
```

```
1        sign this?

2                    DEFENDANT:  Yes.

3                    THE COURT:  And you're 17 years of age.  Is

4        that correct?

5                    DEFENDANT:  Yes.

6                    THE COURT:  You completed the eighth grade?

7                    DEFENDANT:  Yes.

8                    THE COURT:  And you have been committed to

9        mental institution, you have received psychological or

10       psychiatric care.  Correct?

11                   DEFENDANT:  Yes.

12                   THE COURT:  And the court is well aware of the

13       history of this case and the treatment, I remember and

14       know the doctors' reports, so I know his background.

15       Counsel, there's no question though, today, he's aware

16       of what's going on today and he's mentally competent to

17       enter this plea?

18                   MR. LOVE:  I have no such question.

19                   THE COURT:  Okay.  And was this criminal

20       complaint read to you or did you read it yourself?  The

21       one charging you with these sexual offenses?

22                   DEFENDANT:  It was read to me.

23                   THE COURT:  Okay.  So do you understand, and I

24       just discussed with you what you're charged with and I

25       read it to you, what the penalties are, your attorney
```

```
1     told you that, we'll go through that, why you've been
2     charged, and the elements of each of these offenses.  Is
3     that correct?
4                    DEFENDANT:  Right.
5                    THE COURT:  And counsel, you discussed with
6     him what the elements would be, what the state would
7     have to prove in each count in order to convict him?
8                    MR. LOVE:  I did, Your Honor.
9                    THE COURT:  Okay.  Do you understand by
10    pleading Alford or guilty under the Alford decision
11    you're giving up all possible defenses and also the
12    right of your attorney to file motions on your behalf,
13    motions to suppress any statements you made, your
14    identification, among various other motions.  Do you
15    understand that?
16                   DEFENDANT:  Right.
17                   THE COURT:  And also by pleading guilty --
18    guilty under the Alford decision you're giving up the
19    following constitutional rights.  Your right to remain
20    silent, your right to have your attorney ask questions
21    of the state's witnesses, your right to have your own
22    witnesses come to court to testify for you, your right
23    to make the state prove the case against you beyond a
24    reasonable doubt as to each element of this crime, and
25    your right to a trial to the court or a jury trial.  And
```

```
1        a jury trial is what was scheduled today, and that would

2        have been 12 people sitting in the jury box to my right,

3        and all 12 would have to agree you're guilty in order to

4        find you guilty.  Do you understand that?

5               DEFENDANT:  Yes.

6               THE COURT:  Has anyone made any threats

7        against you or promises besides what the district

8        attorney just said on the record to make you give up

9        your constitutional rights and enter this Alford plea?

10              DEFENDANT:  No.

11              THE COURT:  And do you understand I do not

12       have to follow the plea agreement or recommendation by

13       the district attorney's office or any presentence

14       report, and I'm free to sentence you to the maximum

15       penalties, which in this case on the first degree sexual

16       assault is 40 years for each count, and that would be,

17       there's four counts here so you're facing 160 years upon

18       the sexual assaults.  On the armed robbery, that's an

19       additional 40 years, and on the second degree sexual

20       assault where there's one count, that's 10 years.  The

21       total then comes up to 210 years if I ran it

22       consecutive.  Do you understand that?

23              DEFENDANT:  Right.

24              THE COURT:  And there's also, it says a fine

25       of $10,000 on, what, the second degree sexual assault?
```

| | |
|---|---|
| 1 | MS. FALK:  Yes. |
| 2 | THE COURT:  Okay.  Do you understand that? |
| 3 | DEFENDANT:  Right. |
| 4 | THE COURT:  And also you may be required to |
| 5 | make full or partial restitution including any read-ins, |
| 6 | and there will be two read-ins that are dismissed and |
| 7 | read in, the armed burglary and aggravated battery, |
| 8 | counts 2, 5, 7 and 10.  Do you understand that? |
| 9 | DEFENDANT:  Yes. |
| 10 | THE COURT:  Are you on probation or parole |
| 11 | now? |
| 12 | DEFENDANT:  No. |
| 13 | THE COURT:  And do you have a Children's Court |
| 14 | record? |
| 15 | DEFENDANT:  No. |
| 16 | THE COURT:  Okay.  You discussed this decision |
| 17 | to plead guilty with Mr. Love.  Is that correct? |
| 18 | DEFENDANT:  Yes, sir. |
| 19 | THE COURT:  Are you satisfied with the way |
| 20 | he's represented you? |
| 21 | DEFENDANT:  Yeah. |
| 22 | THE COURT:  Do you have any questions you want |
| 23 | to ask me about your plea today, just about the plea, |
| 24 | not the sentence. |
| 25 | DEFENDANT:  No. |

```
1          THE COURT:  Okay.  Counsel, do you believe

2     this plea to be freely, voluntarily, and intelligently

3     made?

4          MR. LOVE:  Yes.

5          THE COURT:  And are you willing to stipulate

6     to this criminal complaint to serve as a basis for the

7     plea?

8          MR. LOVE:  Yes, Your Honor.

9          THE COURT:  Was there a preliminary hearing?

10         MS. FALK:  No, there was not.

11         THE COURT:  Okay.

12         MS. FALK:  Your Honor, I would want to

13    supplement the record only slightly.  First of all, we

14    have -- there's a discrepancy in the terms that defense

15    counsel and I used.  The way that the complaint has

16    count 5 and count 10 enumerated is called aggravated

17    burglary, and it is a burglary that is aggravated by the

18    committing of a battery.  It is my hearing that on that

19    sheet he has it listed as an aggravated battery.  It

20    doesn't make any difference in terms of the title, but

21    just so that Mr. Sanders understands that count 5 and

22    count 10 are, I'm sorry, count 5 and count 7 are, in the

23    criminal complaint, are entitled "aggravated burglary"

24    and that that relates to his entering a dwelling in each

25    of those instances and then committing a battery upon a
```

```
1        person who was lawfully therein.
2                   THE COURT:  Is that your understanding,
3        counsel?
4                   MR. LOVE:  Your Honor, I have, as a matter of
5        fact, I have a copy that I drafted before the one that
6        was submitted to the court, and I have referred to it as
7        aggravated burglary.  It's a misnomer if I have placed
8        the word "battery" instead, I'm sorry.  But yes, we
9        understand the circumstances and the elements.
10                  THE COURT:  Okay, and you're stipulating to
11       the --
12                  MR. LOVE:  And the amendment to that effect.
13                  THE COURT:  And you're willing to stipulate to
14       the criminal complaint to serve as basis for any
15       dismissed read-ins?
16                  MR. LOVE:  Sure.
17                  THE COURT:  State also?
18                  MS. FALK:  Yeah, in light of -- in addition,
19       Your Honor, I would just want to indicate on the record
20       that the state made efforts to have all the witnesses,
21       and we do have all the necessary witnesses, each of the
22       four named victims would come to testify that on the
23       dates that are indicated in the criminal complaint
24       beginning with May 1st and ending with the last
25       incidents that occurred on September 5th, Mr. Sanders
```

```
 1        without their consent entered into their home.  In each

 2        of these circumstances Mr. Sanders entered by prying

 3        open a window of that dwelling.  Once inside the

 4        dwelling, it was almost like a script.  First he would

 5        demand some kind of money as he was placing a pillow on

 6        the face of each of these four named victims.  Then he

 7        proceeded to have penis to vagina intercourse with the

 8        first three of those victims.  With the fourth victim,

 9        Poinciana, she indicated to him that she was -- had just

10        had a baby and was not supposed to have intercourse, so

11        he first did penis to mouth on her, and then he forced

12        her to do penis to vagina because she was not doing it

13        the way that he wanted her to.

14              He then proceeded to ransack the rooms in

15        which the various women were in, taking or attempting to

16        take pieces of property from them.  That included, in

17        the -- count 3, from the person of Yolanda Washington, a

18        variety of rings which were ultimately recovered.  Mr.

19        Sanders had sold those rings to a woman that he knows as

20        Ann, her name is Henrietta Ann Hobbs, also known as

21        Henrietta Chapman.  She sold those to Doc's Pawn Shop,

22        and the rings were recovered from Doc's Pawn Shop and

23        were described before they were seen by Ms. Washington

24        in great detail, and then she identified the two rings

25        that had been stolen from her as being the rings that
```

Case 2:11-cv-00868-LA   Filed 02/02/17   Page 70 of 78   Document 20-3

-147-

```
1    had been recovered from Doc's Pawn Shop.

2              We did a serological testing on all four of

3    the women.  As to the first two women, they had had

4    sexual intercourse with their partners within hours of

5    these sexual assaults, and so the Crime Lab was not able

6    to produce any sort of conclusive results.  However, as

7    to the 14 year old victim, Yvonne, and the last victim,

8    Poinciana, the Crime Lab reports indicate that among

9    other things, they learned that the enzyme peptidase A

10   that was found in the semen in both of those women was a

11   2-1 type.  That is foreign to both Yvonne Redmond and

12   also to Poinciana Sprewell and is consistent with that

13   of the defendant.

14             Finally, before Mr. Sanders committed his last

15   series of sexual assaults on Ms. Sprewell, he committed

16   two burglaries that were about a block and a half away.

17   All of these incidents occurred in a five block radius

18   of each other.  Throughout this entire period of time.

19             During the course of the two burglaries, at

20   the first one Mr. Sanders left behind one of his tools

21   which was a Stanley brand screwdriver.  He also left

22   behind a fingerprint on the window that he was

23   attempting to enter.  He then proceeded directly next

24   door where he left a variety of fingerprints on both the

25   inside and the outside of the storm window that he had
```

```
 1    removed from that residence, and those fingerprints were
 2    processed by the police department and were found to
 3    match known fingerprints that had been taken from Mr.
 4    Sanders.
 5          When Mr. Sanders was leaving the Sprewell
 6    residence on September 5th, Mr. Sanders again left
 7    behind his fingerprints in a number of places.  Those
 8    were matched up not only with the burglary fingerprints,
 9    but also with the known fingerprints of Mr. Sanders, and
10    he was identified as the perpetrator of all three of
11    those incidents.
12          After that, on the same day that he was
13    arrested, which was September 7th, Mr. Sanders' home was
14    searched.  He was living with a cousin named LaTarsha
15    Bush (phonetic) at the time.  She permitted the search
16    of her home, and in fact she gave to the officers the
17    matching Stanley screwdriver to the one that had been
18    recovered from the residence of the burglary that Mr.
19    Sanders had left behind.  She also told to the police
20    officers that there was a matching one to the one she
21    was handing them on the 7th, but that it had been
22    missing for about a week at that point.
23          Finally Mr. Sanders spoke with Detective
24    Daniel Ruzinski.  Detective Ruzinski spoke to him at
25    length about each of the incidents that are involved in
```

1   this criminal complaint and also about the two

2   burglaries that he committed before he committed the

3   last acts on September 5th, and Mr. -- I will character-

4   ize it as a confession.

5           Mr. Sanders agreed that as to each of these

6   incidents he gained entrance by prying open various

7   windows.  He explained in each of the circumstances how

8   it is and what he used in order to get into the

9   buildings.  For example, when he was entering the

10  building of Ms. Poinciana Sprewell, he used a milk crate

11  that was orange in color to help himself climb up

12  through the window.  He indicated that the reason he was

13  going into these various residences was because it was

14  around the 1st of the month and he figured that people

15  would have gotten their checks and would have some

16  money, and he needed that money to support his drug

17  habit.

18          Once inside, he would see the women laying on

19  the bed, he gives various descriptions of where they are

20  and he knew, for example, that when he entered the

21  Redmond home, he crashed a fan down on to her, a window

22  fan.

23          In the case of Miss Sprewell as another

24  example, he observed her laying on her bed with her two

25  children.  In each of the instances when he saw the

1    women, what he described is that, quote, "his stuff got

2    hard," unquote, and he decided to have sexual inter-

3    course with them.  He indicates that he understood that

4    he -- that they did not want to do this, but he forced

5    them to have sex.  He indicates that he used a

6    screwdriver when he was gaining access into each of

7    those places and that -- these places and he could

8    understand how he could believe the women had a gun.

9    (sic)

10         The women would indicate that throughout the

11    course of the time he would make various threats to them

12    like the fact that he was going to shoot them or blow

13    their heads off, which I think corresponds with his

14    personal belief that they might have believed that he

15    had a gun.

16         There are other things that the state would

17    introduce, but I think that is the bulk of the most

18    damaging testimony.

19         THE COURT:  Do you dispute anything, any of

20    those facts?

21         MR. LOVE:  Your Honor, we're not in position

22    to dispute.  We've stipulated to the complaint which I

23    think is sufficient.  At this point I think the rest of

24    the colloquy is -- is really something for sentencing.

25    I have to discuss these matters with my client.  But we,

```
 1          again, we had stipulated to the complaint.  The --
 2                    THE COURT:  Okay, is the state willing to
 3          stipulate to the complaint?
 4                    MS. FALK:  Oh, yes.
 5                    THE COURT:  Okay, then I'll find the basis for
 6          the plea.  I'll find substantial evidence of his guilt,
 7          find if the case would have gone to trial -- to trial
 8          it's most likely that the state would be able to prove
 9          the case beyond a reasonable doubt, based upon the
10          presentation of facts and the stipulation to the
11          criminal complaint, and I'm doing this because it's an
12          Alford plea and I should make those findings and I'll
13          find the plea to be freely, voluntarily, and intelli-
14          gently made.  I'll enter a judgment of conviction.  He's
15          remanded into custody.  We'll give you a date for
16          sentencing.  I'll order a presentence.  Counts 4, 5, 7
17          and 10 are dismissed.
18                    MS. FALK:  2, 5, 7 and 10.
19                    MR. LOVE:  2, 5, 7 and 10.
20                    THE COURT:  Sorry, 2, 5, 7 and 10.
21                    CLERK:  April 14 at 8:30?
22                    MS. FALK:  That's okay, although the 15th is
23          better.
24                    CLERK:  I'm sorry, what?
25                    MS. FALK:  15th is better.
```

```
 1                    CLERK:  15th is fine for the court.

 2                    MR. LOVE:  15th?  8:30?

 3                    CLERK:  April 15 at 8:30.

 4                    THE COURT:  How long is this sentencing going

 5          to be?  This is a Tuesday, if we have a jury Monday, I

 6          don't like Tuesday long sentences.  The victims may

 7          show?

 8                    MS. FALK:  I think some of them will, yes.

 9                    THE COURT:  Then let's pick another day.

10                    MS. FALK:  Friday?

11                    THE COURT:  If we have a jury Monday --

12                    MS. FALK:  Do you want to go Friday, the 18th?

13                    THE COURT:  What's the 18th?

14                    CLERK:  That's fine with the court's calendar.

15                    MR. LOVE:  What day, Friday?

16                    THE COURT:  Friday the 18th?

17                    MR. LOVE:  Okay.

18                    THE COURT:  Friday the 18th.

19                    MR. LOVE:  8:30.

20                    THE COURT:  Thank you.

21                    (Case adjourned to 4/18/97.)

22

23                    *       *       *       *       *

24

25
```

```
 1     STATE OF WISCONSIN )
                          ) ss
 2     MILWAUKEE COUNTY   )

 3

 4                I, Beth J. Fringer, Official Reporter, certify

 5     that I reported the foregoing proceedings and this

 6     transcript is true and correct in accordance with my

 7     original machine shorthand notes taken in said

 8     proceedings.

 9                Dated:  June 13, 1997.

10

11                         Beth J. Fringer

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

STATE OF WISCONSIN

COURT OF APPEALS

DISTRICT I

STATE OF WISCONSIN,

Plaintiff-Respondent,

v.                                    Case No. 2007AP1469-CR

RICO SANDERS,

Defendant-Appellant.

## Certification of Appendix

I hereby certify that filed with this brief, either as a separate document or as a part of this brief, is an appendix that complies with s.809.19(2)(a) and that contains: (1) a table of contents; (2) relevant trial court record entries; (3) the findings of opinion of the trial court; and (4) portions of the record essential to an understanding of the issue raised, including oral or written rulings or decisions showing the trial court's reasoning regarding those issues.

I further certify that if the record is required by law to be confidential, the portions of the record included in the appendix are reproduced using first names and last initials instead of full names of person, specifically including juveniles and parents of juveniles, with a notation that the portions of the record have been so reproduced to preserve confidentiality and with appropriate references to the record.

Signed: *Ellen Henak* ,

ELLEN HENAK
Assistant State Public Defender