STATE OF WISCONSIN : CIRCUIT COURT : MILWAUKEE COUNTY
Branch 42

------------------------------------------------------------

STATE OF WISCONSIN,

        Plaintiff,

   vs.                        Case No. F-954600

RICO SANDERS,

        Defendant.

FILED
CRIMINAL DIVISION

JUL 2 2 1997

GARY J. BARCZAK
CLERK OF CIRCUIT COURT

------------------------------------------------------------

                               HEARING

------------------------------------------------------------

December 19, 1996               Before the Honorable
                               DAVID A. HANSHER
                               Circuit Court Judge,
                               Presiding.

    CHARGE:  Burglary, Armed, Robbery, Armed, Second Degree
            Sexual Assault, Aggravated Burglary, First
            Degree Sexual Assault, Aggravated Burglary,
            First Degree Sexual Assault, First Degree Sexual
            Assault, Burglary, Armed, First Degree Sexual
            Assault.


                 A P P E A R A N C E S

     MIRIAM FALK, Assistant District Attorney,
appearing on behalf of the State.

     EDWARD LITTLE, Attorney at Law, appeared on
behalf of the Defendant.

     Defendant Present in Person.




             JOANNE ALLISON - OFFICIAL REPORTER

Exhibit Y

Case 2:11-cv-00868-LA   Filed 02/03/17   Page 1 of 29   Document 20-25

```
 1                                    1
 2      WITNESS:               I N D E X
                            DIRECT    CROSS    REDIRECT    RECROSS
 3      Dr. Molli Rolli          4      14
 4      EXHIBITS:                     OFFERED    RECEIVED
 5      No. 1                            5           5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2

P R O C E E D I N G S

1

2          THE CLERK:  State of Wisconsin vs. Rico

3     Sanders, Case No. F-954600.  Appearances, please?

4          MS. FALK:  The State is appearing by

5     Assistant D.A. Miriam Falk.

6          MR. LITTLE:  Edward Little appears on behalf

7     of Rico Sanders, who I assume will be coming quite

8     shortly.

9          THE COURT:  While we're waiting for the

10    defendant to be produced, we're here for a hearing on a

11    competency report, is that it?  A challenge to the

12    report?

13          MR. LITTLE:  Yes.

14          THE COURT:  Do I have a copy of the report?

15          MS. FALK:  You should.  It's dated October

16    14, 1996.

17          THE COURT:  So I should get Dr. --

18          THE CLERK:  Do you want me to get it here and

19    then transfer it up to your phone?

20          THE COURT:  Is that what what we did last

21    time or should I try it directly?

22          THE CLERK:  Let me get it on your phone.

23          THE COURT:  Okay.  For the record, we're

24    calling Dr. Molli Rolli.  M-o-l-l-i, R-o-l-l-i.

25          THE COURT:  Dr. Rolli?

3

```
 1              1                    THE WITNESS:  Yes.

                2                    THE COURT:  Okay.  Hold on one second.  Would

                3              you raise your right hand?

                4                    THE WITNESS:  Sure.

                5                    DR. MOLLI ROLLI, called as a witness on

                6              behalf of the State, having been first duly sworn, was

                7              examined and testified as follows:

                8                    THE COURT:  And you know why you're appearing

                9              via telephonic contact I guess is the term?

               10                    THE WITNESS:  Yes.  I believe so.

               11                    THE COURT:  This is regarding the case of

               12              State of Wisconsin vs. Rico Sanders.

               13                    THE WITNESS:  Right.

               14                    THE COURT:  Okay; and you submitted a letter

               15              indicating you thought he was competent on October 14,

               16              1996, correct?

               17                    THE WITNESS:  That's correct.

               18                    THE COURT:  Okay.  We have the defendant in

               19              court with his attorney.  We have a District Attorney

               20              here and we're ready to take some testimony for you --

               21              from you.

               22                    THE WITNESS:  Okay.  Sure.

               23                             DIRECT EXAMINATION

               24       BY MS. FALK:

               25       Q    Dr. Rolli, this is Miriam Falk, I'm the prosecutor on
```

4

```
1          this case.  I will be going first with my questions.

2    A     Okay.

3    Q     The letter that's dated October 14th of 1996, would you

4          agree that that is a document that consists totally of

5          four individual pages?

6    A     Just trying to locate the letter here in front of me.

7          Yes.

8    Q     And there is at the end of this letter your signature;

9          is that correct?

10   A     That's correct.

11   Q     Before you signed and sent this letter did you review

12         it for accuracy?

13   A     Yes, I did.

14   Q     And based upon that review is there anything in this

15         letter that you believe is incorrect or needs to be

16         changed?

17   A     There is one thing, in fact.  In the letter I believe I

18         state that Mr. -- I'm getting a lot of echo here.  In

19         the letter I believe I state that Mr. Sanders does not

20         have a conduct disorder, and on review of the case he

21         actually does meet the diagnostic criteria for conduct

22         disorder.  That, however, does not affect his

23         competency.

24   Q     So that would be underneath the diagnosis section on

25         Page 3.  The correct version should be that he does
```

5

1    meet the diagnostic criteria for conduct disorder?

2  A    Yeah.  What I said there was that Mr. Sanders has met

3       this diagnosis in the past but his behavior on the unit

4       has not been indicative of a conduct disorder.

5       Actually his behavior on the unit is immaterial and he

6       still does meet the criteria for a conduct disorder.

7  Q    And in terms of the ultimate conclusion, the fact that

8       he meets the criterion for conduct disorder is -- does

9       not affect your opinion relating to his competency; is

10      that correct?

11 A    That's correct.

12 Q    And this document other than that correction is

13      accurate?

14 A    Yes, it is.

15          MS. FALK:  Your Honor, for the purposes of

16      the record I will be referring to this, if we could

17      have this marked as Exhibit No. 1.

18          THE COURT:  Sure.  It will be marked and

19      accepted.

20          MS. FALK:  And I would move this into

21      evidence at this time.

22          THE COURT:  Any objection, counsel?

23          MR. LITTLE:  No.

24          (Exhibit No. 1 was received in evidence)

25          MS. FALK:

6

| | | | |
|---|---|---|---|
| 1 | 1 | Q | Dr. Rolli, before we begin talking specifically about |
| | 2 | | the contents of your report, I would like you to |
| | 3 | | explain for the Court your educational background. |
| | 4 | A | Okay.  Starting with what? |
| | 5 | Q | What degrees do you have and in what? |
| | 6 | A | I have a medical degree that I received from Mayo |
| | 7 | | Medical School.  I attended a psychiatric residency at |
| | 8 | | the University of Wisconsin, which I completed last |
| | 9 | | June, and I'm board eligible in psychiatry. |
| | 10 | | THE COURT:  Counsel, will you stipulate that |
| | 11 | | she's competent to testify here as an expert? |
| | 12 | | MR. LITTLE:  Yes, I will. |
| 2 | 13 | | THE COURT:  Okay.  The Court will accept her |
| | 14 | | as an expert.  Proceed. |
| | 15 | | MS. FALK: |
| | 16 | Q | Dr. Rolli, you are currently working at the Mendota |
| | 17 | | Mental Health Institute, is that correct? |
| | 18 | A | That's correct. |
| | 19 | Q | And during the course of your work there have you |
| | 20 | | become familiar with the legal standards related to |
| | 21 | | whether a person is competent or not competent to |
| | 22 | | proceed to trial? |
| | 23 | A | Yes. |
| | 24 | Q | Did you take those legal standards into consideration |
| | 25 | | when you were rendering your report of October 14th of |

7

| | | |
|---|---|---|
| 1 | | 1996? |
| 2 | A | I did. |
| 3 | Q | In addition to what is listed in your report of October |
| 4 | | 19th of 1996 have you had the opportunity since it is |
| 5 | | now December 19, 1996 to have additional observations |
| 6 | | and information relating to Mr. Sanders? |
| 7 | A | Some.  He was transferred off our unit a little while |
| 8 | | ago and I'm not sure the exact date.  Let me see here. |
| 9 | | In any case, I spoke to the people on the unit that he |
| 10 | | was on most recently.  He had been attending a |
| 11 | | competency group there and they felt that from his |
| 12 | | participation he demonstrated that he was, in fact, |
| 13 | | competent.  He did not demonstrate that to me when I |
| 14 | | had seen him but they felt that he had there. |
| 15 | Q | Aside from your conversation with the instructors of |
| 16 | | the competency group, was there any other information |
| 17 | | that you received that you believe is pertinent to your |
| 18 | | ultimate opinion in this case? |
| 19 | A | Nothing that's -- nothing that really adds to what I've |
| 20 | | already said. |
| 21 | Q | Based on the items that you have listed in your report |
| 22 | | of October 14th of 1996, the information you got |
| 23 | | directly from Mr. Sanders, your review of the various |
| 24 | | reports and also your observations and your |
| 25 | | conversations with staff members from Mendota Mental |

8

| 1 | | Health Institute, do you have an opinion about whether |
|---|---|---|
| 2 | | the defendant, Mr. Sanders, is competent to proceed to |
| 3 | | trial? |
| 4 | A | Yes, I do. |
| 5 | Q | What is your opinion? |
| 6 | A | My opinion is that he is competent to proceed to trial. |
| 7 | Q | Will you describe for us, please, why you believe that |
| 8 | | Mr. Sanders is competent to proceed to trial? |
| 9 | A | His -- it's a little bit complicated because he was not |
| 10 | | straightforward with me when I directly interviewed |
| 11 | | him. My belief that he's competent to stand trial is |
| 12 | | based on his behavior on our unit, which indicated that |
| 13 | | he was competent to -- that he was able to follow all |
| 14 | | the rules and procedures, that his level of interaction |
| 15 | | with his peers and with staff was indicative of |
| 16 | | somebody who understood what was going on around him |
| 17 | | and had a fairly good grasp of legal procedures. |
| 18 | Q | Can you give an example for us, please, of a manner in |
| 19 | | which his behavior on the unit was different than his |
| 20 | | appearance and his behavior with you, personally? |
| 21 | A | I gave several examples in the letter. I would refer |
| 22 | | to the example about playing basketball. Mr. Sanders |
| 23 | | regularly engaged in basketball games on the unit with |
| 24 | | the activity staff and seemed to understand the rules |
| 25 | | and was able to perform at that game without any |

9

| | | |
|---|---|---|
| 1 | | special instruction, but when I spoke to him about it, |
| 2 | | he was unable to repeat even the simplest kind of rules |
| 3 | | or procedures of the game. |
| 4 | Q | Dr. Rolli, another example that you gave related to a |
| 5 | | card game in which Mr. Sanders participated and during |
| 6 | | which he was the person who kept track of the score. |
| 7 | | Do you recall that particular example? |
| 8 | A | Yes, I do. |
| 9 | Q | Can you explain for us why that particular example was, |
| 10 | | again, another indication that Mr. Sanders is able to |
| 11 | | follow rules and to communicate and to understand |
| 12 | | matters including legal matters like those he would |
| 13 | | need to understand should he be competent to proceed to |
| 14 | | trial? |
| 15 | A | The card game in which he kept score was Spades, which |
| 16 | | is, you know, a modestly complicated scorekeeping |
| 17 | | procedure where you have to keep track of bidding and |
| 18 | | then add the score related to the number of tricks that |
| 19 | | people get. It requires a fairly good level of |
| 20 | | concentration and the ability to add and subtract and |
| 21 | | Mr. Sanders kept a very accurate tally of the score. |
| 22 | | It was legible and understandable to anybody who would |
| 23 | | look at it. |
| 24 | | When I spoke to him, he was unable to add or |
| 25 | | subtract even on the simplest level, so it was just |

10

```
 1    inconsistent.  I think he demonstrated in the card game
 2    that his ability to concentrate was good, that he could
 3    stay focused on a game for a long period of time and
 4    that he could keep track of everybody's score
 5    accurately.
 6  Q  And how do those skills translate into skills that are
 7    relevant to the issue of whether he is competent to
 8    stand trial?
 9  A  It has more to do with the implication that he was
10    making to me that he was unable to concentrate on even
11    the simplest thing.  When we talked about the
12    participants in a courtroom and I explained who the
13    judge was and who the jury was to him, five minutes
14    later when I asked him who they were, he couldn't tell
15    me.  He even wrote something down on a paper and
16    couldn't remember to read what he had written on the
17    paper.  That's just grossly different from what he was
18    doing in the card game.  So his lack of cooperation
19    with me prevented me from being able to discuss these
20    issues straightforwardly with him.
21  Q  There was one other example that stands out in my mind
22    and that was with you.  You indicated that he was
23    unable to tell you how much he might pay for a pizza;
24    is that correct?
25  A  That's correct.
```

| | | | |
|---|---|---|---|

1    Q    But Mr. Sanders, when called upon to actually do that

2          activity, did order a pizza and then paid for it

3          correctly, is that correct?

4    A    He did that routinely on the unit. He and other people

5          on the unit would get together to order out pizza and

6          he participated in that and understood how much he had

7          to pay for that, et cetera, without any problem and

8          without asking for any guidance from staff.

9    Q    From a clinical standpoint these discrepancies between

10         his actual behaviors on the unit and his obviously

11         demonstrated abilities in that circumstance and his

12         lack of cooperation or apparent lack of ability to do

13         those same things with you, what clinical significance

14         does that have to you?

15    A    It indicates to me that he is attempting to feign

16         symptoms to me of a mental illness or at least to feign

17         incompetence, that he is purposefully acting like he

18         doesn't understand issues with me, that it's apparent

19         from his behavior he would be able to understand fairly

20         easily.

21            THE COURT: Any other questions from the

22         State?

23            MS. FALK: Just a couple more.

24    Q    Your opinion in what you talked about earlier, you

25          discussed something called a competency group. That

3

1     was the one thing that was an additional piece of
2     information.  Will you describe for the Court what the
3     competency group is, please?
4  A  Yes.  It's a group that's held regularly on a number of
5     our units for the men that are here to be treated to
6     competency where they discuss court procedures, how
7     trials work, what the different participants in the
8     room are at a hearing, et cetera, in order to prepare
9     the guys for facing their charges, and it's an
10    educational group.  I'm not sure how big the group was
11    that he was involved in but it's usually several guys
12    and a social worker.
13 Q  And the information that you received from the
14    instructors in this group was that Mr. Sanders was, in
15    fact, demonstrating competence specifically relating to
16    legal issues; is that correct?
17 A  That's correct.
18 Q  Now, does that information change at all the opinions
19    that you have given in your October 14, 1996 letter?
20 A  I can -- my opinion that Mr. Sanders is competent has
21    not changed and all I can say from that is that when he
22    was malingering, he was doing it with me.  He wasn't
23    necessarily doing it with them.
24         THE COURT:  Are all your opinions to a
25    reasonable degree of medical certainty?

13

| | | |
|---|---|---|
| 1 | | THE WITNESS: Yes. |
| 2 | | THE COURT: Or psychological certainty? |
| 3 | | THE WITNESS: Yes. |
| 4 | | MS. FALK: |
| 5 | Q | The only other question that I have, Doctor, is during |
| 6 | | the course of time that Mr. Sanders was at the Mendota |
| 7 | | Mental Health Institute did he -- did anybody report |
| 8 | | observing him have any kind of hallucinatory symptoms |
| 9 | | either auditory or visual, for example, seeing a |
| 10 | | monkey, seeing a dog, talking to a dog, anything like |
| 11 | | that? |
| 12 | A | He did not do that while he was on my unit. I don't |
| 13 | | have the older records. It was my impression that he |
| 14 | | was not thought to be hallucinating. He did when he |
| 15 | | first was admitted to our unit say that he had heard |
| 16 | | voices in the past but he said that he stopped hearing |
| 17 | | voices in jail and that he hadn't hallucinated since he |
| 18 | | came to Mendota. |
| 19 | | THE COURT: Anything else? |
| 20 | | MS. FALK: No, not -- nothing at all. |
| 21 | | THE COURT: Cross. |
| 22 | | CROSS-EXAMINATION |
| 23 | BY MR. LITTLE: | |
| 24 | Q | Yes. Good afternoon, Doctor. |
| 25 | | THE COURT: Speak in the microphone. |

14

MR. LITTLE:

Q   Doctor, how long have you been employed in your present capacity?

A   Since July of 1996.

Q   Mr. Sanders was admitted to Mendota on June 25, 1996; is that correct?

A   I would have to check the record.  Yes.  June 25.

Q   Does that sound about -- around the approximate time that he was admitted?

A   It is correct.  I have it in front of me.  Yes.

Q   And he was admitted for the purposes of an assessment, correct?

A   That's correct.

Q   And you were the doctor or mental health professional that was assigned to do that assessment, correct?

A   Not initially.  He was on a different unit when he was first assessed and he saw a different doctor who extended his time here, that you should have that letter as well.  That's a letter from Dr. Hammer.

Q   Is that the doctor in the unit that you previously indicated that you did not obtain the complete records from?

A   For -- the complete records are here.  It's just that it's a stack about, you know --

Q   Are you telling this Court that you did not totally

```
 1        review all of those records because they were so

 2        voluminous?

 3    A   No.  I reviewed the pertinent parts of those records.

 4        I don't have those records all in front of me.

 5    Q   And what would you determine as being pertinent?

 6    A   Would be the assessments done by the previous

 7        physicians, the treatment reviews, the monthly reviews,

 8        medication, any assessments, medical problems by the

 9        medical physician here.

10    Q   So that it is possible that hidden in some of that

11        material that there might be some indication that he

12        was hallucinating to some extent at some particular

13        time?

14    A   I suppose that's possible.  It would be unusual for

15        them to not mention that in the summaries at the

16        monthly meetings.

17    Q   But it's a possibility, correct?

18    A   Correct.  Mr. Sanders, himself, said he did not

19        hallucinate while he was here.

20    Q   Do you know approximately how long Mr. Sanders was at

21        Mendota?

22    A   Well, he -- he was here from June 6, 1996, to when he

23        was just transferred to you now with some episodes of

24        going back to court.

25    Q   And such an assessment is a process of almost
```

16

```
4     1          continuous investigation; is that correct?

      2    A     That's correct.

      3    Q     And that is over a long period of time, correct?

      4    A     That's correct.

      5    Q     Did you perform any scientific test in conjunction with

      6          this assessment?

      7    A     Well, I gave him a mini mental state examination which

      8          is a standardized test of memory.  I reviewed that in

      9          the letter.

     10    Q     And I understand that Mr. Sanders scored on that test

     11          six over thirty which is consistent with severe

     12          dementia, is that correct?

     13    A     That's right.

     14    Q     What is the definition of severe dementia?

     15    A     Severe dementia is -- it's a severe problem with memory

     16          on mainly short-term memory that's typical of a person

     17          with Alzheimer's disease.  Severe dementia would

     18          indicate somebody who is unable to take care of their

     19          own basic daily needs, that would need nursing

     20          assistance or some kind of assistance to wash their

     21          clothes and brush their teeth and get dressed and so

     22          on.

     23    Q     And they might forget certain important things during

     24          the day, correct?

     25    A     Lots, if they had severe dementia, yes.
```

1    Q    That is correct, right?

2    A    That is correct.

3    Q    Certain important things like legal issues?

4    A    Sure.

5    Q    Is it a -- strike that.  A person with severe dementia,

6         would they have difficulty at some point remembering

7         legal issues during trial?

8    A    Yes.

9    Q    Would they have difficulty remembering issues that are

10        related to a particular case that might assist their

11        defense counsel?

12   A    Yes.

13   Q    What is the defendant's intelligence level, if you are

14        aware?

15   A    He did not have intelligence testing while he was here.

16        His mother said that he had had testing in the past and

17        said that he had a third-grade reading level.  That's

18        basically the only information I have.  His behavior on

19        the unit indicated that he was not mentally retarded.

20        He appeared to have average to low average intelligence

21        based on his ability to remember unit policies and

22        interact with peers and participate in groups, et

23        cetera.

24              THE COURT:  In the file, are you referring to

25        Dr. Emily's report?  I'm talking to the attorney, not

1    you, Doctor.

2                    THE WITNESS:  Okay.

3                    MR. LITTLE:  In regards to which particular

4    portion?

5                    THE COURT:  There's a report from Dr. Steven

6    Emily, Ph.D, June 14, 1996.  He refers to a children's

7    court there was an evaluation by Dr. Tyrone Carter

8    where he tested 72 in the Wechsler Intelligence Scale

9    for children but he gave his own intelligence test and

10   he got a 46 and a 49 which is a point two-tenths

11   percentile and a point 0-three-hundredths percentile.

12                   MR. LITTLE:  And I believe that was quite low

13   in that particular evaluation.  I think he was

14   borderline.

15                   THE COURT:  Pardon?

16                   MR. LITTLE:  I believe that that particular

17   report bears out the fact that he was of low

18   intelligence.

19                   THE COURT:  Well, there's a -- they thought

20   the way I read it that they -- they think that it's --

21   that's what he scored but they thought it's a gross

22   underestimation of the client's ability and as an

23   indicator of his deviant response.  The way I interpret

24   it, they just didn't buy the score.  He was given some

25   questions and this is what his response is.  If he was

1 malingering, it would be consistent also with

2 malingering but that's what the scores were.

3    MR. LITTLE: But you say was I referring to

4 Dr. Emily's, no, I was referring to the report Dr.

5 Rolli submitted.

6    THE COURT: But I was just saying there are

7 some test scores here. Okay. Proceed.

8    MR. LITTLE: But -- but they were not

9 performed more recently by this particular evaluating

10 physician.

11    THE COURT: Correct.

12    MR. LITTLE: That's my point, Judge.

13    THE COURT: Okay.

14    MR. LITTLE:

15 Q Did you administer a wide-range achievement test?

16 A No, I did not.

17 Q Wouldn't this type of test assist you in determining

18 the defendant's academic capabilities and confirm that

19 he is or is not extremely illiterate?

20 A There was sufficient evidence to the contrary that

21 testing was not necessary.

22 Q And that was based on what, Doctor?

23 A His ability to read and write while he was on the unit.

24 Q Did he ever read and write to any particular person

25 that was a member of the mental health staff?

Case 2:11-cv-00868-LA   Filed 02/03/17   Page 20 of 29   Document 20-25

| | | |
|---|---|---|
| 1 | A | Yes, he did. He took courses from the teacher here and |
| 2 | | she informed me that she thought he was reading at a |
| 3 | | junior high level. He also did some -- he rearranged a |
| 4 | | telephone schedule on our bulletin board for the whole |
| 5 | | unit in which he was able to write and spell every man |
| 6 | | on the unit's name correctly. It was a complex |
| 7 | | schedule. He basically demonstrated average abilities, |
| 8 | | so it wasn't necessary to test him because we didn't |
| 9 | | suspect that he was retarded. |
| 10 | Q | Doctor, you had an opportunity to have numerous |
| 11 | | interviews and discussions with Mr. Sanders, correct? |
| 12 | A | That's correct. |
| 13 | Q | Approximately how many times did you, personally, |
| 14 | | interview or observe the defendant? |
| 15 | A | I did formal interviews with him related to competency |
| 16 | | three times but I had seen him a number of times before |
| 17 | | that just as a regular patient on my unit. I saw |
| 18 | | everybody at least once a month and I saw Mr. Sanders |
| 19 | | more frequently because he had many requests of me. |
| 20 | Q | Do you recall what length of time each interview took, |
| 21 | | how much time you spent with him? |
| 22 | A | It was around half hour to 45 minutes. Mr. -- Mr. |
| 23 | | Sanders was not very tolerant of talking to me and |
| 24 | | whenever he was talking to me, he was insistent that he |
| 25 | | wanted the interview to end, that he was bored, that he |

Case 2:11-cv-00868-LA   Filed 02/03/17   Page 21 of 29   Document 20-25

1          wanted to go back to his room, that he didn't want to

2          talk to me, but I was able to interview him for 30 to

3          45 minutes.

4     Q    Was there any medication prescribed for Mr. Sanders?

5     A    There was medication prescribed to him before he came

6          to my unit.  He was placed on a stimulant because of

7          the perception that he might have attention deficit

8          disorder.  I discontinued that because it was not

9          helpful to him.  It's not my opinion that he needs a

10         stimulant medication.

11    Q    Was the defendant tested for mental retardation?

12    A    Was he what?

13    Q    Tested for mental retardation.

14    A    What kinds of testing?

15    Q    Was there any scientific test to determine mental

16         retardation?

17    A    You do an intelligence test if you suspect mental

18         retardation.  We did not suspect it as Mr. Sanders was

19         able to read at a junior high level and do mathematics,

20         et cetera.

21    Q    So that mental retardation has not been ruled out?

22    A    Yes, it has.

23    Q    Based on a scientific test?

24    A    Yes, it has.  I don't -- I guess I don't understand

25         what you mean by a scientific test.

```
 5    1   Q   Intelligence test.  You just indicated that there is

      2       such a test.

      3               THE COURT:  She indicated there was no basis

      4       to give him one because of the --

      5               MR. LITTLE:  In her expert opinion.

      6               THE WITNESS:  That's correct.

      7               THE COURT:  Any other questions?

      8               MR. LITTLE:  Yes.

      9   Q   Isn't it true that the score on the mini mental state

     10       exam is a more accurate way to determine a diagnosis

     11       than observing a person's behavior?

     12   A   No, it is not.  A mini mental state exam is an exam

     13       that is accurate insofar as the person taking the exam

 6   14       is being honest and cooperative and giving their best

     15       effort.  Anybody can pretend to not know the answers

     16       and totally make the test illigitimate.

     17   Q   You had discussions with Mr. Sanders during the

     18       evaluation process, correct?

     19   A   Yes, I did.

     20   Q   And during that discussion with Mr. Sanders about the

     21       courtroom and roles of the various persons in the

     22       courtroom, is that correct?

     23   A   Yes, I did.

     24   Q   Isn't it true that Mr. Sanders during these discussions

     25       was unable to grasp the concepts of the roles of
```

1          various individuals that are in the courtroom?

2     A    He appeared to be unable to grasp but I believe that he

3          was purposely not repeating the information to me that

4          I told him. He was unable to do things at the most

5          rudimentary level, like say what a judge is.

6     Q    Isn't it true that during your discussions with Mr.

7          Sanders he was unable to advise you what the charges

8          were against him?

9     A    That's correct. He said various things when I asked

10         him the question several times and sometimes he said it

11         was a burglary. He never really got straight what all

12         the charges were when I asked him; but this does not

13         mean that I don't think he knows. I think he does

14         know.

15     Q    As a final question, Doctor, does the defendant have a

16         difficulty verbally communicating with individuals?

17     A    He appeared to have some difficulty communicating with

18         me. He used very simple language when he talked to me

19         but it was obvious when I overheard him talking with

20         peers and other people that he could speak much more

21         clearly. He had no difficulty communicating with his

22         peers and he had no difficulty making his needs known

23         on the unit.

24     Q    One follow-up question, Doctor.

25     A    Sure.

1  Q  Is there a scientific test for malingering?

2  A  The test for -- the way that you judge malingering is,

3     again -- I'm not sure what you mean by scientific test.

4  Q  A test other than your subjective opinion.

5  A  I think my -- my opinion is considered to be the

6     objective test.  In order to judge whether somebody's

7     malingering you observe their behavior and observe

8     their behavior in various circumstances, so I believe

9     that the accepted way to assess somebody for

10     malingering is the way that I did it.  I don't think

11     there's another, you know, I don't know, questionnaire

12     that you could give him that would help.

13          MR. LITTLE:  Thank you, Doctor.

14          THE WITNESS:  Sure.

15          THE COURT:  I don't think redirect is needed.

16          MS. FALK:  No.

17          THE COURT:  The Court -- I will not even hear

18     argument here.  I think the Court's going to find the

19     defendant competent to stand trial.  The Court's going

20     to specifically find this is a blatant case of

21     malingering here.  I also reviewed the records and

22     previous reports here and I brought up the fact of the

23     I.Q.'s that were off the board on the bottom end of 46

24     and 49, I think something like that, in the forties,

25     which are completely inconsistent with his entire

25

1　　　　behavior and inconsistent with a previous finding at

2　　　　children's court that it was in the upper seventies.

3　　　　　　　　He may not be the brightest man in the world

4　　　　but he's competent to stand trial and the Court will

5　　　　hold that he is competent.  Doctor, thank you very

6　　　　much.  We're going to discontinue at this point from

7　　　　taking testimony.  Thank you.

8　　　　　　　　THE WITNESS:  Okay.  Thank you.

9　　　　　　　　(Witness excused)

10　　　　　　　MS. FALK:  Your Honor, this case is extremely

11　　　　old and the State is requesting the earliest possible

12　　　　trial date.

13　　　　　　　THE COURT:  The Court is going to reinstate

14　　　　the previous bail of $500,000 set by Judge Sykes.

15　　　　We'll give you the earliest possible trial date.

16　　　　　　　MR. LITTLE:  Judge, I'd like to make an

17　　　　additional statement.

18　　　　　　　THE COURT:  Regarding what?

19　　　　　　　MR. LITTLE:  My client.  I'd like to make an

20　　　　oral motion to withdraw.

21　　　　　　　THE COURT:  Based on what?

22　　　　　　　MR. LITTLE:  Based on my client does not want

23　　　　our services any longer.  He is now indigent.  He

24　　　　indicated he either wants to represent himself or in

25　　　　the alternative have this matter referred to the Public

26

1  Defenders Office so that he can avail himself of their

2  services.

3          THE COURT:  Have you been the only one

4  representing him during this period of time?

5          MR. LITTLE:  Myself along with Attorney

6  McNeely from Illinois.  I was acting as his local

7  counsel.

8          THE COURT:  And he retained you and now he

9  claims he's indigent?

10         MR. LITTLE:  Yes, basically.

11         THE COURT:  State's position?  I think I have

12 no choice here.

13         MS. FALK:  I agree.  I think we need to try

14 to get this man signed up at the Public Defender's

15 Office as soon as possible.

16         THE COURT:  I'm going to not allow you to

17 withdraw in case it turns out he doesn't qualify.

18         MR. LITTLE:  I understand that.

19         THE COURT:  We'll give you another date.

20 We'll ask the Public Defender's Office to appoint

21 someone for him and evaluate him.

22         THE CLERK:  January 6 at 8:30.

23         MS. FALK:  That's fine.

24         THE COURT:  Do we have to keep him here to be

25 evaluated?  Right?  I don't know how they appoint

27

```
 1    someone.

 2                    THE CLERK:  He'll be in custody on the bail

 3    that you will set.

 4                    THE COURT:  Okay.

 5                    MS. FALK:  Right.  He'll be at the jail.

 6                    THE COURT:  He's not going anywhere unless he

 7    posted 500,000.  Okay.  Thank you very much.

 8                    MR. LITTLE:  Thank you.

 9                    (End of proceedings)

10                          *   *   *   *   *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                                            1
                STATE OF WISCONSIN )
        2                          ) SS
                MILWAUKEE COUNTY   )
        3

        4               I HEREBY CERTIFY that I am an official court

        5       reporter in and for Branch 42 of the Circuit Court in and for

        6       the County of Milwaukee, State of Wisconsin; that I was

        7       present at the taking of the foregoing proceedings and that I

        8       recorded said proceedings in machine shorthand; that I have

        9       carefully compared said machine shorthand notes with the

       10       foregoing transcript, consisting of Pages 1 through 29,

       11       inclusive, and find the same to be a full, true and correct

       12       copy in typewritten longhand of my original machine shorthand

       13       notes taken at said proceedings.

       14

       15               Dated at Milwaukee, Wisconsin, this 18th day of

       16       July, 1997.

       17

       18

       19

       20       _____

       21                           Official Court Reporter, Br. 42

       22

       23

       24

       25
```

29

Case 2:11-cv-00868-LA   Filed 02/03/17   Page 29 of 29   Document 20-25

```
1                                            1
                STATE OF WISCONSIN )
        2                          ) SS
                MILWAUKEE COUNTY   )
        3

        4               I HEREBY CERTIFY that I am an official court

        5       reporter in and for Branch 42 of the Circuit Court in and for

        6       the County of Milwaukee, State of Wisconsin; that I was

        7       present at the taking of the foregoing proceedings and that I

        8       recorded said proceedings in machine shorthand; that I have

        9       carefully compared said machine shorthand notes with the

       10       foregoing transcript, consisting of Pages 1 through 29,

       11       inclusive, and find the same to be a full, true and correct

       12       copy in typewritten longhand of my original machine shorthand

       13       notes taken at said proceedings.

       14

       15               Dated at Milwaukee, Wisconsin, this 18th day of

       16       July, 1997.

       17

       18

       19

       20       _____

       21                           Official Court Reporter, Br. 42

       22

       23

       24

       25
```

29

Case 2:11-cv-00868-LA   Filed 02/03/17   Page 29 of 29   Document 20-25