1  STATE OF WISCONSIN        CIRCUIT COURT        MILWAUKEE COUNTY
                                BRANCH 43
2  ------------------------------------------------------------------

3
   STATE OF WISCONSIN,
4
                   Plaintiff,
5                                              Case No. F-954600

6  RICO SANDERS,
                   Defendant.
7
   -----------------------------------------------------AUG - 8 1997---
8
                        COMPETENCY HEARING
9
   ------------------------------------------------------------------
10
   March 15, 1996                        HON. DIANE S. SYKES
11                                        Circuit Court Judge

12
   CHARGE:   First Degree Sexual Assault - 4 counts
13           Armed Burglary - 2 counts
             Armed Robbery
14           Second Degree Sexual Assault
             Aggravated Burglary - 2 counts
15

16                      A P P E A R A N C E S

17          MIRIAM FALK, Assistant District

18             Attorney, appearing on behalf of the State.

19             EDWARD LITTLE, Attorney at Law,

20             appearing on behalf of the Defendant.

21

22

23          Defendant is present in court.

24

25  Barbara J. Bohl, Official Court Reporter

Exhibit AA

Case 2:11-cv-00868-LA   Filed 02/03/17   Page 1 of 25   Document 20-27

```
 1          THE CLERK:  State of Wisconsin versus Rico

 2     Sanders, f-954600, first degree sexual assault, four

 3     counts, armed burglary, two counts, armed robbery, second

 4     degree sexual assault and aggravated burglary, two

 5     counts.

 6          MS. FALK:  State is appearing by Assistant

 7     District Attorney Miriam Falk.

 8          MR. LITTLE:  Ed Little appearing on behalf of

 9     Rico Sanders.

10          THE COURT:  Good morning.  Let's wait for

11     Mr. Sanders to be produced.

12          THE COURT:  All right.  The defendant is now

13     entering the courtroom.  The case is scheduled here today

14     for purposes of a competency hearing.  Dr. Palermo had

15     evaluated the defendant in that regard and returned the

16     report to court on February 9, 1996, and there was a

17     request by the defense for some time to contemplate

18     retaining a defense expert on this issue and some efforts

19     were engaged in in that regard, but that was

20     unsuccessful, at least in as far as returning a report to

21     court today.

22          MR. LITTLE:  That is correct.

23          THE COURT:  So we are proceeding ahead with the

24     competency evaluation with Dr.  Palermo only at this

25     time.
```

```
 1              MR. LITTLE:  That is correct.

 2              THE COURT:  Go ahead.  Doctor, you may take the

 3      witness stand.

 4              DR. GEORGE PALERMO,

 5      being first duly sworn, was examined and testified as

 6      follows:

 7                       DIRECT EXAMINATION

 8              MS. FALK:

 9  Q.   Dr. Palermo, will you explain for us what your

10      professional work involves?

11  A.   My work at the present time is as a senior forensic

12      psychiatrist for the Milwaukee County Mental Health

13      Complex located in the Milwaukee County Forensic Unit.

14      I've been doing that work for about eight and a half

15      years in that function.

16  Q.   What other things have you done in the course of your

17      professional life?

18  A.   Well, I've done plenty of things.  It is a very long

19      curriculum, but I can summarize that by saying that at

20      the present time I am also a clinical professor of

21      psychiatry, neurology and geriatrics at the Medical

22      College of Wisconsin.  I am a professor of criminology at

23      the Marquette University criminology department.  I am a

24      lecturer in psychiatry and medical ethics at the Loyola

25      University Street Medical School.  I am also a visiting
```

| 1 | | professor in several Italian universities, medical |
| 2 | | schools in forensics. I have written and published 70 |
| 3 | | papers, a book, other things, you know. I belong to many |
| 4 | | medical societies. I don't know. I am a board certified |
| 5 | | psychiatrist. I am board certified in also forensic |
| 6 | | psychiatry by the board of medical examiners. I am |
| 7 | | licensed in Wisconsin and Illinois to practice medicine. |
| 8 | Q. | As a result of your work in forensic psychiatry over the |
| 9 | | last eight and a half years and based on your training |
| 10 | | and experience, are you familiar with the standards that |
| 11 | | apply in Wisconsin to the issue of competency to stand |
| 12 | | trial? |
| 13 | A. | Yes, I am. |
| 14 | Q. | Now, Dr. Palermo, you are also a medical doctor; is that |
| 15 | | correct? |
| 16 | A. | I am. |
| 17 | Q. | And you have a specialty in the area of psychiatry? |
| 18 | A. | Correct. |
| 19 | Q. | When did you receive those degrees? |
| 20 | A. | I graduated from University of Milan, one of the oldest |
| 21 | | universities in the world in 1951 and I became a board |
| 22 | | certified american psychiatrist in the american board of |
| 23 | | psychiatry and neurology in 1962. I became certified by |
| 24 | | the board of medical examiners in 1964. I mean, in '94, |
| 25 | | sorry, '94. |

1    MS. FALK:  Your Honor, at this time I would ask

2    that the court recognize Dr. Palermo as an expert in the

3    field of forensic psychiatry, particularly as it relates

4    to issues of competency.

5         THE COURT:  Any objection?

6         MR. LITTLE:  No.

7         THE COURT:  He is received in that capacity and

8    may so testify.

9         MS. FALK:

10   Q.   Did you have an opportunity to do a competency evaluation

11        on an individual named Rico Sanders who is also known as

12        Rico Maholmes?

13   A.   Yes, I did.

14   Q.   Do you see Mr. Sanders in the courtroom today?

15   A.   Yes, he is next to his representing attorney.

16   Q.   What is he wearing?

17   A.   He is wearing the jail garb.

18        MS. FALK:  I would ask that the record reflect

19        that the individual he knows as Rico Sanders is the

20        defendant in this case.

21        THE COURT:  Yes, it shall.

22        MS. FALK:

23   Q.   Did you conduct some testing or interviewing with

24        Mr. Sanders on February 8th of 1996?

25   A.   Correct, I did.

| | | |
|---|---|---|
| 1 | Q. | In addition to meeting personally with Mr. Sanders, what |
| 2 | | else did you do relative to this evaluation of his |
| 3 | | competency to stand trial? |
| 4 | A. | I reviewed obviously the police complaint and also a |
| 5 | | record that I found in the nursing office in the County |
| 6 | | Jail.  And I also discussed his behavior with one or two |
| 7 | | of the officers.  I don't remember exactly the name of |
| 8 | | his people who are aware of his behavior during the day |
| 9 | | in the pod where he is located. |
| 10 | Q. | You mean officers who are working, Deputy Sheriffs who |
| 11 | | are working in the jail? |
| 12 | A. | Correct, Deputy Sheriffs. |
| 13 | Q. | And in the course of your conversation with Mr. Sanders |
| 14 | | and based also upon these documents that you have |
| 15 | | reviewed, did you address with him the issues that |
| 16 | | pertain specifically to his competency to stand trial? |
| 17 | A. | Obviously. |
| 18 | Q. | As a result of your evaluation of Mr. Sanders and your |
| 19 | | review of these documents, did you reach any professional |
| 20 | | conclusions about the question of whether he is competent |
| 21 | | to stand trial? |
| 22 | A. | Yes, I did. |
| 23 | Q. | Did you reach conclusions that you are holding to a |
| 24 | | reasonable degree of professional certainty? |
| 25 | A. | Correct. |

1   Q.   What are the conclusions that you reached regarding

2        Mr. Sanders' competency to stand trial?

3   A.   The conclusion I reach to a reasonable degree of medical

4        certainty is that the young man, Rico Sanders, at the

5        present time is competent to stand trial.  In other

6        words, he understands what he has been charged with and

7        he also has an adequate, even though unsophisticated,

8        understanding of courtroom procedures, and the role of

9        the various actors in the court of law.

10           There were, if I may say, some let's say there

11       was some behavior on his part that required further

12       attention from me.  And the behavior on his part that

13       required further attention was that he appeared to be

14       from what he was telling me hallucinating in the vicious

15       fears.  He was seeing I think a monkey I have here

16       described and a dog in the same room where I was

17       examining him.  And he was telling me especially that

18       this particular dog was following him around and so on

19       even when he was not in the examining room with me in the

20       pod.  That he had expressed this kind of thought to his

21       own roommate and the roommate said to him, I don't see

22       anything.  He also told me that he had some voices.  In

23       other words, he experienced voices telling him to do away

24       with himself.

25           However, the quality and the intensity of these

1  hallucinatory experiences were of such a nature that
2  actually cannot be true.  In other words, it belonged to
3  the group of the malingered hallucinations which means
4  intentional production of symptoms that oftentimes we see
5  in people, especially in people who are in custody.
6  However, being a physician, I do know that the drugs and
7  alcohol at times produce these kind of auditory and
8  visual hallucinations.  The production, however,
9  reflecting about the case, of these hallucinatory
10  experiences in those people over those medications
11  doesn't usually last over much, over the time of their
12  intoxication.  And if it does it is never so gross like
13  in this particular case.  They have some kind of
14  whispering.  They have some kind of fleeting visions, but
15  not this time.

16      Therefore, it was my conclusion that due to the
17  medical legal context the young man finds himself in and
18  of the marked discrepancy between what he claimed and his
19  behavior in the pod as I was told by the officers, that
20  he was gregarious and cheerful like the other people, and
21  the type of hallucinatory experiences this young man was
22  malingering.  However, I want to say this.  He is
23  competent.  He probably malingers, but malingering has to
24  be viewed not in a negative fashion because it is a way
25  that one tries to defend himself.  So this is a defensive

```
 1         type of behavior which he has the right to do.  And I
 2         have my own right to not believe in it.  That's all.
 3    Q.   Based on your overall evaluation of this case, did you
 4         find that Mr. Sanders understood the nature of the
 5         charges that had been brought against him?
 6    A.   Yes, yes.
 7    Q.   And did that conclusion, was that based in part upon your
 8         review of the statement that he made to the police
 9         wherein he described in detail his activities on these
10         various occasions?
11    A.   Yes.
12    Q.   Did your conclusions include that he would be able to
13         assist his attorney in discussing possible defenses to
14         the actions that are brought against him?
15    A.   Yes, I think so.  I think he is an intelligent young man.
16         So intelligent that he tries to defend himself in a way
17         that is not to actually listen but I think he has
18         substantial mental capacity to not only to understand
19         what he has done but to be able to communicate with the
20         counselor and have the counselor help him.
21    Q.   And in your communications with him about matters
22         separate from the charges themselves was he able to
23         communicate to you information about his personal
24         history?
25    A.   Sure.
```

1   Q.   And was he able to remember?

2   A.   Sure.

3   Q.   Information about his own life?

4   A.   Sure.

5   Q.   Was he able to articulate that information in a manner

6        that was understandable?

7   A.   Yes, even to us.

8            MS. FALK:   I have no other questions, Your Honor.

9            THE COURT:   Cross-examination.

10                       CROSS EXAMINATION

11           MR. LITTLE:

12  Q.   Dr. Palermo, how long have you been employed in your

13       present capacity?

14  A.   How long?

15  Q.   Yes.

16  A.   As I said, eight and a half years.  However, I have done

17       this type of work for many years before elsewhere and

18       also in Milwaukee in 1960-- from '60 to '69.

19  Q.   But presently for this particular community in this

20       treatment facility it's eight and a half years?

21  A.   With this treatment facility eight and a half years.

22  Q.   Thank you.  How long was the defendant at your testing

23       facility?

24  A.   How long what?

25  Q.   How long was he at your facility?

```
1   A.   Was he?

2   Q.   Yes.

3   A.   I think my examination of him lasted about an hour and a

4        half.

5   Q.   How many times were you with him?

6   A.   Just once.

7   Q.   Was there any scientific testing administered?

8   A.   I think-- I don't know what you refer to scientific

9        testing.  I think my clinical expertise is scientifically

10       based.  I don't know if you're talking about any

11       psychological testing, no.

12  Q.   It was not psychological testing?

13  A.   I don't think it was necessary, honestly.

14  Q.   So you didn't think it was necessary in this case.  In

15       what cases do you determine that it should be necessary?

16            MS. FALK:  I'm going to object to the relevance.

17            THE COURT:  Overruled.  Go ahead, doctor.

18  A.   Well, I consider it necessary in cases that a are more, I

19       would say, complicated by the confusion of the mind of

20       the individual and the diffusion of his ego.  In those

21       cases where the individual is vague and this kind of

22       reaction and statement are not as clear as in his

23       particular case, then I would probably thought that it

24       may be necessary to test him psychologically.  Even

25       though, let me say, this psychological testing is in
```

```
 1            ajoint to a diagnosis.  A clinician makes a diagnosis not

 2            on psychological testing.  I don't think that is proper.

 3    Q.     But isn't it true that the psychological testing is used

 4            as an aid adjuncting to a clinical conclusion that you

 5            draw?

 6    A.     Yes, I think it is true.

 7    Q.     So then to just clarify the answer, there was no testing

 8            done other than your observation and your expertise in

 9            your opinion?

10    A.     No.

11    Q.     Again were there any verbal tests done?

12    A.     Verbal?

13    Q.     Verbal.

14    A.     Verbal test was my questions and my listening of his

15            statement.  No, there was-- See, the psychiatric

16            examination is composed of various very clear, well

17            defined steps.  The observation like any other doctor

18            does.  The observation of the individual, the questioning

19            of an individual, the listening to the individual and the

20            diagnostics which includes diagnosis because not

21            everybody who is mentally ill is mentally ill in the same

22            way.  So the clinician has to be perceptive,

23            knowledgeable and aware of what is going on in order to

24            reach a diagnosis.

25    Q.     So was he given any performance test?
```

1   A.   No.

2   Q.   Was he given any IQ test?

3   A.   No.  I just asked him a few questions and the usual
4        questions I gave and that is on their orient.  Whether he
5        remembers correctly.  He remembered I think a telephone
6        number or two.  I asked him some present day knowledge of
7        social affairs.  I didn't test him intellectually.  I
8        thought he was intellectual from a clinical point of
9        view.  He is of low average intelligence from a clinical
10       point of view.

11  Q.   But I believe your prior statement, did you determine him
12       to be an intelligent person, I think that was your
13       statement that you made earlier.

14  A.   What did I make?  What statement did I make?

15  Q.   That you found him to be intelligent.

16  A.   I find him to be of average intelligence for his
17       background, I would say low average intelligence I would
18       say, but that's.  Even if a person is boarder line or
19       even mentally retarded, many mentally retarded people,
20       mild mental retardation, they are competent, you see.
21       Those are not props that one can bring up, you know,
22       against competency.  And there are many intelligent
23       people with an IQ of 140 who are incompetent.

24  Q.   So what basis can you find him intelligent if there was
25       no IQ test to gage him on?

```
 1   A.   As I said, you don't need to have an IQ testing.  You

 2        see, the experiences of a person, you know, is something

 3        that you have to take into consideration.

 4   Q.   And you based that upon, I believe, you stated earlier a

 5        few questions and telephone numbers?

 6   A.   Like the way he behaved, the way he reacted to me.  The

 7        way he communicated with me, the way he performed during

 8        the examination tells me that he is of a low average

 9        intelligence.  However, there is no need for that.  There

10        is no need for an IQ test in a case like that.

11   Q.   Did you view or have available to you any previous

12        testing?

13   A.   What?

14   Q.   Did you view or did you have available to you any

15        previous testing?  Did you view or did you have available

16        to you any previous testing?

17   A.   No, I have did not.  I did not have available to me, you

18        know.

19   Q.   Did you request any school records pertaining to the

20        defendant?

21   A.   No.  I was satisfied with my clinical interview, and I

22        saw no reason otherwise I would have had the psychologist

23        at least in my opportunity to do an IQ.  We have such a

24        facility, but we do it only when it is necessary.

25   Q.   You determined in this particular incident--
```

1   A.   --I determined it was not necessary.

2   Q.   As part of your evaluation did you review the records

3        that were available at the Health Services Department at

4        your facility?

5   A.   Not available in my facility.

6   Q.   Available through the Milwaukee County Sheriffs

7        Department, these records were in the Milwaukee County

8        Jail where he was incarcerated.  I believe that is the

9        same place that you spoke with the correctional officers

10       as far as their observation of him?

11  A.   Yeah, but I did not see that, no.

12  Q.   Did you inquire as if-- Strike that.   Did you inquire

13       if there were any medical records available pertaining to

14       him?

15  A.   I reviewed the records in the nursing office, but I

16       didn't see anything that was of such a nature that I had

17       to consider it in my final position.

18  Q.   In those records did you observe-- Strike that.  In those

19       records did you observe that the defendant had been

20       administered medication?

21  A.   Yes.

22  Q.   And based on that observation you did not feel that there

23       was any further evaluation that might need to be done on

24       him?

25  A.   Yes, I did not.

```
 1   Q.   How much of your evaluation is based on observations,

 2        reports or notes of other persons at your facility.

 3   A.   My evaluation is based primarily on the police complaint

 4        and on my own examination of the defendant.  My own

 5        examination of the defendant at that particular time.  At

 6        that particular time.

 7   Q.   As well as your question and answers with the

 8        correctional facility staff?

 9   A.   And also as I mentioned, the nursing office.  They have a

10        dose a help in the nursing office.

11   Q.   Did you ever observe the defendant in his interaction

12        with other inmates during the day at the correctional

13        facility?

14   A.   Personally?

15   Q.   Yes.

16   A.   No.

17   Q.   In your opinion does the defendant have any limitations?

18   A.   Limitations?

19   Q.   Yes?

20   A.   As I said to you before, on the basis of his low average

21        intelligence and the poor exposure to schooling and so

22        on, he is somewhat limited obviously.  But he is not a

23        stupid individual, you know.  Not that way.  His

24        limitations are of socialization.  I don't think that

25        this young man can be called as retarded.  Actually, if
```

```
1        you look and read the testimony of the victim's, I think

2        he is quite intelligent.  Maybe he is more than what I

3        said.  Maybe he is just average.

4                MR. LITTLE:  No further questions.

5                THE COURT:  Redirect.

6                        REDIRECT EXAMINATION

7                MS. FALK:

8    Q.   The medication that Mr. Sanders was on, is that for

9         depression?

10   A.   What did you say?

11   Q.   What was the purpose for the medication that he was

12        taking?

13   A.   I think the purpose was for his dillusions.  For his

14        hallucinations.

15   Q.   And in your experience did it appear that these

16        hallucinations, let's assume that he was having these

17        hallucinations just for this purpose of the argument.

18        Did it appear to interfere with his ability to understand

19        and communicate with you about the questions you were

20        asking him?

21   A.   Not at all.  Actually, I would like to say this.  That

22        there are cases where people may be suffering from

23        hallucinosis which is actually a disease entity suffered

24        by people who have been using drugs and alcohol for years

25        and so on.  And it continues for a long time.  At times
```

1      many, many months.  However, even in those cases those

2      people may be competent and they are most of the times

3      competent except for these hearings and so.

4  Q.  In the case of Mr. Sanders, assuming that he was seeing a

5      monkey and dog and hearing voices, do you feel that those

6      conditions cause him to be incompetent to stand trial,

7      assuming that they exist?

8  A.  That is a big assumption you want me to make because it

9      is an hyperbole what he told me.  I would say even then

10     he would be competent.

11            MS. FALK:  I have no other questions.

12            THE COURT:  Recross, counsel?

13            MR. LITTLE:  I have no questions.

14            THE COURT:  Thank you, doctor.  You may step

15     down.

16            MS. FALK:  He is excused?

17            THE COURT:  Yes, you are excused.

18            MS. FALK:  Thank you.

19            THE COURT:  Any further witnesses for the state?

20            MS. FALK:  No.

21            MR. LITTLE:  For the defense?

22            MR. LITTLE:  No.

23            MS. FALK:  Your Honor, the standards that the

24     court has to apply is whether in fact Mr. Sanders

25     possesses a sufficient capability to understand the

charges that are being brought against him, the nature of
the players in this process, and also has the ability to
communicate adequately with his lawyer about matters
pertinent to the proceedings in this case and the defense
of this matter. And it is very clear that Mr. Sanders
possesses all of those abilities. There is absolutely no
evidence to the contrary and even assuming that he in
fact has these hallucinations, and I would agree with
Dr. Palermo based on all of the evidence in front of the
court, it would be hard to believe that he actually did
have these since nobody else seems to have noticed these
at a point in time when Mr. Sanders could not have been
needing to create these things for somebody's benefit.
But even assuming that those things are there, it isn't
affecting fact his abilities to remember those things and
communicate and understand the process. So I believe
that the record supports only one conclusion which is
that he is competent to stand trial.

THE COURT: Thank you. Mr. LITTLE.

MR. LITTLE: Well, our position remains that he
is not competent. Irrespective of the report that was
submitted by the doctor, we submit that this particular
report completed by Dr. Palermo is woefully inadequate.
It is based primarily on one particular visit for a very
short period of time for a case of this magnitude. He

1  visited with the defendant for an hour and a half.  And
2  during that time he asked very few, by his own admission,
3  a few questions.  He asked him if he can remember a
4  couple of telephone numbers and based on that and some
5  other questions that he asked of some correctional
6  facility staff members of their particular observations
7  and the conclusions that they had drawn and in addition
8  to that he relied heavily on the information that was in
9  the complaint and he subjectively states that that
10  particular, this person is competent.

11      THE COURT:  The test for competency is whether
12  the defendant has sufficient present ability to consult
13  with his attorney with a reasonable degree of rational
14  understanding and whether the defendant has an
15  understanding of the proceedings, the roles of the
16  principals in court and an adequate understanding of the
17  proceedings and whether the defendant understands the
18  charges and the essentials of the criminal process.  And
19  I have no evidence in this record to contradict Dr.
20  Palermo's conclusions based upon his expertise and
21  evaluation of this defendant to conclude that this
22  defendant is anything but competent.

23      He reported that based on his evaluation of the
24  defendant and his history of evaluating defendants for
25  competency purposes, he believes this defendant is

```
1    competent to all of these levels to stand trial in this

2    case.  That he is a young man of low average intelligence

3    with a substantial mental capacity to understand the

4    charges that he possesses in adequate, although

5    unsophisticated, uneducated terms, and has the

6    understanding of the court proceedings and the roles of

7    various principals in court and he has the ability to

8    communicate and assist his counsel in the defense of

9    these charges.

10          And therefore I will find and adopt Dr.

11    Palermo's opinion as the finding of this court that the

12    defendant is competent to stand trial.  It is

13    uncontroverted by this record.  The proceedings,

14    therefore, are reinstated.  I believe at this point we

15    need to schedule a trial.

16          MS. FALK:   That is correct.  I would be able to

17    try this case.  You've got a number of different

18    episodes.  I gather it will take a better part of the

19    week.  May 13th or May 15th.

20          THE CLERK:  No.

21          MS. FALK:  May 20th.

22          THE CLERK:  No.

23          MS. FALK:  How about May 6th.

24          THE CLERK:  Firm homicide trial.  June 10th.

25          THE CLERK:  June 10, 8:30 for trial.
```

```
 1              THE COURT:  Let's also schedule a final pretrial

 2      in the case.

 3              MS. FALK:  Can we do the Miranda Goodchild at the

 4      final pretrial?

 5              THE COURT:  Sure, if you want to bring your

 6      witness in.

 7              THE CLERK:  May 31st.

 8              THE COURT:  Any contemplated defense motion at

 9      this time outside of a statement motion on the Miranda

10      Goodchild issues?

11              MR. LITTLE:  Not that we have at this time.

12              THE COURT:  All right.  Thank you.

13              MS. FALK:  Your Honor, the other thing is with

14      respect to bail.

15              THE COURT:  That's what I just raised with the

16      clerk.  Prior bail is $25,000?

17              MS. FALK:  No, $500,000 dollars cash.

18              THE COURT:  I thought there was a reference in

19      the juvenile proceeding for twenty-five.

20              MS. FALK:  It is $500,000 cash bail that was set

21      at the initial appearance on 10-21-95.

22              THE COURT:  What is the state's request?

23              MS. FALK:  I would request that that simply be

24      reinstated.  This is a very, very serious case.  There

25      are four victim's in this case with multiple assaults to
```

1    several of them, robberies, several of them.  These

2    offenses occurred for the most part while Mr. Sanders was

3    armed.  He also burglarized all of these people in the

4    process of committing these assaults.  This is an

5    extremely strong case because not only do we have the

6    victim's and we have other physical evidence of

7    Mr. Sanders, including fingerprints and semen, but we

8    also have Mr. Sanders own acknowledgement of the fact

9    that he did these and other crimes that are similar to

10   this.

11        THE COURT:  Also, he has a juvenile history here

12   and in Chicago.

13        MS. FALK:  Correct, and he is from Chicago.  He

14   was, I believe, either awaiting trial or probation.  I

15   can't remember specifically at the time of these

16   offenses.  He was living in Milwaukee a fairly short

17   period of time so I think he is also a flight risk.  I

18   just think this is such a serious case being there is

19   likely prison involved here there needs to be a very high

20   amount of cash bail.

21        THE COURT:  Do you wish to be heard on bail?

22        MR. LITTLE:  Well, we would request a reduction.

23   We understand that this type of case does require some

24   type of cash bail, but we would like a reduction from the

25   two hundred and fifty, in light of the fact that the

1    juvenile court will set twenty-five and I think something

2    between twenty-five and five hundred is more appropriate.

3         THE COURT:  Apparently once this is charged in

4    adult court the bail set out of Intake was $500,000 cash.

5    I think based on everything I have been told about the

6    case as well as this defendant and his history and ties

7    to other states, that he is by definition a serious

8    flight risk and therefore the bail is appropriate and

9    will be reinstated at this time.

10        MS. FALK:  Your Honor, I don't know if I have

11   prepared a notice of intent to introduce some other acts.

12   There were some other burglaries that ultimately resulted

13   in the arrest of the defendant, and I don't see it in my

14   stuff here so I'm guessing that I did not file it yet.

15   But I do intend to file that.

16        THE COURT:  All right.  Everyone is on notice

17   then.  Thank you.

18

19

20

21

22

23

24

25

1

2
STATE OF WISCONSIN )
3              CC: )
MILWAUKEE COUNTY   )
4

5

6
       I, Barbara J. Bohl, do hereby certify that I am a
7
Registered Professional Reporter, that as such I recorded the
8
foregoing proceedings, later transcribed same, and that it is
9
true and correct to the best of my abilities.
10

11

12
       Dated at Milwaukee, Wisconsin, this ____ day of
13
August, 1997.
14

15
                                Barbara J. Bohl
16                              Barbara J. Bohl

17

18

19

20

21

22

23

24

25