---

STATE OF WISCONSIN,

    Plaintiff,

v.                                          Case No. F-954600

RICO SANDERS,

    Defendant.

FILED
CRIMINAL DIVISION

---

SENTENCING        JUN 2 6 1997

---

April 25, 1997                    Hon. David A. Hansher
                                  Circuit Judge, Presiding

## CHARGES/DISPOSITION

Ct. 1 - First Degree Sexual Assault - 30 YEARS, WISCONSIN
    STATE PRISON

Ct. 3 - Armed Robbery - 10 YEARS, WISCONSIN STATE PRISON,
    CONSECUTIVE TO COUNT 1

Ct. 4 - Second Degree Sexual Assault - 10 YEARS, WISCONSIN
    STATE PRISON, CONSECUTIVE TO COUNT 3

Ct. 6 - First Degree Sexual Assault - 30 YEARS, WISCONSIN
    STATE PRISON, CONSECUTIVE TO COUNT 4

Ct. 8 - First Degree Sexual Assault - 30 YEARS, WISCONSIN
    STATE PRISON, CONSECUTIVE TO COUNT 6

Ct. 9 - First Degree Sexual Assault - 30 YEARS, WISCONSIN
    STATE PRISON, CONSECUTIVE TO COUNT 8

APPEARANCES:

    MIRIAM FALK, Assistant District Attorney,
appeared on behalf of the State.

    MARTIN LOVE, Attorney at Law, appeared on
behalf of the Defendant.

    DEFENDANT present in Court.

Beth J. Fringer - Court Reporter

Exhibit EE

TRANSCRIPT OF PROCEEDINGS

2                    CLERK:  State of Wisconsin versus Rico

3    Sanders.  Case No. F-954600.  Appearances, please.

4                    MS. FALK:  The state is appearing by Assistant

5    D.A. Miriam Falk.

6                    MR. LOVE:  Martin Love for and with Mr.

7    Sanders, Your Honor.

8                    THE COURT:  Okay, we're here for sentencing.

9    The court has in front of it a presentence report.  Any

10   additions or corrections from the state?

11                   MS. FALK:  Well yes, Your Honor, there are

12   just a few things that I wanted to correct or note for

13   the record.

14                   THE COURT:  And there's also a social study

15   that's attached also, I should add.

16                   MS. FALK:  Your Honor, there are a number of

17   references in the presentence report that are different

18   than information that I have.  On page 4, underneath

19   "Academic and Vocational Skills," it indicates that the

20   defendant is saying he was in LD classes because, quote,

21   "They said I was slow functioning."  I would refer the

22   court, however, to the 2/9/96 report that is attached to

23   the presentence report.  It's one of the, let me see

24   where I have this here.  Tell you exactly what it is.  "

25   think it's one of the competency things.  Yes, it's the

1       report that was submitted to Diane Sykes on -- dated

2       February 9th of 1996. That was authored by Dr. Palermo,

3       and in getting the history at that time, Mr. Sanders --

4               MR. LOVE: What was, I'm sorry, counsel, what

5       was the date there?

6               MS. FALK: February 9th of 1996, it's right on

7       the first page where Mr. -- Dr. Palermo is talking about

8       the relevant history, the defendant told him that he had

9       attended Park Manor School in Chicago up to the eighth

10      grade in regular classes. And that he was kicked out

11      "because someone was going to kill me." That part, that

12      last sentence is consistent with what the defendant is

13      saying.

14              I would also note for the record that in the

15      public defender prepared social study that is the last

16      document that is attached, at page, the third page under

17      the "Education" section, again it indicates that Mr.

18      Sanders is considered to be in the ninth grade, the last

19      school that he attended was Park Manor Grammar School

20      and that he has always been in regular classes. In fact

21      it goes on to indicate that according to the principal

22      of that school, Rico's mother did not want her son

23      screened for any kind of special classes.

24              So there is a dispute in the documentation

25      itself as to what exactly it is that Mr. Sanders was

1     doing when he was in school. I would suggest to the

2     court that he was in regular classes based on the

3     plethora of information that we got before this

4     particular presentence was prepared.

5             The rest of the -- the differences, Your

6     Honor, I will simply just raise by referring the court

7     to various documents in the course of my arguments.

8     They're just things that people are saying now that are

9     different than what people had said in other places and

10    to other people, and I will simply refer the court to

11    those other contradictions, but I felt that the

12    educational level, since it is one of the specific

13    things that the court needs to consider related to the

14    character and rehabilitative needs of the defendant,

15    should be pointed out to the court in advance.

16            THE COURT: Counsel? Any additions or

17    corrections or comment --

18            MR. LOVE: Yes, Your Honor. Just to comment

19    on that point, unfortunately the references that are --

20    are made here are made to third parties and they're

21    hearsay representations as to Mr. Sanders' background.

22    Fortunately on that point, and I really can't personally

23    illuminate it, his family is here. There -- his mother

24    is here. I -- I just asked Rico if in fact he did take

25    special classes. He told me he did. His mother's here,

1    she can indicate whether or not Rico took special

2    classes, and even if that is not the case, the record is

3    replete with documentation of the special needs of Rico,

4    and -- and that there is a special -- there is a

5    circumstance of -- of if not retardation, that the

6    impression has been -- has been shared by many of the

7    people who have talked to Rico and who have investigated

8    this background, that he has some sort of disability in

9    that area.  So that's my comment on that.  If Miss -- if

10   Mrs. Sanders wants to, if his mother wants to make a

11   statement and I know that she's -- she's -- she's

12   concerned about that, she's nervous and apprehensive,

13   but I -- we can find out from their point of view

14   whether or not he had those special training.

15            Now with respect to various I think scrivener

16   errors in the -- in the presentence, on page 3,

17   paragraph 1, and it's just a typo, paragraph 1, line 12,

18   we believe 27th Street should be 47th Street as I think

19   it refers to the location of a -- of an act, of an

20   incident.

21            On page 6, there's a reference to Rico's

22   chronological place in the family.  Rico is the youngest

23   of the children, and the -- his brother Charles is

24   between, occurs between Jackie and Jill.

25            On page 7, Paragraph 4, it should be clear

1    that it's Rico's father who passed away. His father

2    died. And Rodney was the brother who was a profound

3    influence and to whom Rico looked up to and lived with

4    Rodney and his mother. Rodney was killed, was murdered.

5    Paragraph 5. "Brother," I've got a -- a reference to

6    and I believe that's the next paragraph on page 7 --

7          MS. FALK: Right, it's the last sentence there

8    of the word "offender," should be "brother," the second

9    last time it says --

10         MR. LOVE: Yeah, the "brother" does not

11    believe. Now those are the only corrections that we

12    have, Judge, and as a threshold matter, if -- if I may,

13    maybe I -- I have -- I request to make of the court with

14    regard to the process of sentencing, it's -- if I could

15    speak to it now, I'd be happy to. If the court wants --

16         THE COURT: Just ask her and just report back

17    to me what she says. You want to go ask her?

18         MR. LOVE: Oh, okay. She says yes. He took

19    learning disability classes.

20         THE COURT: Okay.

21         MR. LOVE: The other thing is, Judge, was the

22    manner in which this proceeding would take place. I

23    advised the court at the suggestion of -- of counsel,

24    Mrs. Falk, that I -- I wanted to have this matter

25    adjourned and I had spoken to Miss -- Mrs. Falk about

1    that and we discussed that, the propriety of doing that.

2    She indicated to me that there were several reasons why

3    she would object, and I don't mean to speak for her, but

4    I understood that --

5            THE COURT:  Could you move the microphone

6    closer to you?

7            MR. LOVE:  Sure.  Is that better, Judge?

8            THE COURT:  Yes, thank you.

9            MR. LOVE:  I understood that Mrs. Falk

10   anticipates taking some leave and that this is a copious

11   file, and she didn't want to be really putting that

12   responsibility in somebody else's hand who weren't

13   adequately -- who wasn't adequately prepared, and that

14   she wanted closure for the victims in this case.  That

15   they have been living with this for a considerable

16   period of time, and that whatever opportunity they had

17   to make their positions known to the court would be

18   consummated and they could go about repairing their

19   lives as best they could, this would be behind them.

20   And I don't disagree with those reasons, Judge, I think

21   they're valid.

22           On the other hand, my request for the

23   adjournment was based on the needs of my client as I

24   perceive them.  The court has a view of his history.

25   You know, there's -- there's substantial -- there's

1    substantial data that gives you background on Rico, and
2    so much so that some of it's been attached to the
3    presentence report.  It's his wish that family members,
4    even though he has some support here, there's some
5    particular family members to whom he's very attached,
6    would have the opportunity to be here.  One is an aunt
7    from Tennessee, his mother's sister, who -- to whom he
8    has very close ties and is not able to come here today.

9           I would like some time to consider an element
10   of -- of qualifying a principle that I want to enunciate
11   to the court in the course of my argument or my -- my --
12   my statement to the court in his behalf.  Recently we --
13   the court will recall that this was an Alford plea.  And
14   the Alford -- the aspect of it really centered on the
15   sexual assaults.  The court will also recall that when
16   we presented that plea, that Mrs. Falk told you on that
17   issue where we had centered on -- on DNA testing and --
18   and blood typing with respect to certain specimens that
19   were drawn, and that some of them didn't compare to
20   Rico.  She told you that yes, there was a -- there were
21   incidents with some of these victims where they had
22   recently had sex -- sexual intercourse with -- with
23   other people, people that they were involved with, and
24   that was an explanation for these disparities.

25          Rico had taken the position that although he

1    was present at each of these homes when the burglaries
2    occurred, that there was another actor, that actor was
3    named, and that it was he who had conducted these
4    assaults.  The -- it's come to my attention--and I don't
5    know if there's any confirmation of this--but yesterday
6    in this community there were reported assaults of this
7    type wherein the actor apparently followed the same
8    method that's attributed to the defendant in this case.
9    Those are post -- those are -- as far as I can tell,
10   those are -- those are post-conviction issues.
11           But I would like and I would suggest to the
12   court that we bifurcate this proceeding today.  We allow
13   the state to make its statement.  We allow the victims
14   if they wish to make theirs.  We allow for closure for
15   them, and we put this matter off for just a couple
16   weeks.  See if I can get the brother, if I can get --
17   and I'm just talking about our part of it.  That will
18   relieve Mrs. Falk of her anxiety, that will permit
19   closure for the victims, and certainly the disposition
20   that the court levels here will be communicated to the
21   victims anyway.  So I don't see that as --
22           THE COURT:  The reason you want it adjourned
23   is again for what reason?
24           MR. LOVE:  Well, there are members of the
25   family --

| | |
|---|---|
| 1 | THE COURT: Okay, the aunt from Tennessee. |
| 2 | MR. LOVE: Yeah. |
| 3 | THE COURT: And who else? |
| 4 | MR. LOVE: Yeah. There's a brother, too, |
| 5 | who's -- who's presently involved in Chicago, can't get |
| 6 | out of the -- can't get out of the community in Chicago |
| 7 | right now, but we hope that he'll be out and available |
| 8 | for us within a few -- within a week or so. |
| 9 | THE COURT: Is this the one who's interviewed |
| 10 | in the presentence? |
| 11 | MR. LOVE: No. |
| 12 | THE COURT: Another brother. |
| 13 | MR. LOVE: Yeah. And I want the opportunity |
| 14 | to try to present to the court some information that I |
| 15 | think is important that I haven't been able to get yet. |
| 16 | And it -- it's technical information and that's all. |
| 17 | THE COURT: What information? |
| 18 | MR. LOVE: Well I want to deal with -- tell |
| 19 | the court -- I want to deal with some of the issues of |
| 20 | Mr. Sanders' drug experience, and I haven't had an |
| 21 | opportunity to -- to determine that. |
| 22 | THE COURT: Well I think it's something you |
| 23 | can argue to the court. I'm not going to adjourn a case |
| 24 | just to get an aunt from Tennessee here and his brother. |
| 25 | If it was so important to his brother, he should have |

1    made arrangements to be here.  I adjourned this from
2    last week on my own motion, and they at least had a
3    week's warning and some relatives could make it, and who
4    knows if the brother or aunt could even make the next
5    date because I wouldn't put this over for a long period
6    of time, he's sitting in the County Jail which we all
7    know is overcrowded, and I don't think it's fair to him
8    or fair to the system or fair to the state, and the
9    court is going to deny your motion.  Anything else as to
10   additions or corrections to the presentence?

11            MR. LOVE:  Not by the defense, no.

12            THE COURT:  State's recommendation.

13            MS. FALK:  Your Honor, this was a negotiated
14   plea, and I will restate those conditions for the record
15   so the court has them.  Mr. Sanders entered pleas to the
16   following counts.  Count 1, which is first degree
17   assault, the victim was Yolanda Washington.  Count 3,
18   armed robbery with the use of force.  The victim was
19   also Yolanda Washington.  Count 4, second degree sexual
20   assault, the victim in that case was Tracy Robinson.
21   Count 6, first degree sexual assault, the victim in that
22   case was a juvenile named Yvonne Redmond.  Count 8,
23   first degree sexual assault, penis to mouth, the victim
24   in that case was Poincianna Sprewell.  And count 9,
25   first degree sexual assault, penis to vagina, the victim

1     in that case was also Poincianna Sprewell.

2            The state moved to dismiss and read in count

3     2, which was an armed burglary, the victim was Miss

4     Washington.  Count 5, which was an aggravated burglary.

5     The victim in that case was Miss Robinson.  Count 7,

6     which was another aggravated burglary, the victim was

7     Miss Redmond, and count 10, which was an armed burglary.

8     The victim in that case was Poincianna Sprewell.

9            To the plea that was entered by Mr. Sanders,

10    the state was requesting a presentence and was

11    recommending at the option that was chosen by Mr.

12    Sanders that he be incarcerated for a period of 50 to 70

13    years on the sexual assault charges, and that with

14    respect to the armed robbery charge, that Mr. Sanders be

15    sentenced and that that sentence in prison be stayed and

16    that he receive a lengthy consecutive period of

17    probation on the armed robbery charge.  The robbery

18    charge, Your Honor, was the count 2 that he pled to --

19    I'm sorry, count 3.  I have provided to the court the --

20            THE COURT:  Wait.  So it's count 1, 3, 4, 6, 8

21    and 9?

22            MS. FALK:  Yes.

23            THE COURT:  And you're recommending 50 to 70

24    years total--

25            MS. FALK:  Fifty to 70 years total.

1          THE COURT: --on all the sexual assaults with

2    an imposed and stayed sentence on the armed robbery,

3    consecutive.

4          MS. FALK: Yes, and consecutive lengthy

5    probation on that charge.

6          THE COURT: Is that your understanding,

7    counsel?

8          MR. LOVE: I understand that's their

9    recommendation, Your Honor, yes.

10          THE COURT: And you're free to argue for less.

11          MR. LOVE: I am.

12          THE COURT: Okay. State's recommendation.

13          MS. FALK: Your Honor, I did give to the court

14    today the victim impact statement that had been filled

15    out by Miss Washington at the time that this was first

16    being considered in juvenile court, and I will just

17    highlight some of the things from that, and then I also

18    have notations that were made by the victims when this

19    case was first issued related to the impact that this

20    was having on them. I do this since the presentence

21    writer apparently did not have any personal contact with

22    these victims like I have had.

23          Miss Washington indicated that this has had a

24    tremendous result on her. She describes that she gets

25    an upset stomach thinking about it. She doesn't sleep

1    well. She tosses and turns. She sees a counselor even

2    though it's very hard for her to talk about what it is

3    that happened to her. She considered moving out of her

4    apartment but could not afford to do so because she

5    couldn't afford -- couldn't financially afford to do it.

6    She says that this crime has had an effect on her every-

7    day life by causing her to be always fearful for her

8    life and her children's lives. She doesn't like to go

9    outside much anymore. She says that now she gets sick a

10    lot and is easily stressed. She said that knowing --

11    because after she was assaulted Mr. Sanders was out on

12    the street for quite a number of months, knowing that he

13    was still out on the streets gave her a huge sense of

14    insecurity. They're fearful now of even doing simple

15    things like leaving their windows up in the heat of the

16    summer, leaving lights off, and they react to every

17    unrecognized sound that they hear.

18            Her friends and her relatives are outraged by

19    this, and I remember talking with her about how

20    difficult it was, even though she understood that they

21    were very angry for her, to talk about this with them

22    because it was such a disgusting and embarrassing thing

23    for her to have experienced.

24            Those kinds of sentiments were also expressed

25    by Miss Robinson. She spent a great deal of time

1    actually living somewhere else because of what had
2    happened. She was able to move in with somebody else
3    for a short period of time. She told the victim
4    advocate that she was very traumatized and that the most
5    difficult times are between 8 o'clock in the evening and
6    midnight. That is when she is the most frightened
7    because that is when she was assaulted. She says that
8    it will take her a long time to recover from this, and
9    that she was also going to be seeking counseling, which
10   she did.

11       Miss Sprewell indicated that she stayed at a
12   girlfriend's home since this offense had occurred for
13   quite a long time, and after she had gone to the
14   hospital, although when she left she felt okay, by the
15   time she got home she began what she described as the
16   beginning of three very difficult days following this
17   assault, and that she felt almost suicidal, that she
18   didn't really quite know how to cope with what had
19   happened to her.

20       Miss Robinson, Miss Washington and Miss
21   Sprewell also had the additional burden of having
22   children with them at the time that the assaults had
23   happened, and all three of those women indicated to me
24   that they felt that they needed to be strong for their
25   children, and a lot of their decisions and what happened

1   reflected the fact that they were very concerned about
2   their children both during the course of the assault and
3   afterward, that their children not be traumatized just
4   because the moms were traumatized by this. And I will
5   talk about each of the -- of the cases specifically
6   since this court has not had the opportunity to hear all
7   the facts because Mr. Sanders took advantage of the fact
8   that there were children in the rooms when he was making
9   his threats to gain compliance to what he was asking
10  them to do.

11          With respect to Miss Washington who was the
12  first victim, this occurred in May of 1995, so we are
13  almost two years now from the time that this happened.
14  She was at home and she was in her bed when she was
15  awakened because somebody was inside of her bedroom.
16  Mr. Sanders put the covers over her face and she was
17  finding it very difficult to breathe because he was
18  pressing down. He then whispered to her, she described
19  it as a menacing whisper, "Give me those rings, take
20  them off." She was saying she couldn't breathe and she
21  was struggling with him, and that he told her if you
22  don't cooperate, I'm going to shoot you. He also
23  repeated throughout the course of his crime with her,
24  "Don't look at me, don't look at me, don't look 'cause
25  I'm going to hurt you." He was trying to remove the

1    rings that were on her hand and he was unable to do so,

2    so he ordered her to take them off.

3         She was then feeling that he was straddling

4    over her and telling her not to move. And he asked her

5    whether she had any more property, and she was directing

6    him to different places in the room. He told her to

7    keep her face covered, and he then removed the covers

8    and put a pillow on to her face and she had to struggle

9    again because it was very hard to breathe, and he

10   continued to repeat to her, "Don't look at me."

11        Now this -- this aspect of the crime, the fact

12   that he was essentially smothering these women during

13   the course of what was happening, also served to help

14   conceal his identity from them, and even though these

15   weren't charged as concealing identity, clearly this is

16   an aspect of the crime that the court needs to consider.

17        He twisted Miss Washington around and told

18   her, "I'm going to hurt you. You don't want me to shoot

19   you, do you." And as he was saying this, she was

20   feeling small areas of pressure, he would move some

21   object that was cold and hard on different points on her

22   head and was telling her to just be still. She said

23   that she continued to struggle and to wiggle as he was

24   doing this because she was having such a hard time

25   breathing.

1    He then told her to open your legs, asked her

2    if she was a virgin, and asked her when was the last

3    time that she had sex. He pulled up her shirt,

4    revealing her breasts, took off the lower part of her

5    clothing that she was wearing. She said that she was

6    not only struggling at this point but was crying and

7    very afraid, and she was afraid for her life. He then

8    had an act of penis to vagina intercourse with her that

9    lasted, she said, a very short period of time, probably

10   three minutes, and that he was also fondling her breasts

11   while he was doing this.

12       After he was finished, he then asked her

13   whether she had any more jewelry around and whether she

14   had money. He asked whether she had got a gun, and he

15   told her in her -- with respect to her responses that

16   she was telling him no, she didn't, that she better not

17   be lying because if he found something, and he left that

18   threat dangling.

19       She could hear him opening her drawers, and

20   then he turned to her and he asked her if she was

21   scared. And she said yes, that she was. And she says

22   that he kind of chuckled at that. He continued to

23   rummage around the room, and then he started asking her

24   questions about her children, which she found very

25   frightening because she knew at that point that he knew

1    that she had children and that they were asleep in the

2    house.

3            Mr. Sanders' activities in Miss Washington's

4    house were interrupted by the return of Miss

5    Washington's boyfriend.  Mr. Washington (sic) had to

6    make a very quick exit out of the bedroom window, and it

7    was during this time when he was struggling with the

8    window to get out that she was able to see him quite

9    well because the light was shining in from the street on

10   the window.  They called 911 right away and ultimately

11   they were able to locate the rings that he had stolen.

12           He told the police that he had given them to a

13   person named Ann, and they located this person named Ann

14   who in fact had the rings of Miss Washington, she

15   identified them, and Ann identified Mr. Sanders whom she

16   knew very well because he pawned quite a few things to

17   her in the past, and she knew who he was and had agreed

18   to buy these because Mr. Sanders assured her that they

19   were not his mother's property.

20           Mr. Sanders made a statement--and I'll give a

21   copy of Mr. Sanders' statement to the court so that the

22   court can follow along if it wants to--about this.  At

23   the time that he was arrested.  Now I'm offering this to

24   the court because Mr. Sanders is now arguing that he did

25   not do the sexual assaults, that it was somebody else.

1     The court will note that this is a very lengthy and

2     detailed statement that he made to Detective Rozinski,

3     and that throughout this entire statement he never

4     mentions any other co-actor, he never mentions a person

5     named Reginald Hart, and it is my belief based on all

6     the facts in this case that I will give you that Mr.

7     Sanders is making this up now because he doesn't want to

8     admit to the worst of the things that happened.

9          What he did say about the case involving Miss

10    Washington is that he entered the building through the

11    back door that was unlocked.  As he proceeded through

12    the house, he saw a baby on a couch and then went to a

13    bedroom and saw the lady on the bed.  When he saw her,

14    he felt like doing something.  He covered her mouth with

15    his hand and told her to take her clothes off.  He then

16    forced sex on her.  He went through the dresser drawers.

17    From on top of the dresser from a heart-shaped bowl he

18    took two rings.  He heard someone coming, opened the

19    bedroom window, and went out.  Those are the facts that

20    Miss Washington would also indicate.

21          I specifically asked her what kinds of things

22    she kept her jewelry in and she described, among other

23    things, the heart-shaped bowl which he would not have

24    been able to know if he hadn't been in the bedroom.

25    Which makes it absolutely incredible that some other

1    person could have been raping this woman while he stood
2    there and went through the heart-shaped bowl without
3    knowing it.  He also wouldn't have known what he did in
4    the room either, and I doubt that he would have admitted
5    that he felt like doing something when he saw her on the
6    bed if that in fact had not been the case.

7          The next victim was Miss Robinson.  Miss
8    Robinson was laying in the living room with her children
9    at the time that Mr. Sanders entered her home.  He
10   grabbed a pillow and put it on her face and told her,
11   "Don't look at me, I don't want you to see my face.  I
12   want you to tell me where the money is at, bitch."  She
13   told him she didn't have any because she had not gotten
14   her check, and then he told her well, then you're going
15   to have to give me some pussy.

16         At this point the baby who was on the same
17   couch with Miss Robinson started to cry, and Miss
18   Robinson started to struggle with Mr. Sanders.  They
19   even at one point were actually standing up, and at this
20   point when she was face-to-face with Mr. Sanders she saw
21   him quite clearly.

22         She said that he forced her back on to the
23   couch which is again where this baby was, and this child
24   grabbed on to Mr. Sanders' shoulders, apparently in this
25   pathetic attempt to fight off this attacker of his

1    mother.  He pushed the baby back and the baby fell back

2    on to the couch, and he said to Miss Robinson, "I'll

3    kill the baby if it's not quiet.  I'll kill the little

4    fucker if you don't do what I tell you."  He had

5    something in his hand but she couldn't see what it was,

6    and he put it on the floor.  He then pushed the pillow

7    back on to her face very hard and was telling her to lay

8    down and then the baby would lay down, too.  "Just lay

9    still and I won't have to hurt you."  Miss Robinson says

10   that she was absolutely terrified for her life and for

11   her child's life.

12            Mr. Sanders then got on top of Miss Robinson

13   and had an act of penis to vagina intercourse while he

14   kept this pillow on her face.  As he was getting up, she

15   could hear him rummaging around the room.  She heard him

16   near the television set.  She could hear him opening up

17   her purse.  She didn't know what he was taking at that

18   point, and then he announced to her he was going out the

19   front door.

20            When she got up and locked the front door, she

21   saw that he had taken all of her food stamps which she

22   would have used to feed her family and the $12 in cash

23   that she had as well.  As in the case of Miss

24   Washington, Miss Robinson noticed that apparently Mr.

25   Sanders had been throughout portions of her house

1   because the lights that they had left on were now turned

2   off.

3        Mr. Sanders talked about this incident as

4   well, and he said that he got into Miss Robinson's house

5   through an already open back window. He went and he

6   looked around and he saw the woman on the couch with a

7   baby. He saw some food stamps on top of the TV and he

8   took them. His stuff got hard and he wanted some. He

9   went to her and put his hand over her mouth. He asked

10  her if she had any money, and she said she had some food

11  stamps. She had a nightgown and panties on. He got on

12  top of her and forced sex on her, and then he left out

13  the front door. He had to unlock the front door in

14  order to get out. Again, it is just not credible to

15  believe that Mr. Sanders was not the person who

16  committed this sexual assault as well.

17       The third victim was a child. This child was

18  living in a foster home because her life has already

19  been somewhat bad at that point. Miss Redmond, who I

20  met recently, is doing better now than she had been at

21  the time that this was happening only because I think

22  she is a very remarkable person. She was awakened

23  because there was a fan, a window fan in her room that

24  fell on to her arm. It fell because Mr. Sanders was

25  crawling in through that window. He then placed a

1    pillow on her head and forced her back down on the bed.
2    She had sat up at this point because she -- somebody was
3    climbing into the window and she was screaming.  He said
4    to her, "Shut up, or I'll blow your head off."  He
5    finished climbing in through the window as he was saying
6    this and continued to hold this pillow over her head.
7    He told her, "If you scream or make any noise, I'll blow
8    your head off," and just like Miss Washington, she could
9    feel something cold and hard pressed against the side of
10   her head.  He forced an act of penis to vagina sexual
11   intercourse with this 14-year-old girl and asked her if
12   she had any money, to which she responded no, and taking
13   advantage of this child's age, and it's very interesting
14   to me that Mr. Sanders used the particular threats he
15   did with the particular victims because I think that it
16   evidences some pretty sophisticated criminal thinking on
17   his part.  To this child victim he told her, "If you
18   tell, I'll blow up the house."  It was very interesting
19   because he did not make any kind of statement about
20   telling or anything like that with any of the adult
21   victims, he only chose to do that with this child
22   victim.  He then climbed out of the window and she ran
23   out of the room screaming.
24           Mr. Sanders remembered this incident as well.
25   He said he went to the side of this house and pushed the

1    fan in and climbed into the window. He told Detective

2    Rozinski that at first he didn't see her, but then he

3    came back to her room after going through the house and

4    saw -- she saw him and started to yell, so he covered

5    her face with a pillow. He got on top of her and he

6    forced sex, and after the sex he then went out the

7    window that he had entered. He even remembered the

8    shoes that he was wearing when he committed that

9    particular assault, and I suspect that the officer was

10    asking him because there was a -- a footprint with an

11    Adidas tennis shoe that had been left outside the

12    window.

13    The last victim, Miss Sprewell, had had a baby

14    a few weeks before the sexual assault had occurred and

15    she was sleeping in her bedroom with her two children,

16    one of whom was this infant, when she was awakened by

17    the defendant who was armed with some sort of a dark

18    handgun, although she did not get a very good look at

19    it. She was awakened because he told her, "Bitch, if

20    you scream, I'll kill you." And as he was saying this

21    to her, she was feeling this gun next to her right

22    temple. He then shoved a green silk shirt into her

23    mouth and held it over her mouth and pushed it down her

24    throat so that she could not scream. He told her to get

25    down on her knees. There was a small mattress that was

1     on the floor next to the bed, and that's what she knelt
2     down on.

3            He then asked her what valuable things she had
4     and she told him to take her TV.  She also told him that
5     all the money she had was in the top drawer.  Mr.
6     Sanders said, "Well, I have to have something.  I've got
7     to have some pussy."  Miss Sprewell begged with him.
8     She said don't you see my kids, don't you see my
9     newborn.  And he said well then you've got to suck my
10    dick.  She didn't want to do that.  She was telling him
11    no, and he said then I'll kill you.

12           He then pushed her head on to his penis saying
13    make me -- I'm sorry, she said making me suck and deep
14    throat -- and that he was pushing her so far down into
15    her throat that she gagged.  She begged him please don't
16    do this, you're making me gag, and he got very angry
17    with her and he told her, "I got to have me some pussy
18    then." He forced her to lay down, pulled off her
19    underpants and threw them on the floor, and then had an
20    act of penis to vagina intercourse with her.

21           During this time he had laid the gun that he
22    had in his hand down on the floor next to him, and once
23    he was finished with the sex act, he began to feel under
24    the mattress looking for something.  She suspected it
25    was money.  He then said to her, "Well, I guess I've got

1  to kill you." He continued to ask her questions like
2  what have you got, do you got money, do you got a pager,
3  and she again repeated to him that she had some money in
4  the top drawer. He continued to tell her that he was
5  going to kill her and ask her whether she was going to
6  call the police. And she says that she was so very
7  afraid because she believed that he would.

8        Mr. Sanders said of this particular assault
9  that he had seen the lights on at the back part of the
10 house and thought there was no one home. He tried to
11 open up some windows and found one that had a wooden
12 screen part way pushed out. Mr. Sanders had to work
13 very hard to get into Miss Sprewell's apartment because
14 the -- the police found that virtually every window on
15 the house had been pried or tampered with before Mr.
16 Sanders was eventually able to make his way in. He used
17 an orange milk crate to get in which he told the
18 officers about, and in fact there was an orange milk
19 crate that was underneath the window that was ultimately
20 opened by Mr. Sanders.

21       He went in to a bedroom, went through that
22 room, looked around the rest of the house and then he
23 went into a room that had lot of toys in it but he
24 didn't see anything that he wanted to take. He then
25 went into a bedroom. This is perhaps the most chilling

1     statement that he makes here. And he saw a woman on the

2     bed sleeping. She was wearing a silk nightgown and he

3     could see her pubic hair. She had two children in bed

4     with her. He shook her and asked her if she had

5     anything worth money. She was going to yell, so he put

6     a green shirt into her mouth. He -- she told him to

7     take the TV and was struggling with her. He then told

8     her that he would shoot her. She asked him not to hurt

9     her baby. There was a small mattress on the floor and

10     he told her to get on it. He did not want to wake the

11     baby. He told her he wanted to have sex with her, and

12     she told him that she could not have sex because she had

13     just had a baby. She then did oral sex on him. She was

14     not doing it right and he pulled out of her. He then

15     got on top of her and forced sex. She told him she had

16     seven dollars. He asked her where, and she then

17     described that -- where it was. He left out the window,

18     and he referred to "sex," what he means by sex as penis

19     to vagina intercourse.

20         Mr. Sanders was caught because he was becoming

21     more careless. He had left his fingerprints on the

22     inside and outside of the windows at Miss Sprewell's

23     house, and he had left his fingerprints on windows that

24     were just down the street from her when he attempted to

25     commit two burglaries that were two days before this

1    particular sexual assault.

2         Mr. Sanders was positively identified as an

3    individual who attempted to get into the home of a woman

4    named Katherine Wright who described to the victim

5    advocates that she just felt very lucky knowing what

6    else he had done that she was not victimized by him in

7    the way that these other women had.  Mr. Sanders

8    apparently abandoned that burglary when he was unable to

9    get in, and went next door and he was able to get in

10   there.  Again, not only leaving his screwdriver behind,

11   but also leaving his fingerprints behind, and so the

12   police were able to match up his fingerprints with those

13   of this particular burglary.

14        The victims, some of them were able to also

15   positively identify Mr. Sanders, and of course Mr.

16   Sanders agreed that he was in fact the culprit in all of

17   these crimes.

18        I don't think that I need to point out to the

19   court in great detail that these are horrific crimes.

20   These were planned, premeditated crimes that are the

21   worst kind of crimes people can commit short of

22   homicide.  They are the kind of crimes that will visit

23   these women over and over again throughout their lives.

24   Everybody would like to feel safe inside of their own

25   home, and Mr. Sanders repeatedly and routinely for him

1    terrorized people inside the sanctity of their own home

2    and used against them the kinds of things that normally

3    bring joy to a person's life, like the lives of their

4    children.  I will be surprised if these women ever

5    completely recover from this because in my experience

6    and in the studying that I have done, this is the kind

7    of crime that stays with you pretty much forever.

8         The things that Miss Washington and Miss

9    Sprewell and Miss Robinson described as to how they felt

10   during and after these assaults are very typical and

11   classic kinds of reactions.  The security that you felt

12   in your own home is completely robbed from you, and you

13   are vulnerable forever with those feelings that you are

14   never completely safe anywhere.

15        You also have to deal with the fact that you

16   were violated in a humiliating way.  It is very clear

17   here that Mr. Sanders made a quick decision in each

18   occasion to sexually assault these women, and the way

19   that he describes it is so frightening because to them

20   he was -- to him, they were merely receptacles for his

21   need that apparently arose in a flash.  He victimized a

22   juvenile as part -- as one of his victims here, and he

23   did these horrible crimes in front of the children of

24   these other women.

25        Mr. Sanders started out each of these cases

1    what he claims as a burglary, that he was planning
2    specifically to do these kinds of crimes around the 1st
3    of the month because he knew that people got their
4    checks then, and he was trying to support his drug
5    habit.  So he needed to get money.

6         That -- this is ruthless.  He is just
7    absolutely ruthless, and he is the kind of person that
8    people look at and would describe very accurately as a
9    predator.  He's the kind of person from whom the
10   community has a great fear.  There is absolutely no
11   empathy for the victims that is described in his
12   statement that the court has in front of it, and there
13   is no empathy for the victims that appears in his
14   presentence investigation either.

15        Now he is hiding behind this Alford plea and
16   this foolish story that somebody else did it, which
17   makes him a continued gigantic risk in this community in
18   terms of his character and his rehabilitative needs.

19        Now Mr. Sanders has what can only fairly be
20   described as a pretty bleak life.  He has experienced
21   much violence in his own life, both at the hands of his
22   father and also because of what he has seen within his
23   family in terms of his brother being killed.  The reason
24   that he came here to Milwaukee was supposedly to escape
25   the violence of Chicago.  He had gotten involved with

1   people and now his life was at risk.  That's why he had
2   to leave that school at this young age of 14 so that he
3   could come up here and perhaps live out a better life.
4           But when Mr. Jennings was talking with the
5   police, he said that -- he confirmed that that was in
6   fact the reason or one of the reasons that he had moved
7   here.  He said that Rico moved here in January of 1995.
8   Well as the court can see, it took him less than five
9   months to get hooked up with the bad kinds of activities
10  that he was hooked up with in Chicago, and he was
11  committing heinous, heinous crimes.
12          The court should know that I did contact the
13  city of Chicago department that is responsible for this
14  report that was generated regarding all of these 1994
15  and 1995 contacts that he has with their juvenile
16  justice system.  Every single one of those is in a bench
17  warrant status.  These are not convictions, only because
18  Mr. Sanders has never appeared in court with respect to
19  being held accountable.  These were not dismissed, they
20  are all still open cases in the city of Chicago.  And as
21  the court can see, his behaviors there were already
22  related to a lot of the same kinds of behavior that he
23  was doing up here within the few short months that he
24  was here.  He was using drugs, he was stealing things,
25  he was going into homes and places where he had no

1    business going, and he was even dealing drugs.  All of
2    those things are very serious for a person as young as
3    Mr. Sanders, and I find it disingenuous to believe that
4    he had any intention of changing his ways.

5           Mr. Jennings also indicated that he kicked Mr.
6    Sanders out when he was talking with the police.
7    Because Mr. Sanders was hanging out with bad guys, that
8    he was hanging out with gang members in this first five
9    months when he was here.  Now I understand that Mr.
10   Jennings has a good deal of feeling for his brother, and
11   that's quite obvious.  I think it takes a lot to -- to
12   bring a teenager into your house with the expectation
13   that you're going to be the supervisor, you're going to
14   be the person who is going to be responsible for a kid
15   who is pretty much of a handful.

16          I think that Mr. Jennings' statements to the
17   police when he was talking with them as they were
18   looking for Mr. Sanders in August of 19 -- or September
19   of 1995 are -- are interestingly different from the
20   statements that he makes now.  The family members in
21   their statements to, even -- even to the reporters that
22   are contained in the back of this report are very
23   different from the picture that they're trying to paint
24   of Mr. Sanders now.  They do say that he was a very
25   confused kid, and they attribute that to the problems

1   that he had with his brother being killed and with the
2   issues related to his father.

3          I would take issue with the characterization,
4   however, that he's close to his mother.  The woman who
5   was living with Mr. Jennings, I don't know if she still
6   is or not, says they didn't even know how to get in
7   touch with Miss Sanders once Rico get -- excuse me,
8   began living here.  And that he was staying with them
9   because the mom had her own drug and alcohol problems to
10  deal with.  Mr. Sanders made comments to people at
11  Children's Court that he actually kind of enjoyed living
12  with his mom because when she would become drunk or
13  high, then he could steal money from her more easily.
14  So that's really a rather callous attitude that he
15  takes, and it belies the statement that he -- he's so
16  close to his mom or that his mom is able to really
17  control him.

18          Miss Bush (sic) also indicated that during the
19  time period that Mr. Sanders was living with them, she
20  was unsure of when he would come and go, so it appears
21  that Mr. Sanders was sort of doing what he wanted to do
22  no matter where it is that he lived.

23          He -- he did hang around with the gang members
24  that were called Gangster Disciples.  There are some
25  other references in the juvenile records also to his

1    gang affiliations, and I would agree with the agent's
2    assessment here as well that when we look at all the
3    different documents that we have regarding Mr. Sanders,
4    he does show very little emotion or affect about any of
5    these things that he has done.  He even denies sexually
6    assaulting these people, and it's frightening that a
7    person of Mr. Sanders' age could be so cold.  What that
8    indicates to me is that it will be very unlikely that he
9    will positively respond to treatment.  We can hope that
10   he will.

11          He also has what can only be described as a
12   very substantial drug and alcohol problem.  This young
13   man is heavily involved not only into using but in
14   selling so that he can support his own habit, and in
15   addition to doing that he has chosen this very criminal
16   lifestyle and this -- criminal people when he has had
17   other options.

18          His brother strikes me as a person who was
19   very interested in helping his little brother out.  His
20   brother seems to be a more stable person, has a job,
21   has -- has opened or had opened his home to his little
22   brother, and what he got in return was Mr. Sanders
23   abusing that privilege and instead running the streets,
24   climbing into people's homes at night, stealing things
25   from them and using drugs.

1    THE COURT    I'd ask you to please summarize

2    MS. FALK:  Uh-huh.  Finally there are the

3    interests of the community in protection and punishment.

4    This is -- this is the kind of crime that people are

5    just completely outraged about, and these are the people

6    that the community is very scared of.  Mr. Sanders

7    represents the face of -- of what everybody would

8    consider to be a menace to this community.

9    Mr. Sanders' treatment needs are huge, and his

10   motivation, his insight into this seem to be very

11   minimal.  One of the things that I would want to remind

12   the court of is that Mr. Sanders, I believe, based on

13   everything that we have about Mr. Sanders including his

14   behavior over the course of all these various competency

15   hearings, is actually a very clever person who plays the

16   game really well.

17   Mr. Sanders successfully escaped from

18   Children's Court when he was there on these charges.

19   Mr. Sanders, I believe, played a game with the courts

20   about his competency issues.  The court can see that

21   while he was trying to persuade people that he was a

22   very stupid individual who could do just about nothing,

23   didn't really know what his name was or what his age was

24   or money or anything like that, when in the living

25   circumstances where apparently he was unaware that he

1    was being very carefully watched was exactly the

2    opposite of that.

3         Mr. Sanders is a dangerous person because of

4    that. He is willing to manipulate and to change and to

5    play these kinds of games for his own ends. I consider

6    his statements now that there was this other person,

7    this other actor as part of this, to be again an effort

8    on his part to try to deflect the attention for the

9    really bad things from him where the attention belongs

10   to somebody else. All of those things indicate that Mr.

11   Sanders is a very dangerous man and he needs to be

12   incarcerated for a long period of time. That is why the

13   state is recommending this range of 50 to 70 years. Mr.

14   Sanders has so many treatment needs and he is such a

15   dangerous person that the community deserves to have the

16   aassurance that Mr. Sanders will not be available as a

17   menace to this community for a very long period of time.

18   This also will enable Mr. Sanders within the prison

19   system to obtain the help that he very, very much needs.

20        I'm not even sure where they're going to start

21   with Mr. Sanders. He has his substance abuse needs, he

22   has vocational needs. He has sex offender needs. He

23   has criminal thinking needs. Mr. Sanders has many, many

24   needs, and it will take a very long time to address

25   those needs.

1      I also feel that due to his age, there is the
2   need to have extra protection for the community once he
3   will be paroled, and that will be in the form of a very
4   lengthy period of probation so that he can be very
5   closely supervised, and if he does not succeed in the
6   community, that there is a heavy hammer hanging over his
7   head such that he would go back to the state of
8   incarceration should he not follow through with the
9   demands of his parole and his probation officer.  I
10  think that is the only way to protect this community
11  from somebody like Mr. Sanders and the only assurance
12  that we have that he will not offend in the future.
13          THE COURT:  Okay.  Mr. Love.
14          MR. LOVE:  Thank you, Your Honor.  Judge, I'm
15  going to ask you to make certain assumptions.  In this
16  case.  Assume that the people who make reports and
17  submit them to you do not provide you with precise and
18  consistently accurate information because that
19  information is filtered through their perceptions and
20  through their analysis, through their disciplines and
21  through their biases.  I've seen that in this case.
22          Some of those things that were addressed by
23  Mrs. Falk I think are valid.  Some of the represen-
24  tations that she makes to you I think are accurate.  I
25  take exception to some of them as well.  Wasn't too many

1    months ago that this court had to sentence a young man

2    for murder, for an execution type murder, and that young

3    man went away for a long, long time. That man that this

4    court imposed that sentence on had a background that was

5    180 degrees different than that of Mr. Sanders. He had

6    opportunity. He had support and family. And he had

7    personal resources that were strong, and his performance

8    in the community had up until that time been almost

9    exemplary, and this court had to interpose a harsh and

10   severe sentence.

11          While Mr. Sanders is accused and has pled to

12   lesser crimes in the scale of offenses that are

13   promulgated in this state, I agree with Mrs. Falk that

14   they are horrendous. The question I think is, I think

15   simply what is to be done to Mr. Sanders. Is this a

16   knee jerk reflex that we're -- we're all engaging in

17   here when we have a young man with this history and

18   these offenses. Are we simply crossing the "T"s and

19   dotting the "I"s when we know that no matter what I say,

20   no matter what his family says, that in view of the

21   facts of these offenses, that there's no hope for him,

22   that he's going to be warehoused for the rest of his

23   practical life, just on the basis of these offenses and

24   facts. I would hope not. I can't tell you what my

25   expectation is.

1    I noted when I received this case, I am the

2    third lawyer in this case, Judge.  That Mr. Sanders was

3    waived from juvenile or from Children's Court.  The

4    Mental Health Complex on June 7th, 1996, submitted a

5    report to Judge Sykes and listed date of birth for Rico

6    Sanders as November 10th, 1978.  His family tells me

7    that that's not his date of birth.  His date of birth is

8    11/10/79.  That meant that when he was waived, he was

9    waived on the assumption that he was 17-and-a-half when

10   he was 16-and-a-half.  I don't know and I suspect that

11   it doesn't have any jurisdictional significance with

12   respect to the waiver.  It may factually in that had

13   that been raised, the court would have taken that into

14   account in its determination for waiver.  That is a

15   post-conviction issue.  But I want you to know that the

16   young man that sits before you today was 16 and a few

17   months when these crimes were committed --

18          MS. FALK:  Excuse me, I hate to interrupt.  I

19   just want the court to know we did get a certified copy

20   of his birth certificate before we did the waiver

21   hearing and I did have a copy of it, so the court was

22   aware of that at the time was November 10th, 1979.

23          THE COURT:  Thank you, just move the

24   microphone closer.

25          MR. LOVE:  That's information I did not have.

1              THE COURT: Okay.

2              MR. LOVE: All right.

3              THE COURT: Let's move on, past that.

4              MR. LOVE: All right, Judge, I'll move on.

5    The point is, Judge, for the majority of Rico Sanders'

6    life, he has been assaulted by his environment. We live

7    in Milwaukee that is a microcosm of what's going on in

8    Chicago. I don't think anybody here in this courtroom

9    who has not lived in the ghetto has any idea, has any

10   idea of what Rico Sanders experienced as a child and how

11   that affects the person and how that has created the

12   person that sits next to me.

13             These victims of these cases experienced

14   horrendous events, horrendous. But they were isolated.

15   Rico Sanders had to live with an environment like that

16   continually. It wasn't -- they weren't isolated

17   incidents. He bears the scars on his head now of being

18   beaten brutally near death when he was a child. He was

19   shot several times when he was a child. And that was in

20   his environment. That was in his community. That was a

21   day-by-day atmosphere that he had to deal with.

22             If we're to believe that his family had

23   problems, that they were dysfunctional, that was his

24   environment. If we're to believe that in fact that he

25   had disabilities, mental disabilities, that was his

1       environment. That's the -- the -- the -- the basic clay

2       that was presented to be molded in this environment. It

3       was flawed. It needed expensive and consistent and --

4       and -- and in-depth attention. It was unrealistic to

5       ever expect something like that to happen for Rico.

6               He had made attachments in his family and they

7       were taken away from him. Now how does -- how does a

8       young man and a boy, if you will, respond to the murder

9       of his brother, the death of his father, being attacked

10      by his peers in his community, beaten and shot, and then

11      uprooted and coming to a community where all he really

12      knows is to survive, and he's reduced to a fairly low

13      creature. He has been. To disregard those factors is

14      to turn a blind eye to reality.

15              Nothing that I'm trying to -- I'm saying here

16      in any way is -- is -- is to suggest that there's an

17      excuse and an enablement, a license, for Rico to act as

18      it is claimed that he has acted. I have seen the

19      statements that are attributed to Rico Sanders in the

20      discovery material provided me by the state. As it was

21      recited to this court, it is interspersed with other

22      facts. Those statements were embellished by other data

23      that the district attorney had and incorporated into the

24      account of what happened. These statements were not the

25      written product of Rico Sanders. These are the

1   statements that had been provided by the police officers
2   after his investigation or her investigation of the
3   facts in this case and her confron -- their
4   confrontation of Rico in custody. Those issues about
5   the reliability of those statements are -- are gone for
6   us at this hearing. We can't deal with those. Rico has
7   elected to enter his pleas.
8           One of the things that I've been primarily
9   concerned with, Judge, is the degree to which Rico I
10  believe has been affected by the drugs that he's
11  ingested. Taking hallucinogen, LSD, which is an
12  insidious drug, and as I understand it can affect a
13  person long after the initial intake. It's not uncommon
14  for people to have flashbacks and disabilities and
15  hallucinations far into the future after using these
16  drugs.
17          If you take a look at the account given in
18  this case by the report of the Probation Department,
19  Rico had, and it's acknowledged by the state, tremendous
20  substance abuse problems. I would submit to the court
21  that those -- those problems -- those needs were so
22  substantial that they affected Rico who committed these
23  crimes in the course of satisfying those needs. Nobody
24  disputes that.
25          What happened to these women, to these

1    children, is unconscionable.  If the only thing that we
2    can do here is warehouse Rico for the rest of his
3    practical natural life, then there's very little hope
4    for this system in my view, and there's very little
5    meaning to these sentencing procedures.

6           What I would ask the court to do here is to
7    fashion a sentence that will give Rico the chance to
8    have some of his life left when he gets out of -- when
9    he gets out of an institution.  I believe he has
10   abilities.

11          I think that it's impressive and significant
12   that the presentence writer when he encountered Rico in
13   the jail encountered a person he didn't expect to meet.
14   Based on everything that that person had read, he
15   believed that Rico would be withdrawn, uncommunicative,
16   perhaps act in bizarre fashion.  That wasn't the case.
17   And I can tell you that hasn't been my experience
18   either.  I think that Rico has finally become clean.  I
19   think that Rico no longer is disabled or affected by the
20   drugs that he's been taking.  I think that those drugs
21   would affect him and I think they phased.  I think that
22   there were times when he was more affected than not.  I
23   think they were in his system and intermittently they
24   would surface and make things difficult for him.

25          Now notwithstanding those statements that are

1    attributed to Rico, it is my understanding that there is

2    a history in this case that does reflect on another

3    individual. That that individual was named to the

4    prosecution by previous counsel, and that a request or

5    at least an inquiry was made as to whether or not there

6    was any interest in pursuing that. As I understand it,

7    the state was not interested and maybe for good reason.

8    I don't know what the dynamics were of that transaction,

9    but I just -- it's my understanding, at my late entry

10   into this case, that that was some of the history.

11           Nevertheless, Mr. Sanders is here to be

12   sentenced. He's going to be gone for a long time no

13   matter what kind of sentence the court imposes. I'm

14   just asking that if this clay can be remolded, if

15   there's that possibility that somebody imprint on it

16   something positive and that -- that the man that comes

17   out of this prison is not the risk that we all fear, is

18   not the same person that we're putting in, that that

19   chance be given to him.

20           I don't know how long it will take for him to

21   be rehabilitated or that if he can be rehabilitated.

22   Sometimes just the passage of time provides for that. I

23   hope and pray that it will happen for Rico. He was 16

24   years old when these crimes happened. They are

25   terrible. But the man who is 30 will not be the boy who

1    was 16 who committed these crimes, just by virtue of the
2    passage of time.  If we can overlay that passage of time
3    with some positive treatment--I don't know if it's
4    realistic to expect that in the institution--but if it's
5    there and Rico's motivated to make use of it, then I
6    would hope that that could combine with his freedom.

7         I'm asking the court to consider some
8    concurrency in these sentences.  I'm asking the court
9    not to warehouse him for 50 years.  I'm asking the court
10   for a sentence that it must objectively fashion that
11   will give this person a chance to realize a positive
12   and -- and hopefully a chance to -- to be a rehabili-
13   tated or at least a person who has -- has paid his price
14   and allow him to do that with some life left for him.
15   Something positive, and something at least meaningful.

16        He has family here today who are deeply
17   concerned, but they live in the same -- the mother lives
18   in that environment that -- that war zone in Chicago.
19   In speaking to me, they can articulate their feelings
20   and their surprise.  They don't believe that Rico did
21   these things.  They don't want to believe that he did
22   these things.  But they know the hard life that he's
23   had, they know how he's been impacted, they know he's
24   been near death on two occasions, and they're here in
25   the hope that there will be some mercy shown to their

1     son and to their brother. And I think that can be done.

2            And I'm asking the court to do that without

3     diminishing the seriousness of these offenses, without

4     disregarding the needs and -- and the impact of these

5     victims. I'm just asking the court to at least consider

6     the youth of this young man, his background, and the

7     fact that whatever sentence that is imposed is an

8     opportunity for him, to give him that chance even though

9     we don't know that the quality of -- of treatment and

10    care is going to effectuate that, at least give him that

11    chance.

12           Now I have a letter that I've shown to

13    counsel. It's -- it's a brief letter from a pastor in

14    Chicago, the family asked me to give that to you. I

15    concluded my remarks. It may be that members of the

16    family would like to say something on Mr. Sanders'

17    behalf. Anybody here would like to say something for

18    Rico? His mother would. If that's all right with the

19    court.

20           THE COURT: Yeah, I'll permit up to two

21    members of the family to make a statement. They'll step

22    forward here. One at a time. Okay, I'll limit it to

23    two.

24           CLERK: Would you state your name, please.

25           MS. SANDERS: My name is Pearline Mahomes

```
1       Sanders.

2                   CLERK:  Pearlie is spelled how?

3                   MS. SANDERS:  P-e-a-r-l-i-n-e.

4                   CLERK:  Okay.

5                   MS. SANDERS:  L-i-n-e.  Mahomes spelled

6       M-a-h-o-m-e-s.  Sanders is S-a-n-d-e-r-s.

7                   CLERK:  Thank you.

8                   THE COURT:  You're the mother of the

9       defendant?

10                  MS. SANDERS:  Yes, sir.

11                  THE COURT:  And what do you want to say

12      regarding his sentence?

13                  MS. SANDERS:  It's kind of hard for me to say

14      anything.  Your Honor, I've had -- I've lost one -- one

15      son in death.  And look like to me I'll lose another

16      one.  I don't know whether you're a parent or not, but

17      this have been really, really hard on me.  I will make

18      it very short.  Just want my child to have a second

19      chance at life because he didn't have any kind of -- he

20      haven't had any kind of life.  I didn't get him the help

21      he needed when he lost his brother.  His brother was a

22      father figure for him, and it's just been a really bad,

23      bad life for my child.  So I'm asking you to have mercy

24      on him, please.  I just don't want to lose another son.

25      That's all I needed to say.
```

1          THE COURT:  Thank you.

2          MS. SANDERS:  And if he did these crimes, I

3     apologize to the ladies that it happened to.  I thank

4     you.

5          CLERK:  Would you tell us your name, please.

6          MS. RHYMES:  Good morning, Your Honor.  My

7     name is Eloise Rhymes.  E-l-o-i-s-e.  R-h-y-m-e-s.

8          CLERK:  Thank you.

9          THE COURT:  How are you related to the

10    defendant?

11         MS. RHYMES:  I'm Rico's aunt.

12         THE COURT:  And what do you want to say on his

13    behalf.

14         MS. RHYMES:  First of all, I would like to say

15    that I'm sorry to the families of the victims and to the

16    victims.  I've known Rico all his life.  There is no

17    excuse for any kind of crime.  I know Rico has been into

18    some trouble, but never, none of the trouble that some

19    of this is I've heard, and I've heard quite a lot and

20    read quite a lot.  But Rico is a young man that has had

21    problems, and I know sentences must be imposed, and on

22    behalf of my family, we're asking for a little mercy and

23    little leniency.

24         THE COURT:  Thank you.

25         MS. RHYMES:  And we are also asking that Rico

| | |
|---|---|
| 1 | get some counseling because he does need counseling. |
| 2 | And I truly hope that he did not commit most of these |
| 3 | acts.  I'm sorry if he committed any, but some of these |
| 4 | acts I'm -- I was just truly surprised to hear.  And I |
| 5 | thank you, Your Honor. |
| 6 | THE COURT:  Thank you very much.  Mr. Sanders, |
| 7 | is there anything you want to say prior to sentencing? |
| 8 | DEFENDANT:  Sorry for the victims.  I |
| 9 | apologize to the victims.  That's about it. |
| 10 | THE COURT:  Okay.  Well for sentencing, I have |
| 11 | to consider the nature of these crimes, and I've been |
| 12 | assigned to the Homicide/Sexual Assault Unit on two |
| 13 | occasions, which means I've handled hundreds of sexual |
| 14 | assaults over the last three years, in the high |
| 15 | hundreds.  So nothing should shock me nowadays, but |
| 16 | comparing these sexual assaults with others, these are |
| 17 | some of the most horrific and horrible sexual assaults |
| 18 | that I've seen, and I think maybe that word is sometimes |
| 19 | overused, "horrific," but I'm not sitting here seeing my |
| 20 | fourth and fifth sexual assault sentencing.  I'm seeing, |
| 21 | as I indicated, one of several hundred.  So I can |
| 22 | compare each, and these sexual assaults are just beyond |
| 23 | belief. |
| 24 | The state has gone into detail as to each one. |
| 25 | I'm going to briefly summarize them because I have to |

1    consider the nature of the offense. I will take in
2    consideration the specific facts as set forth by the
3    state and the specific facts set forth in the criminal
4    complaint including the defendant's admission as to
5    count 1, the sexual assault of Yolanda Washington, which
6    was on May 1st, 1995. And as the state pointed out, was
7    shortly after he moved to Milwaukee and was wanted on
8    warrants in Chicago.

9         He broke into a home, and I'm going to
10   consider these are home invasions which I think is an
11   aggravating factor. Got jewelry, and the court will
12   consider the armed -- burglaries and armed burglaries
13   that were dismissed and read in for sentencing purposes,
14   and the court will consider the burglaries also only for
15   sentencing purposes. Obviously he can't be sentenced on
16   each count.

17        But as to Miss Washington, he threatened to
18   kill her by putting a gun to her head. You can imagine
19   what she thought at that point even prior to the sexual
20   assault, put a pillow on her face and forced her to have
21   sex.

22        On August 2nd as to Tracy Robinson, which is
23   count 4, and I should add I have to consider that --
24   going back to Yolanda Washington, there is an armed
25   burglary which he is to be sentenced for. He threatened

1       the imminent use of force against her and robbed her of

2       her valuables, and the state -- specifically her

3       jewelry.

4              As to count 4, as to Tracy Robinson, as the

5       presentence said, he followed the same modus operandi

6       with the above victim breaking into the home.  This was

7       even -- this one was even more aggravating than the

8       first one in the sense there was a baby there, pushed

9       the baby off and told the victim, keep the baby quiet or

10      he'd kill the baby.  And then went along with -- and he

11      also robbed the offender of $551 in food stamps.

12            As to count 6, the first degree sexual assault

13      of Yvonne Redmond, that happened on August 2nd, 1995,

14      and she's the one who state pointed out suddenly felt a

15      fan fall on top of her and she observed offender coming

16      through the window, another home invasion.  He put a

17      pillow on the victim's face as he did in the first

18      incident, threatened to kill her and blow up the house.

19      The defendant sexually assaulted her.

20            CLERK:  Was that August 9th, Your Honor?

21            THE COURT:  The presentence says August 2nd,

22      the criminal complaint says August 9th.  Which date is

23      correct?  I assume the criminal complaint.

24            MS. FALK:  August 9th is the date.

25            THE COURT:  Okay, the presentence then is

1    wrong.  It would be August 9th.

2            As to count 8, September 5th, 1995, sexual

3    assault of Miss Sprewell and again this is another home

4    invasion.  3:00 a.m. he had a gun -- he put a gun to her

5    head and the victim screamed, he threatened to kill her.

6    He shoved her shirt in her mouth.  The offender ordered

7    the victim to give him her valuables and demanded to

8    have sex.  And again the state went into details how she

9    said she just had a baby, she couldn't have sex.  He

10   forced her to have oral sex.  When that wasn't

11   satisfying, he proceeded to sexually assault her, penis

12   to vagina, which was count 9.  So all these sexual

13   assaults were violent.

14           The armed burglary as to count 3 were violent

15   involving guns, some involving close to the head, two

16   involving threatening to kill young children.  As I

17   indicated, compared to hundreds of others I've seen,

18   this is one of the worst if not the worst sexual assault

19   I've seen.

20           I also should -- counsel brought up the fact

21   that the defendant is a product of the inner city and

22   has been traumatized.  The victims in this case were

23   living, I will say in the inner city.  They weren't

24   suburbanites.  This happened at 50th and Center, almost

25   in the same area, every single one, an area where I grew

up in. So this is someone who, violence begets
violence, he committed upon his fellow members of the
inner city.

As to the defendant's prior record and
character, as we discussed, he was arrested in Illinois,
Chicago. Possession of stolen autos on January 5th,
1994. Juvenile arrest warrant issued, JAW, which is
still out. April 15th, '95, possession of controlled
substance, juvenile arrest warrant. August 9th, 1994,
possession of stolen auto. Criminal trespass to
vehicle. Ethnic intimidation, whatever that means.
Theft of auto again, a juvenile arrest warrant issued.
Burglary to auto, attempted theft of auto, criminal
trespass to vehicle. Criminal damage to property on
November 29th, 1994, again a juvenile arrest warrant.
December 20th, '94, possession of controlled substance
and delivery of controlled substance. Again a juvenile
arrest warrant.

One could argue that he came to Milwaukee not
to escape Chicago, that can be a reasonable inference,
or the violence of Chicago, because we have our own
violence here, but to avoid prosecution in Illinois,
specifically Chicago. I have to consider the
defendant's character, and one of the things I can
consider for character is the fact he was an absconder

1        from Illinois.

2                I also can consider the violent nature of
3        these offenses.  It shows someone who's willing and
4        might have killed these women if they didn't consent.
5        It's also frightening when you consider character when
6        in the presentence report as pointed out by defense
7        counsel, the presentence writer expected to see someone
8        who would act more bizarre, but she was struck or he was
9        struck--it's a male--that he expected to be -- the
10       offender to behave in a bizarre fashion.  "Quite
11       frankly, this agent was surprised the offender behaved
12       like any other offender this agent has interviewed.  As
13       a matter of fact, had the agent not read the
14       psychological reports, this agent would have thought the
15       offender was like any other offender this agent had
16       interviewed."  Defense saying well, this indicates the
17       fact he's off drugs and alcohol, and this is the type of
18       individual he is.

19               I think I might feel more comfortable if I
20       knew there was an underlying psychological problem that
21       could be handled, but if this is the type of individual
22       he is, someone who appears normal when interviewed, it's
23       frightening what he could do when released back into the
24       community, and that's why the state made its
25       recommendation.

1        I have to consider the community's needs and
2    his needs.  The community's needs basically is to be
3    protected.  We -- the community holds the courts up to
4    the standard of protecting them from violent offenders.
5    And also I have to consider the defendant's needs and he
6    has needs, be it -- and the court will accept the fact
7    he has learning disability problems.  I will accept the
8    defense version, it's probably consistent, and there
9    might be drug and alcohol problems.  There is delivery
10   and possession in his past in juvenile record.  But even
11   assuming he was taking drugs or alcohol when he
12   committed these offenses, it shows a complete lack of
13   self-control.  And again, we don't know if he committed
14   these offenses while under the influence of alcohol or
15   drugs.  So I have to weigh all these factors in here.
16        The victims in this case have been trauma-
17   tized.  The state says outside of homicide this is --
18   these are the most shocking cases, the most
19   traumatizing.  Some of these women I think are going to
20   be traumatized themselves, I know it will affect them
21   the rest of their lives, and I think some sexual
22   assaults can be equated to homicide cases because you
23   rob people of their souls, of their self-respect, and I
24   think this is what happened in this case.
25        And counsel again argues that he's a product

1   of his environment. There are hundreds if not thousands

2   of children who have the same problems in the inner

3   city, but hundreds and not thousands of children grow up

4   to be 17, I don't even know if he's grown up, to commit

5   crimes so violent at the age of 17. If that's true, we

6   would have thousands of 17-year-olds in here. So I

7   don't think his background makes him a serial rapist,

8   and that's what he is, a serial rapist.

9           So what we have here is violent offenses,

10  violent sexual assaults, home invasions, threats to kill

11  victims and their babies, pillows used on faces, all

12  this indicates to me that the defendant is a great risk

13  to this community if not other communities if released

14  after a short period of time.

15          The state has made a recommendation, the

16  defense has countered. I believe the state's recommen-

17  dation is insufficient, and I try to give great

18  deference to the state recommendation, but it's

19  insufficient to protect the community and is

20  insufficient to punish the defendant.

21          He has pled or entered Alford pleas so there's

22  somewhat an acceptance of responsibility. And he has

23  avoided forcing the victims to testify, and I will take

24  that in consideration. When given the chance to speak

25  today, he just said he feels sorry for the victims.

1      Again, very little if any acceptance of responsibility
2      if one wants to interpret that.  But the violence of the
3      offenses and the defendant's prior record is more
4      aggravating and is more of a consideration than the fact
5      that he barely accepts responsibility.
6              Based upon all these facts and circumstances,
7      the court's going to impose the following sentences.  As
8      to count 1, the court is to sentence the defendant to 30
9      years in Wisconsin State Prison.  As to count -- that's
10     the first degree sexual assault.
11             As to count 2, the armed robbery --
12             MS. FALK:  That's count 3.
13             THE COURT:  I'm sorry, count 3, just a second
14     here.  The court's going to sentence the defendant to
15     ten years in Wisconsin State Prison, consecutive.
16             As to count 4, the court's going to sentence
17     the defendant, that is a second degree sexual assault
18     and that's a Class B felony, too?
19             MS. FALK:  No, Your Honor, that would be a
20     class, I think it's a class C.  I'm just going to pull
21     my file and make sure.  It should be a 10 year felony.
22     I think it's a 10 year felony, but let me just make
23     sure.  Yes, it is a ten year felony.
24             THE COURT:  The court's going to sentence the
25     defendant to ten years in the Wisconsin State Prison,

1    consecutive to count 3.

2              As to count 6, the court's going to sentence

3    the defendant to 30 years, again a first degree sexual

4    assault, in Wisconsin State Prison, consecutive to count

5    4.

6              As to count 8, the court's going to sentence

7    the defendant to 30 years in Wisconsin State Prison,

8    consecutive to count 6.

9              As to count 9, the court's going to sentence

10   the defendant to 30 years in the Wisconsin State Prison,

11   consecutive to count 8.

12             The court feels a longer prison sentence than

13   the state's recommending is needed to protect the

14   community.  That probation at the end is not needed due

15   to the length of the court's sentence.  I feel that he

16   needs, counsel says to be warehoused.  I think -- I view

17   it to be put in prison to protect the community.  If

18   it's warehousing, so be it.

19             Every sentence, as I indicated, to be

20   consecutive.  The defendant is a convicted felon, he

21   cannot possess a firearm.  He has 20 days to appeal this

22   decision.  What are your calculations?  That would be,

23   consecutive, would be a total --

24             MR. LOVE:  It's 140 years.

25             THE COURT:  One hundred forty years.  That's

1    mine. He has 20 days to appeal this decision. What's

2    the sentencing credit?

3              MR. LOVE: He's been in since --

4              CLERK: The delinquency petition is dated

5    September 8th. If we compute from September 8th of 1995

6    to today's date, it's 594 days, but I don't know how

7    long he was in custody before that.

8              MS. FALK: Before the delinquency petition?

9              CLERK: Yes.

10             MS. FALK: Let me see if I can find the date

11    of arrest.

12             MR. LOVE: The date of the --

13             MS. FALK: Your Honor, also I think that there

14    are requirements with respect to submitting a blood

15    sample.

16             THE COURT: The defendant will, it's DNA --

17    he'll commit -- submit a sample of saliva, I don't think

18    it's blood, for the DNA bank. It says saliva rather

19    than blood. Also as a convicted felon of first degree

20    sexual assault, if he's ever paroled, he cannot be

21    employed in any job where children are present or be a

22    volunteer where children are present.

23             MS. FALK: His arrest date was September 7th

24    of 1995.

25             THE COURT: Okay, I'll give him credit from

1     September 7th.

2            CLERK.  That's 595 days.

3            THE COURT:  I'll award 595 days.

4            CLERK:  As to count 1.

5            THE COURT:  And he has 20 days to appeal this

6     decision.

7            CLERK:  And the mandatory surcharges are

8     ordered imposed?

9            THE COURT:  Seventy dollars as to each count.

10           CLERK:  Thank you.

11

12           *     *     *     *     *

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1      STATE OF WISCONSIN )
                          ) ss
2      MILWAUKEE COUNTY   )

3

4              I, Beth J. Ezinger, Official Reporter, certify

5      that I reported the foregoing proceedings and this

6      transcript is true and correct in accordance with my

7      original machine shorthand notes taken in said

8      proceedings.

9              Dated:  May 19, 1997.

10

11                     Beth J. Ezinger

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```